Jessica A. Skelton, OSB #102714
jessica.skelton@pacificalawgroup.com
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
206-245-1700

*Attorney for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>     Plaintiffs,<br><br>  v.<br><br>KATE BROWN, et al.,<br><br>     Defendants. | Case No. 2:22-cv-01815-IM *(Lead Case)*<br>Case No. 3:22-cv-01859-IM *(Trailing Case)*<br>Case No. 3:22-cv-01862-IM *(Trailing Case)*<br>Case No. 3:22-cv-01869-IM *(Trailing Case)*<br><br>CONSOLIDATED CASES |
| MARK FITZ, et al.,<br><br>     Plaintiffs,<br><br>  v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>     Defendants. | **INTERVENOR-DEFENDANT OREGON ALLIANCE FOR GUN SAFETY'S RESPONSE TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION** |
| KATERINA B. EYRE, et al.,<br><br>     Plaintiffs,<br><br>  v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>     Defendants. | |
| DANIEL AZZOPARDI, et al.,<br><br>     Plaintiffs,<br><br>  v.<br><br>ELLEN F. ROSENBLUM, et al.,<br><br>     Defendants. | |

ALLIANCE'S RESPONSE TO PLTFS' MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................... 2

III.   ARGUMENT ....................................................................................................... 2

       A.    Plaintiffs Are Unlikely to Prevail on Their Challenge to the LCM Provision . 2

             1.    Plaintiffs try to misallocate their burden and misstate the *Bruen* standard. 3

             2.    LCMs are not protected by the Second Amendment's plain text ............... 4

             3.    Plaintiffs' historical arguments cannot withstand scrutiny ...................... 18

             4.    Plaintiffs' historical experts are unqualified and biased .......................... 20

             5.    Plaintiffs are unlikely to prevail on their takings and due process claims 23

       B.    Plaintiffs Are Unlikely to Prevail in Their Challenge to the
             Permitting Provision .................................................................................... 25

             1.    Plaintiffs cannot demonstrate a likelihood of success under *Bruen* ......... 26

             2.    Plaintiffs misunderstand the nature of their facial challenge ................... 29

       C.    Plaintiffs Have Failed to Show They Face An Immediate, Irreparable Injury 31

       D.    The Balance of the Equities and Public Interest Weigh
             Against an Injunction .................................................................................. 33

IV.    CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

## Federal Cases

*Am. Trucking Ass'ns v. City of L.A.*, 559 F.3d 1046 (9th Cir. 2009) ...................................... 31, 32

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) ............................................................................. 32

*Ariz. Hosp. & Healthcare Ass'n v. Betlach*, 865 F. Supp. 2d 984 (D. Ariz. 2012) ...................... 33

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106 (3d Cir. 2018) ... 11, 18

*Barnes v. Healy*, 980 F.2d 572 (9th Cir. 1992) ............................................................................ 10

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ......................................................................... 10

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098 (9th Cir. 2010) ................................... 33

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .................................................................................. 9

*Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172 (9th Cir. 2020) .......... 29

*Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640 (7th Cir. 2022) ............. 34

*Colony Cove Properties, LLC v. City of Carson*, 640 F.3d 948 (9th Cir. 2011) .......................... 25

*Croman Corp. v. United States*, 724 F.3d 1357 (Fed. Cir. 2013) ................................................ 30

*Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851 (9th Cir. 2007) ............................... 25

*Cuviello v. City of Vallejo*, 944 F.3d 816 (9th Cir. 2019) ........................................................... 32

*D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518 (6th Cir. 2007) (per curiam) ........................... 4

*DISH Network Corp. v. FCC*, 653 F.3d 771 (9th Cir. 2011) ...................................................... 3, 4

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................................... passim

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012) ............................................ 33

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ............................................................ 11, 24, 25

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc) .......................................................... 6

*E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026 (9th Cir. 2019) ............................................ 9

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................ 32

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ............................... 17

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ................................................... 8, 9

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ................... 4

*Great N. Res., Inc. v. Coba*, No. 3:20-cv-01866-IM, 2020 WL 6820793
    (D. Or. Nov. 20, 2020) ......................................................................................... 31

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ................................... 12

*Hunters United for Sunday Hunting v. Pa. Game Comm'n*, 28 F. Supp. 3d 340
    (M.D. Pa. 2014) ..................................................................................................... 5

*Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ................ 8

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ......................................................... 28

*Kim v. United States*, 121 F.3d 1269 (9th Cir. 1997) ............................................... 28

*Knick v. Township of Scott*, 139 S. Ct. 2162 (2019) ............................................... 24

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) ........................................ 17

*Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995) ................................................ 24

*Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180 (9th Cir. 2012) ........... 24

*Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005) ................................................ 25

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) ...................................................... 3

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 n.12 (1982) ............. 24

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) ............................................. 24

*Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ...................... 33

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ............................................................ 4

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam) ........................................ 3

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .............................................. 31, 32

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).......................................................... 31

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .................................. passim

*Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 2022 WL 3083715
    (N.D. Cal. Aug. 3, 2022).................................................................................................................. 3

*Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175
    (D.R.I. Dec. 14, 2022)........................................................................................................... passim

*Penn Central Transp. Co. v. N.Y.C.*, 438 U.S. 104 (1978)........................................................... 25

*Prof'l Beauty Fed'n of Cal. v. Newsom,* No. 2:20-cv-04275-RGK-AS,
    2020 WL 3056126 (C.D. Cal. June 8, 2020) ................................................................................ 23

*Rushia v. Town of Ashburnham*, 701 F.2d 7 (1st Cir. 1983)......................................................... 31

*Sampson v. Murray*, 415 U.S. 61 (1974) ..................................................................................... 33

*State v. Misch*, 256 A.3d 519 (Vt. 2021) (per curiam)................................................................. 12

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ................................................... 9, 32

*United States v. Al-Azhari*, No. 8:20-cr-206-T-60AEP, 2020 WL 7334512
    (M.D. Fla. Dec. 14, 2020)............................................................................................................... 7

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018)................................................................... 7

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424
    (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022)................................................. 7, 8

*United States v. Lanier,* 520 U.S. 259 (1997)............................................................................. 25

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................................... 29

*United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282
    (S.D. Cal. Aug. 30, 2022) ............................................................................................................ 11

*Valdez v. Lujan Grisham*, 559 F. Supp. 3d 1161 (D.N.M. 2021), *aff'd*, No. 21-2105,
    2022 WL 2129071 (10th Cir. June 14, 2022)............................................................................. 31

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)........................ 29, 30

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................................................... 3

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) .......................................................................... 16

**State Cases**

*Dwyer v. Farrell*, 475 A.2d 257 (Conn. 1984) ........................................................... 28

*Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314 (Colo. 2020) ............................. 12

**Federal Statutes**

26 U.S.C. § 5845(a) ...................................................................................................... 7

26 U.S.C. § 5861(d) ...................................................................................................... 7

**State Statutes**

720 ILCS 5/24-1.10(a)(1) ............................................................................................. 6

Colo. Rev. Stat. § 18-12-206(1) ................................................................................... 30

Colo. Rev. Stat. § 18-12-301(2)(a)(I) ........................................................................... 6

Conn. Gen. Stat. § 29–28(b) ........................................................................................ 27

Fla. Stat. § 790.06(6)(c) ............................................................................................... 30

Measure 114 ........................................................................................................... passim

O.R.S. 166.291(1) ................................................................................................. 24, 26

O.R.S. 166.293(2) ........................................................................................................ 27

Vt. Stat. tit. 13, § 4021(e)(1) ......................................................................................... 6

**Constitutional Provisions**

Or. Const. art. I, § 18 .................................................................................................. 24

U.S. Const. amend. II ..................................................................................................... 5

# Other Authorities

*Baltimore man pleads not guilty in Cross Keys Robbery*, Wash. Examiner, May 10, 2006, https://www.washingtonexaminer.com/baltimore-man-pleads-not-guilty-in-cross-keys-robbery ............................................................................................................................... 14

Chris Bair, *Thank God I had a Gun: True Accounts of Self-Defense* (2d ed. 2014)..................... 14

David Kopel, *Magazines Over 10 Rounds Were Well-known to the Founders*, Reason (Feb. 11, 2020), https://bit.ly/3uZRHJF..................................................................................... 18

Giffords Law Center, *Large Capacity Magazines,* https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/................................................................................................................................... 6

Gun Violence Archive, *General Methodology*, Jan. 3, 2022, https://www.gunviolencearchive.org/methodology.................................................................. 16

Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (Oct. 14, 2009) https://listverse.com/2009/10/14/top-10-most-audacious-shootouts-in-us-history/ ................ 20

Jennifer McMenamin, *Two killings test right of self-defense: Each case may turn on whether life was in danger*, Baltimore Sun, Apr. 7, 2006, https://www.baltimoresun.com/news/bs-xpm-2006-04-08-0604080024-story.html ............... 14

Kyle Wintersteen, *9 Commonly Misused Gun Terms*, Guns & Ammo (Nov. 21. 2018) https://www.gunsandammo.com/editorial/9-misused-gun-terms/249625 ................................. 6

*Mass Shootings in the United States Involving Large Capacity Ammunition Magazines*, Sept. 16, 2022, https://vpc.org/fact_sht/VPCshootinglist.pdf ................................................. 16

Nasdaq, *AMMO, Inc. Common Stock (POWW)* https://www.nasdaq.com/market-activity/stocks/poww .......................................................... 21

Nat'l Archives, *Founders Online*, Ltr. from George Washington from Benjamin Franklin, 22 July 1776, https://founders.archives.gov/documents/Washington/03-05-02-0311 ............. 19

Nielson Himmel, *Police Say Watch Shop Owner Kills 4th, 5th Suspects*, L.A. Times, Feb. 21, 1992, https://www.latimes.com/archives/la-xpm-1992-02-21-me-2663-story.html .. 13

Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191 (2022)........................................................................................ 34

Stevenson Swanson, *Winchester rifles face end of an era*, Baltimore Sun, Mar. 25, 2006, https://www.baltimoresun.com/news/bs-xpm-2006-03-26-0603260077-story.html ............... 19

U.S. Census Bur., QuickFacts, https://www.census.gov/quickfacts/.............................................. 6

UC Davis Campus Community Book Project, *Glossary of Firearms Terminology,*
    https://ccbp.ucdavis.edu/firearms-glossary................................................................................. 6

William English, *2021 National Firearms Survey: Updated Analysis*
    *Including Types of Firearms Owned* (May 13, 2022).............................................................. 12

## I.    INTRODUCTION

This Court's Opinion and Order denying Plaintiffs' motions for temporary restraining order ("TRO Order"), ECF 39, rests on six key conclusions, each well-supported in law and fact. First, Plaintiffs "failed to show that" large-capacity magazines ("LCMs") are "covered by the plain text of the Second Amendment," because they are both not "necessary to the use of firearms for lawful purposes" and not "'in common use today for self-defense.'" ECF 39 at 20 (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2134 (2022)). Second, the 20th-century development and proliferation of LCMs—and their pairing with semi-automatic firearms— represents a "dramatic change in firearms technology" and "implicates unprecedented societal concerns," including LCMs' frequent use in mass shootings. *Id.* at 25, 27. Third, Measure 114's LCM provision is "analogous" to "historical firearm regulations" because they "impose comparable burdens on the right to self-defense" that are "comparably justified." *Id.* at 28. Fourth, Measure 114's permit provision is "presumptively constitutional under . . . *Bruen*," because the case endorses 43 states' "shall-issue" concealed-carry laws, including Oregon's, which uses nearly identical language to Measure 114. *Id.* at 31. Fifth, Plaintiffs' takings claim is unlikely to succeed, both on the merits and "because the appropriate remedy" for a taking is damages, "not injunctive relief." *Id.* at 35. Sixth, the remaining *Winter* factors do not favor injunctive relief. *Id.* at 37–43.

Since this Court's TRO Order, the four sets of Plaintiffs have together filed nearly 800 pages of supplemental briefing and declarations in an effort to persuade the Court to change its mind. ECF 72–80, 82–85, 109–11. None of their new material undercuts the Court's initial decision. On the law, Plaintiffs attempt to misallocate their burden to Defendants, continue to misread *Bruen*, and ignore the standards governing their facial challenge. On the facts, Plaintiffs have presented no credible evidence to support their numerous ahistorical, unsupported, and

illogical claims—including that LCMs are commonly used for self-defense, that firearms capable of firing more than 10 rounds were "particularly popular" before the late 19th century, and that LCMs have rarely been used in mass shootings. The expert witnesses Plaintiffs have found to support such farfetched assertions are unqualified, biased, or both—from their historical expert, Stephen Helsley (a former NRA lobbyist with zero education or training as a historian), to their self-defense expert, Massad Ayoob (the president of Plaintiff Second Amendment Foundation, who appears to have copied verbatim whole paragraphs of Helsley's report), to their firearms industry expert, Mark Hanish (who has spent nearly his entire career with companies that sell LCMs and who continues to have a large financial stake in one). This Court gave Plaintiffs the opportunity to assemble a more complete record to support their motions for preliminary injunction. They have failed. Intervenor-Defendant Oregon Alliance for Gun Safety (the "Alliance") respectfully requests that the Court deny Plaintiffs' motions for preliminary injunction.

## II.     STATEMENT OF FACTS

The Alliance incorporates by reference the factual background and procedural history set forth in the Response to Plaintiffs' Motions for Preliminary Injunction filed by State Defendants (the "State"), ECF 115.

## III.     ARGUMENT

### A.     Plaintiffs Are Unlikely to Prevail on Their Challenge to the LCM Provision

Plaintiffs cannot demonstrate that they have a likelihood of success on their challenge to Measure 114's regulation of LCMs. Their Second Amendment claim fails because they cannot show that LCMs are covered by the constitutional text—which is their burden to prove. Even if they could carry that burden, their challenge also fails because Measure 114 is consistent with our nation's historical tradition of regulating dangerous firearms. Plaintiffs' takings claim is foreclosed

by the unavailability of injunctive relief for such claims and an on-point Ninth Circuit decision. And Plaintiffs have no viable due process claim, which is subsumed within their takings claim.

### 1.  Plaintiffs try to misallocate their burden and misstate the *Bruen* standard

Plaintiffs repeatedly attempt to misallocate the burden to Defendants at this preliminary injunction stage. *E.g.*, ECF 84 at 28 (incorrectly arguing that the State has the burden as to "common use" question); ECF 83 at 9 (same). But as this Court has already held, it is *Plaintiffs* who must demonstrate that they meet each *Winter* factor. ECF No. 39 at 2 (citing *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011)); *see Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Nothing in *Bruen* changed the traditional rule that a "preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

In *Bruen*, the Supreme Court established a new method for resolving Second Amendment challenges, dividing the analysis into two parts: (1) a textual inquiry to determine if "the Second Amendment's plain text covers an individual's conduct" regulated by the challenged law, 142 S. Ct. at 2129–30, and (2) a historical inquiry into whether the statute "is consistent with this Nation's historical tradition of firearm regulation," *id.* at 2130. Thus, Plaintiffs bear the initial "burden to show that large-capacity magazines fall within the purview of the Second Amendment." *Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022). Only if they succeed does the burden shift to Defendants on the history prong. *See Bruen*, 142 S. Ct. at 2135; *see also Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose*, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) ("If the conduct at issue is covered by the text

of the Second Amendment, the burden then shifts to the government to show why the regulation is consistent with the Nation's historical tradition of firearm regulation . . . .").

In other words, the burden of persuasion is mixed for the "likelihood of success" *Winter* factor, with Plaintiffs bearing the initial burden as to text and, if met, Defendants assuming the burden as to history. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial.") And Plaintiffs alone bear the burden to establish each of the three remaining *Winter* factors by a "clear showing." *Mazurek*, 520 U.S. at 972; *DISH Network Corp.*, 653 F.3d at 776 (plaintiff "must demonstrate that it meets all four of the elements of the preliminary injunction test established in *Winter*"); *see, e.g.*, *D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 525–26 (6th Cir. 2007) (per curiam) (district court did not err "by assigning [plaintiffs] the burden of proof with respect to the four-part balancing test for acquiring preliminary injunctive relief"; "[a]lthough the plaintiffs correctly observe that the defendants would bear the burden at trial of establishing that the Confederate flag ban does not violate the Constitution, it remains the plaintiffs who bear the burden of establishing the need for a preliminary injunction").

Correctly reading *Bruen*, and correctly allocating the burden at this preliminary injunction phase, Plaintiffs' Second Amendment challenge to the LCM provision fails.

## 2. LCMs are not protected by the Second Amendment's plain text

The *Bruen* Court divided the threshold prong into three distinct questions, each tied to a "textual element" in the Second Amendment: "the people," "arms," and "keep and bear." 142 S. Ct. at 2134. As applied here, Plaintiffs must provide evidence to affirmatively answer three questions. First, are Plaintiffs part of "the people" protected by the Second Amendment? *Id.*

Second, are LCMs "weapons 'in common use' today for self-defense"?[1] *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). And third, does "the plain text of the Second Amendment protect[] [Plaintiffs'] proposed course of conduct," i.e., purchasing or possessing LCMs "for self-defense"? *Id.*

Plaintiffs cannot carry their burden on the textual prong. Unlike handguns, LCMs are not weapons and they are not commonly used for self-defense. Further, even if LCMs were weapons, they belong to a class of dangerous and unusual ones that the Second Amendment does not protect.

### a. Detachable LCMs are accessories, not arms

Measure 114 regulates both detachable and fixed magazines, but the vast majority of the affected magazines are detachable. *See* Measure 114 § 11(1)(d) (defining LCM as a "fixed or detachable magazine" but exempting significant categories of fixed LCMs). A detachable LCM is not an "Arm[]." U.S. Const. amend. II. It is a firearm accessory that is not necessary for a firearm to function—and thus not within the Second Amendment's plain text. That was this Court's conclusion in its TRO Order, ECF 39 at 20. It was also the conclusion of the only other district court so far to examine this issue post-*Bruen*. *See Ocean State Tactical*, 2022 WL 17721175, at *13 ("[P]laintiffs have failed to meet their burden of establishing that [detachable] LCMs are 'Arms' within the textual meaning of the Second Amendment."). Nothing in Plaintiffs' additional submissions calls the Court's ruling into doubt.

A magazine is an "ammunition feeding device" for a firearm. Measure 114 § 11(b) , (c). Most commonly, a detachable magazine is a rectangular metal box that holds cartridges or rounds.

---

[1] Even if the Second Amendment protects lawful uses other than self-defense, like hunting, "individual self-defense is the *central component* of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (cleaned up); *see also Hunters United for Sunday Hunting v. Pa. Game Comm'n*, 28 F. Supp. 3d 340, 346 (M.D. Pa. 2014) (finding "no legal support for Plaintiffs' argument that Second Amendment protections extend to recreational hunting").

UC Davis Campus Community Book Project, *Glossary of Firearms Terminology*, https://ccbp.ucdavis.edu/firearms-glossary (last accessed Feb. 3, 2023). Many magazines are spring-loaded such that, once a round is fired, the magazine automatically loads the next round into the firearm until the magazine is emptied. *Id.* Detachable magazines are reusable; they are reloaded using either individual rounds or clips, which are groupings of rounds that usually come in clusters of five or eight. *Id.*; *see also* Kyle Wintersteen, *9 Commonly Misused Gun Terms*, Guns & Ammo (Nov. 21. 2018), https://www.gunsandammo.com/editorial/9-misused-gun-terms/249625 ("[C]lips feed magazines. Magazines feed firearms.").

An LCM is a magazine that accepts a large number of rounds. Fourteen states and the District of Columbia prohibit the sale, manufacture, transfer, or possession of LCMs. Giffords L. Ctr., *Large Capacity Magazines*, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/ (last visit Feb. 3, 2023). Those 15 jurisdictions together contain over one-third of the U.S. population. *See* U.S. Census Bur., QuickFacts, https://www.census.gov/quickfacts/ (last visit Feb. 2, 2023). And the near-universal dividing line for detachable LCM capacity is ten rounds—the same number used by Measure 114. *Id.*[2]

Alone, a detachable LCM cannot be used as a "weapon[] of offence, or armour of defence," which is how *Heller* defined "Arm." 554 U.S. at 581 (cleaned up); *see also Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc) ("On its own, a magazine is practically harmless and poses no threat to life or limb."), *cert. granted, judgment vacated in light of Bruen*, 142 S. Ct. 2895 (2022). Nor are detachable LCMs necessary for any firearm to effectively function. *See Ocean State Tactical*, 2022 WL 17721175, at *13 ("To the ordinary reader, magazines themselves

---

[2] The three exceptions set the limit at 15 rounds for handguns but 10 rounds for long guns (Illinois and Vermont) or 8 rounds for shotguns but 15 rounds for all other firearms (Colorado). Colo. Rev. Stat. § 18-12-301(2)(a)(I); 720 ILCS 5/24-1.10(a)(1); Vt. Stat. tit. 13, § 4021(e)(1).

are neither firearms nor ammunition. They are *holders* of ammunition, as a quiver holds arrows, or a tank holds water for a water pistol, or a pouch probably held the stones for David's sling."). Although some firearms require a detachable magazine to fire bullets, Plaintiffs have not presented evidence that any firearm requires a *large-capacity* magazine to function. *See id.* at *12 ("[A] firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful.").[3]

Because detachable LCMs are unnecessary for a firearm to operate, they are properly considered accessories, not "Arms" in themselves, and thus fall outside the Second Amendment's protection. In *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018), the court rejected a challenge to a federal law prohibiting possession of unregistered firearm silencers, 26 U.S.C. §§ 5845(a), 5861(d) . The challengers claimed that silencers were "commonly used by law-abiding citizens for lawful purposes." *Cox*, 906 F.3d at 1186. But the court declined to reach the common-use question because silencers failed "a more basic question." *Id.* Because a "silencer is a firearm accessory[,] . . . not a weapon in itself," it "can't be a 'bearable arm' protected by the Second Amendment." *Id.*; *see also United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.4th 610 (4th Cir. 2022) (same) (quoting *Cox*, 906 F.3d at 1186); *United States v. Al-Azhari*, No. 8:20-cr-206-T-60AEP, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020) ("[A] silencer is not a bearable arm within the meaning of the Second Amendment.").

Like silencers, scopes, or bump stocks, detachable LCMs provide an additional feature to a firearm—the ability to fire more bullets in rapid succession—but they are not *necessary* for the

---

[3] According to Plaintiffs' firearms industry expert, Mark Hanish, certain firearms have "proprietary magazines that are specific to the manufacturer, product family," or "model," and for which "[r]eplacement magazines may not be available in the future." ECF 80 ¶ 23. But he does not identify a single firearm that accepts only LCMs.

firearm to function as designed. What one court said of a silencer is equally true of an LCM: it "does not serve any intrinsic self-defense purpose" and "is not useful independent of its attachment to a firearm." *Hasson*, 2019 WL 4573424, at *4; *accord Ocean State Tactical*, 2022 WL 17721175, at *12 ("LCMs, like other accessories to weapons, are not used in a way that 'casts at or strikes another.' . . . 'You can't hurt anybody with one unless you hit them over the head with it.'") (cleaned up) (quoting *Heller*, 554 U.S. at 582, and *Hasson*,  2019 WL 4573424, at *2). That some firearms may be sold in tandem with LCMs is immaterial. If retailers began including silencers as standard with all firearm sales, such bundling would not transform a silencer from an accessory into an "Arm" for Second Amendment purposes.[4] The same principle applies to LCMs.

Plaintiffs' reliance on *Jackson v. City and County of San Francisco*, 746 F.3d 953 (9th Cir. 2014), and *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), is misplaced. Neither case holds that LCMs are protected "Arms" as a matter of constitutional *text*. Rather, each court addressed whether the challenged laws "regulate[d] conduct *historically* understood to be protected by the Second Amendment"—a separate question from *Bruen*'s text-focused threshold inquiry. *Jackson*, 746 F.3d at 967 (emphasis added) (cleaned up); *see also Fyock*,  779 F.3d at 997 (considering "whether the regulation resembled prohibitions *historically* exempted from the Second Amendment") (emphasis added). In *Jackson*, the court upheld a restriction on hollow-point bullets but concluded that "prohibitions on the sale of ammunition do not fall outside 'the historical understanding of the scope of the [Second Amendment] right.'" *Id.* at 968 (quoting *Heller*, 554 U.S. at 625). The court reasoned that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* at 967 (cleaned up). This is consistent with the principle that

---

[4] In fact, the firearm industry's marketing choices confirm that LCMs are accessories, for "at least some gun manufacturers" do not list magazines as "gun parts" but as firearm "accessories." *Ocean State Tactical*, 2022 WL 17721175, at *13 n.26 (cleaned up).

"'[t]he right to keep arms . . . necessarily involves the right . . . to purchase and provide ammunition suitable for such arms'"—as opposed to ammunition-feeding accessories. *Teixeira v. County of Alameda*, 873 F.3d 670, 678 (9th Cir. 2017) (en banc) (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)). Plaintiffs' reliance on *Jackson* ignores the atextual nature of its holding, as well as the significant "distinction between bullets and magazines, between ammunition and the *holder* of ammunition." *Ocean State Tactical*, 2022 WL 17721175, at *12 n.25 (distinguishing *Jackson*).

Similarly, the *Fyock* plaintiffs challenged an ordinance banning LCMs and the Ninth Circuit upheld the district court's denial of a preliminary injunction. 779 F.3d at 994. In dicta, the court assumed that, because handguns are commonly possessed for self-defense, "there must also be some corollary, albeit not unfettered, right to possess the magazines *necessary* to render those firearms operable." *Id.* at 998 (emphasis added) (citing *Jackson*, 746 F.3d at 967). But the court expressly did not reach whether LCMs were "arms" as a matter of text or even history. *See id.* at 997 n.3 (noting that it was "bypassing the historical analysis step and assuming without deciding that [the challenged LCM ordinance] burdens the Second Amendment"); *see also Ocean State Tactical*, 2022 WL 17721175, at *12 n.25 (noting that *Fyock* contains "no discussion of whether LCMs are 'Arms'").

Thus, no circuit precedent addresses the threshold question under *Bruen* of whether "the plain text of the Second Amendment protects" LCMs. 142 S. Ct. at 2134. For the reasons above, the answer to that question is no. Because detachable magazines are not "Arms" at all, the Court should at the very least decline to enjoin Measure 114's application to detachable magazines. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("the scope of injunctive relief is dictated by the extent of the violation established"); *E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) (noting the "well-established rule that injunctive relief must be tailored to remedy the

specific harm alleged.") (cleaned up); *see also Barnes v. Healy*, 980 F.2d 572, 576 (9th Cir. 1992)
("When injunctive relief is sought against a state agency or official, such relief must
be no broader than necessary to remedy the constitutional violation.") (cleaned up).

### b. LCMs are not necessary, nor typically used, for self-defense

An independent reason why LCMs fall outside the "plain text of the Second Amendment"
applies to detachable and fixed LCMs alike: even if LCMs were weapons (or a component of a
weapon), they are not "*self-defense* weapons." *Bruen*, 142 S. Ct. at 2143 (emphasis added). As this
Court held in its TRO Order, there is no evidence that LCMs are "'in common use' for lawful
purposes like self-defense." ECF 39 at 24 (cleaned up) (quoting *Heller*, 554 U.S. at 624).
Criticizing this conclusion, Plaintiffs contend that the Court erred in distinguishing "between
magazines *owned* by law-abiding citizens, and magazines *used* by law-abiding citizens" for self-
defense. ECF 83 at 19; *see also* ECF No. 84 at 24 (claiming that whether LCMs "are rarely *used*
to expend more than 10 rounds in self-defense settings" is "not what matters").

They are mistaken. The Supreme Court has repeatedly emphasized that "individual self-
defense 'is the *central component*' of the Second Amendment right." *McDonald v. City of
Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599). For that reason, the Second
Amendment "guarantee[s] the individual the right to possess and carry weapons in case of
confrontation." *Heller*, 554 U.S. at 592. Reaffirming *Heller* and *McDonald*, the *Bruen* Court made
clear that the Second Amendment's text covers "weapons 'in common use' today for self-defense."
142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 627); *see also Caetano v. Massachusetts*, 577 U.S.
411, 416–17 (2016) (Alito, J., concurring in judgment) (rejecting proposition that Second
Amendment does not protect stun guns because they "were not in existence at the end of the 18th
century"; "the same is true for the weapons most *commonly used today for self-defense*, namely,
revolvers and semiautomatic pistols") (emphasis added). The Second Amendment protects self-

defense weapons only, not machineguns or other weapons "most useful in military service." *See Heller*, 554 U.S. at 627. Thus, the purpose of the "common use" inquiry is to determine whether "there is a link between LCMs and the use of firearms for self-defense." *Ocean State Tactical*, 2022 WL 17721175, at *15 (concluding there is not).

The operative question under *Bruen*, then, is not how many LCMs *exist* in the United States, but whether LCMs are "in common *use* today *for self-defense*." 142 S. Ct. at 2134 (emphasis added) (cleaned up); *see also United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *4 (S.D. Cal. Aug. 30, 2022) (noting that *Bruen* asks "if the type of weapon at issue, handguns, was in 'common use' today for self-defense"). More specifically, because Measure 114 does not restrict magazines of ten or fewer rounds, the relevant inquiry is how common and necessary it is for a civilian to consecutively fire more than ten bullets in self-defense. *See* ECF 39 at 24 (finding that, on the TRO record, LCMs "are rarely used by civilians for self-defense"). As Judge Berzon wrote in her *Duncan* concurrence (joined by five other judges), "*Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon." *Duncan*, 19 F.4th at 1127 (Berzon, J., concurring). This Court asked the right "common use" question in its TRO Order, and Plaintiffs' objections misread *Bruen* and *Heller*.

This Court also reached the right answer in concluding that LCMs are not in common use today for self-defense. ECF 39 at 24. Many courts, including the Ninth Circuit, have recognized that LCMs provide little if any benefit for individual self-defense. *Duncan*, 19 F.4th at 1105 (majority) ("[T]he record here, as in other cases, does not disclose whether the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has *ever* been realized in self-defense in the home."); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 118 (3d Cir. 2018) ("The record here demonstrates that LCMs are not well-

suited for self-defense."); *Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011)

("[P]laintiffs present hardly any evidence that semi-automatic rifles and magazines holding more

than ten rounds are well-suited to or preferred for the purpose of self-defense or sport"); *State v.*

*Misch*, 256 A.3d 519, 553 n.29 (Vt. 2021) (per curiam) ("[N]o one has come forward with even

anecdotal examples of any LCM being necessary for individual self-defense."); *Rocky Mountain*

*Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020) ("[T]estimony at trial established that '[i]n

no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more.'").[5] The

*Ocean State Tactical* court also agreed with this pre-*Bruen* case law. *Ocean State Tactical*,

2022 WL 17721175, at *14 ("There is simply no credible evidence in the record to support the

plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth

by the State that they are not.").

     Despite the additional time they have had to support their motions, Plaintiffs still fail to

offer persuasive evidence that LCMs have any utility for civilian self-defense. The best they can

offer are a few isolated and thinly-sourced anecdotes and the say-so of their most obviously biased

witnesses. Take the unpublished *2021 National Firearms Survey*, which Plaintiffs repeatedly

invoke for the supposedly numerous instances where "'it would have been useful for defensive

purposes to have a firearm with a magazine capacity in excess of 10 rounds.'" ECF 84 at 22

(quoting parenthetically William English, *2021 National Firearms Survey: Updated Analysis*

*Including Types of Firearms Owned* 26–33 (May 13, 2022)). These anonymous survey results,

which cannot be fact-checked or verified, fail to bear the weight of Plaintiffs' claims. Almost all

---

[5] *Bruen* abrogated many of these cases to the extent they applied means-end scrutiny in the two-step approach adopted by nearly every circuit after *Heller*. *See* 142 S. Ct. at 2127. But the Supreme Court's rejection of the second step does not undermine the courts' analysis of LCMs' utility for self-defense.

of the examples are scant on details and lack any explanation of how an LCM would have actually

aided in self-defense. Listed examples include:

- On the farm, we have had mountain lions killing our calves so a larger
  animal could require more rounds[.]
  . . .
- I was charged by a bear. It was very scary in the moment[.] I panicked and
  rattled over multiple shots. Most missed but some hit home and eventually
  stopped him.
  . . .
- 2 men broke into my home while I was sleeping. I woke up and heard them
  breaking stuff downstairs. I grabbed my gun and ran down stairs [sic] and
  confronted them. I pointed my gun at them and told them to get out. They
  ran off.

ECF 80 at 176–78.

Massad Ayoob's opinion is no more persuasive. The president of Plaintiff Second

Amendment Foundation, Ayoob believes that LCM restrictions limit "law-abiding citizen[s'] . . .

ability to protect themselves from violent criminals in certain situations." ECF 73 ¶ 6. In fact, such

situations are vanishingly rare. Claiming to have studied "thousands" of incidents of defensive gun

use, Ayoob points to just four incidents in which a civilian appears to have fired more than ten

shots in self-defense. *Id.* ¶¶ 14–16; Declaration of Zachary J. Pekelis ("Pekelis Decl."), Ex. A at 7

(Ayoob Dep. 109:18–22). Two of those incidents involved attempted robberies of uniquely

vulnerable businesses more than a decade ago—a South Carolina gun store in 2012 and a Los

Angeles jewelry store in the early 1990s. ECF 73 ¶¶ 14, 16. The jewelry store shoot-out appears

inapt, involving as it did multiple armed employees firing more than 10 rounds *collectively* to kill

two would-be robbers, while wounding a passerby in the process. *See* Nielson Himmel, *Police Say*

*Watch Shop Owner Kills 4th, 5th Suspects*, L.A. Times, Feb. 21, 1992,

https://www.latimes.com/archives/la-xpm-1992-02-21-me-2663-story.html. As for the gun store,

the owner, who "live[d] in the rear of the store" into which three robbers crashed a truck in the

middle of the night, grabbed his AR-15 and "emptied a 30 round magazine," killing one. *Gun shop owner shoots, kills man during attempted robbery*, WIS News 10, Aug. 19, 2012, https://www.wistv.com/story/19236842/gun-shop-owner-shoots-kills-man-during-attempted-robbery/. Neither incident seems remotely representative of typical individual self-defense needs.[6]

Ayoob's other two incidents involved attempted armed robberies on public streets that resulted in the deaths of the assailants. ECF 73 ¶¶ 14, 15. In each case, the fusillade of bullets fired by the victim drew law enforcement scrutiny, raising questions as to whether it was truly an act of lawful self-defense. *See* Chris Bair, *Thank God I had a Gun: True Accounts of Self-Defense* 326 (2d ed. 2014) ("While [Deputy Prosecutor] Crawford was obviously uncomfortable with the number of shots fired, she felt there was not enough evidence that Honeycutt had used excessive force. 'He gets the benefit of the lack of evidence; that is what it boils down to,' she said."); Jennifer McMenamin, *Two killings test right of self-defense: Each case may turn on whether life was in danger*, Baltimore Sun, Apr. 7, 2006, https://www.baltimoresun.com/news/bs-xpm-2006-04-08-0604080024-story.html; ("[P]rosecutors have not decided whether to charge Beckwith, present the case to a grand jury or rule the shooting a justified use of deadly force."); *see also Baltimore man pleads not guilty in Cross Keys Robbery*, Wash. Examiner, May 10, 2006, https://www.washingtonexaminer.com/baltimore-man-pleads-not-guilty-in-cross-keys-robbery (noting that attempted robbery victim "shot at [the robbers] *as they took off*") (emphasis added). Though ultimately no charges were filed, neither incident serves as a model of defensive gun use.

---

[6] A second jewelry store robbery referenced by Ayoob does not appear to have involved more than ten defensive shots fired—at least not according to the one article Ayoob cites. *Jewelry store burglarized, scene of deadly 1994 robbery attempt*, NBC 12, Jan. 4, 2012, https://www.nbc12.com/story/16445849/jewelry-store-burglarized-scene-of-deadly-1994-robbery-attempt/). That article only refers to a "hail of bullets" fired by multiple "employees and owners of the store."

ALLIANCE'S RESPONSE TO PLTFS' MOTIONS FOR PRELIMINARY INJUNCTION… - 14

Recognizing that they have no actual evidence of a link between LCMs and self-defense, Plaintiffs instead offer empty rhetoric and unhelpful truisms, such as "[i]t is for the American people to decide what firearms are necessary for self-defense, not Oregon or the Court," ECF No. 83 at 16, and that "the Second Amendment's text . . . guarantees a right to keep and bear arms, full stop," ECF No. 84 at 21. Plaintiffs overlook the Supreme Court's clear and repeated instruction that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626); *see also id.* at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations.") (quoting *Heller*, 554 U.S. at 636). One important limitation on the right is that it protects only weapons "'in common use' today for self-defense"—the "'*central component* of the Second Amendment right.'" *Id.* at 2134, 2135 (majority) (cleaned up) (quoting *Heller*, 554 U.S. at 627, 599). Because LCMs are neither commonly used nor *useful* for self-defense, Plaintiffs cannot meet their burden of demonstrating that LCMs are protected by the Second Amendment's plain text.

### c.   LCMs are dangerous and unusual

A third reason places LCMs outside the Second Amendment's textual scope: there is no Second Amendment right to bear "dangerous and unusual" arms. *Heller*, 554 U.S. at 627; *Bruen*, 142 S. Ct. at 2128. LCMs are both.

The State's experts demonstrate the modern phenomena of mass shootings and the critical role that LCMs play in increasing their deadliness. *See* ECF 115 at 18. In addition, Dr. Mackenzie Cook, a trauma surgeon who treats many victims of gun violence in Oregon, testifies regarding the challenges medical providers face from the increased carnage that LCMs cause. Declaration of Mackenzie Cook ("Cook Decl.") ¶¶ 6–11. It is undisputed that LCMs are capable of firing more bullets more quickly. *See, e.g.*, Pekelis Decl., Ex. C at 25 (Helsley Dep. vol. II 155:5–22) ("Q. If your goal were to fire as many rounds as possible in as short a time as possible, would you select

a ten-round magazine or a larger capacity magazine? . . . A. Well, to shoot as fast as you can as many rounds as you can, you would want fewer magazine changes. . . . [I]f the objective was to fire as many rounds as fast as I could, I would opt for a higher capacity magazine."). And the more bullets fired, the more likely a victim is to receive a critical injury. Cook Decl. ¶ 7. If a victim is hit by multiple bullets, the wounds can interact in ways that dramatically increase the risk of disability or death. *Id.* ¶ 8. Additionally, mass shootings—which generally involve LCMs[7]—can overwhelm trauma centers, forcing doctors to make difficult decisions about how to use their limited resources. *Id.* ¶ 9.

Courts examining LCM restrictions pre-*Bruen* recognized the serious danger posed by LCMs. The First Circuit described how semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. Similarly, the Fourth Circuit recognized that LCMs are

---

[7] *See* ECF 116 ¶¶ 26–28. Plaintiffs' expert, Professor Gary Kleck, contends that "only 11.7% of all mass shootings (4+ dead) in the U.S. involve LCMs." ECF 76 ¶ 15. He reaches this figure by relying on two flawed databases. For the denominator (total mass shootings), Kleck relies on the overinclusive Gun Violence Archive ("GVA"), *id.* ¶ 12, which treats as a mass shooting any incident in which four or more people are "shot or killed, not including the shooter," GVA, *General Methodology*, Jan. 3, 2022 https://www.gunviolencearchive.org/methodology. These include incidents with multiple shooters, "domestic violence" shootings, "gang-involvement" shootings, "defensive [gun] uses," "accidents," and many other types of shootings that, however tragic, are not what Americans generally associate with the term "mass shooting." *Id.* For the numerator (mass shootings using LCMs), Kleck relies on the Violence Policy Center ("VPC") report on mass shootings, ECF 76 ¶ 13, which both Kleck and VPC itself admit is underinclusive. *See* VPC, *Mass Shootings in the United States Involving Large Capacity Ammunition Magazines* at 1, Sept. 16, 2022, https://vpc.org/fact_sht/VPCshootinglist.pdf ("A total of 883 people were killed in these shootings and 1,249 were wounded. This number is likely a significant undercount of actual incidents as there is no consistent collection or reporting on this data. Even in many high-profile shootings, information on magazine capacity is neither released nor reported."); Pekelis Decl., Ex. D at 29–30 (Kleck Dep. 45:13–49:12) (acknowledging that VPC report is underinclusive).

dangerous even when not combined with assault rifles, describing how handguns equipped with LCMs were used in mass shootings at Virginia Tech (32 dead and 17 wounded); Fort Hood, Texas (13 killed and over 30 wounded); Binghamton, New York (13 killed and four wounded); and Tucson, Arizona (six killed and 13 wounded, including a member of Congress). *Kolbe v. Hogan*, 849 F.3d 114, 120 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 142 S. Ct. 211. Nothing in *Bruen* casts doubt on the dangerous lethality of LCMs.

As described above, LCMs are not commonly used for self-defense (or, indeed, any lawful purpose) and as such are unusual. Plaintiffs assert that many LCMs are in circulation, but federal courts have considered and convincingly rejected the argument that the Second Amendment applies "to each and every weapon deemed sufficiently popular—no matter how violent or dangerous that weapon." *Id.* at 141; *see also Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015). As *Friedman* notes, submachine (or "Tommy") guns were "all too common" during Prohibition before being federally prohibited in 1934. 784 F.3d at 408. The Tommy gun's "popularity didn't give it a constitutional immunity," *id.*, and *Heller* expressly approved of the "National Firearms Act's restrictions on machineguns." 554 U.S. at 624. Relying on a weapon's popularity at the time legislation was passed would be nonsensically circular, as Judge Easterbrook observed: "Machine guns aren't currently owned for lawful purposes today because they are illegal . . . . Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so it isn't commonly owned." *Friedman*,  784 F.3d at 409.

This logic applies with equal force post-*Bruen*. The constitutionality of firearm regulations does not depend on how successful marketing campaigns are in encouraging gun owners to adopt a particular technology. The question of *how* LCMs are actually used must factor into the analysis of whether they are unusual. As explained above, LCMs are rarely if ever used for self-defense,

but commonly used in mass shootings. Accordingly, they are dangerous and unusual devices, and thus fall outside the Second Amendment's textual scope.

### 3.    Plaintiffs' historical arguments cannot withstand scrutiny

For the reasons above, Plaintiffs are unlikely to prevail on their challenge to Measure 114's LCM provision because they cannot meet their burden to show it is covered by the Second Amendment's plain text. Even if they could, however, the State persuasively explains how Measure 114 is consistent with a historical tradition of arms regulation. *See* ECF 115 at 19–22.

In contrast, Plaintiffs' historical arguments are unfounded, misleading, and contradictory. A casual reader of their motions would be left with the impression that repeating firearms with large magazines were being hawked on every street corner while James Madison was drafting the Bill of Rights. But even a cursory examination of Plaintiffs' evidence reveals that the "repeaters" they cite were rare and experimental at the time of the framing. For example, Plaintiffs claim that "Lorenzoni repeaters 'made by London gunsmith John Cookson' were particularly popular among colonists 'in the eighteenth century.'" ECF 84 at 26–27 (quoting David Kopel, *Magazines Over 10 Rounds Were Well-known to the Founders*, Reason (Feb. 11, 2020), https://bit.ly/3uZRHJF.) The cited blogpost does not assert that repeaters capable of firing 11 or more shots were popular in 18th-century America. Rather, it claims that "9 or 10 shot" versions were "popular." Kopel, *supra.* And in practically the same breath, the author acknowledges that pre-industrial "firearms manufacture was artisanal" and prohibitively expensive, so "repeaters were only affordable for the wealthier minority of the population." *Id.*

Plaintiffs also overstate the importance of the "Belton rifles" ordered by the Continental Congress, which "'were able to discharge sixteen or twenty rounds.'" ECF 84 at 27 (quoting *Ass'n of N.J. Rifle & Pistol Clubs, Inc.*, 974 F.3d at 255 (Matey, C.J., dissenting)). Plaintiffs admit that

the Continental Congress's order was cancelled due to the extraordinary expense of these experimental firearms, which strongly undermines any use these guns might have in a historical analysis. *Id.* But they leave out the fact their own history expert, Ashley Hlebinsky, says that the guns in question could fire only eight rounds, not sixteen or twenty. ECF 72 ¶ 21 ("In 1776, [Belton] wrote Congress saying he designed a firearm that could fire eight shots in three seconds.") (citing Nat'l Archives, *Founders Online*, Ltr. from George Washington from Benjamin Franklin, 22 July 1776, https://founders.archives.gov/documents/Washington/03-05-02-0311 (last visit Feb. 5, 2023) ("Belton soon turned his attention to a scheme to make rapid-fire muskets for the Continental army. 'I have discover'd,' he wrote Congress on 11 April 1777, 'an improvement, in the use of Small Arms, wherein a common small arm, may be maid to discharge *eight* balls one after another, in eight, five or three seconds of time.'") (emphasis added)).

Finally, Plaintiffs cite the Winchester rifle in an attempt to prove the supposed ubiquity of repeaters before in the 19th century. ECF 84 at 28. It is unlikely that "James M. Wilson used his Winchester rifle . . . to defend himself in 1864," *id.*, given that, according to Hlebinsky, "the first firearm sold using the Winchester name" was made in 1866. ECF 72 ¶ 30. That early model had a fraction of the production as the 1873 model, *see id.* ¶¶ 30, 32, and even the latter's popularity may be overstated. *See* Stevenson Swanson, *Winchester rifles face end of an era*, Baltimore Sun, Mar. 25, 2006, https://www.baltimoresun.com/news/bs-xpm-2006-03-26-0603260077-story.html (whether the Winchester "deserved its later reputation as the tamer of the frontier is another matter"; "by far, the most common gun in the West was the shotgun"). As the Court noted in its TRO Order, the Winchester rifle's "celebrity surpassed its actual production." ECF 39 at 26 n.17. More fundamentally, Plaintiffs ignore the fact that, although some models of the Winchester repeating rifle had built-in, tubular magazines that exceeded 10 rounds, the Winchester was a lever-

action firearm. ECF ¶ 17-2 ¶ 28 (Winchester "was a lever-action rifle that required the shooter to manipulate a lever in a forward-and-back motion before each shot" and, "when the gun was emptied, it had to be manually reloaded, one round at a time"); *see also* ECF 39 at 26 n.17 (noting that 19th-century multi-shot weapons were "dramatically different than their twenty-first century counterparts"). In sum, Plaintiffs' actual evidence fails to bear the weight of their claims.

### 4. Plaintiffs' historical experts are unqualified and biased

Plaintiffs' flimsy historical arguments are unsurprising given the three history "experts" they have retained, who lack both the credentials and neutrality of the State's historians. First, while Stephen Helsley presents himself as a historian, he has no training or education in the field. ECF 109 at 8–11; Pekelis Decl., Ex. B at 17 (Helsley Dep. vol. I 102:2–12). In his deposition, he acknowledged he is not "what most people . . . would call a historian," and that a more accurate term for his part-time job would be "archivist." Pekelis Decl., Ex. B at 15 (Helsley Dep. vol. I 100:5–9). But Helsley cites no archives or primary sources in his report. The closest thing to a relevant historical document cited is a blog post from 2009 by someone called "FlameHorse." ECF 109 at 21 (citing Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (Oct. 14, 2009), https://listverse.com/2009/10/14/top-10-most-audacious-shootouts-in-us-history/). Helsley is a former NRA lobbyist who "strongly oppose[s]" LCM restrictions and has worked to defeat multiple bills proposing to restrict LCMs. Pekelis Decl., Ex. B at 11–12 (Helsley Dep. vol. I 90:9–91:20). He "still believe[s] in the [NRA] cause" and "readily admit[s] [that] . . . I'm biased." *Id.* at 13, 14 (Helsley Dep. 94:21–24, 97:11–12).

Plaintiffs' second historical expert, Ashley Hlebinsky, fares little better. She does not have a doctoral degree or other traditional qualifications for a historian. ECF 72 ¶ 1. She prefers to write for "popular magazines" like "Recoil Magazine" rather than publish articles in academic or peer-

reviewed journals, of which she has just three. *Id.* at 40–50; Pekelis Decl., Ex. E at 38 (Hlebinsky Dep. 92:14–20). An NRA "life member" and a self-described member of the "guns community," Hlebinsky is a frequent featured speaker at events organized by gun rights groups, including multiple events for Plaintiff Second Amendment Foundation and Gun Freedom Radio's "Celebrate and Protect the Second Amendment Rally" at the Arizona State Capitol. ECF 72 at 43; Pekelis Decl., Ex. E at 37, 41, 42 (Hlebinsky Dep. 27:2–3, 100:13–25, 116:15–18). Along with her husband and business partner Mark Hanish (another of Plaintiffs' experts), Hlebinsky owns 600,000 shares of stock in a publicly traded ammunition company, which have a current value of approximately $1.5 million. *Id.* at 39–40 (93:8–94:16); Nasdaq, *AMMO, Inc. Common Stock (POWW)*, https://www.nasdaq.com/market-activity/stocks/poww (last visit Feb. 6, 2023) (listing share price of $2.42). As the *Ocean State Tactical* court noted, "Ms. Hlebinsky's biases are obvious." 2022 WL 17721175, at *7 n.14.

Finally, Clayton Cramer, a purported expert in the history of mass murders, is an adjunct instructor at an Idaho community college who identifies as "a strong opponent" of what he calls "the gun ban movement." Pekelis Decl., Ex. F at 63 (Cramer Dep. 112:9–13). Cramer views the debate over firearm regulations in this country as a "culture war," sees Measure 114 is part of a "war" against his rights, and "absolutely" considers himself to be on the NRA's side of that conflict. *Id.* at 70–71 (135:20–136:3). He is a frequent contributor to an NRA website called AmericasFirstFreedom.org. *Id.* at 59–60, 62, 67–69 (108:23–109:25, 111:5–18, 131:22–133:2). His articles include those denouncing the "Ninth Circus" Court of Appeals and its judges[8] for

---

[8] Shortly after Judge Stephen Reinhardt's passing, Cramer wrote a blog post celebrating a district court's entry of a preliminary injunction against California's LCM restrictions, in which he noted: "Of course the 9th Circuit will hear the appeal, but Judge Reinhardt has recently been demoted to Hell, so who knows?" Pekelis Decl., Ex. G (Dep. Ex. 17). Cramer testified that he wrote that because "many people on

upholding California's LCM restrictions. *Id.* at 64–65 (125:23–126:8), *id.*, Ex. G at 74 (Dep. Ex. 17). Asked in his deposition if he considers himself a "neutral witness" on whether LCMs should be restricted, he answered in the negative: "I'm not a neutral witness on that issue." *Id.*, Ex. F at 63 (Cramer Dep. 112:3–8).[9]

Even if these three witnesses were neutral and qualified historians (and they are neither), their testimony would not support the historical claims for which Plaintiffs rely on them. Helsley offers nothing of value regarding the historical "prevalence of firearms and/or magazines capable of holding more than ten rounds of ammunition." ECF 109 at 4. In his deposition, Helsley admitted that he did not know how popular multi-shot weapons were before the 19th century. Pekelis Decl., Ex. C at 23–24 (Helsley Dep. vol. II 138:19–139:1). And although he asserts that "[r]ifles with fixed magazines holding 15-rounds were widely used in the American Civil War," when asked for a "specific document that supports that assertion," Helsley admitted: "I suppose I could go find one, but I didn't provide one." *Id.* at 21–22 (136:9–137:9).

Likewise, Hlebinsky admitted that she focused her research on the *existence* of multi-shot firearms in the 18th and 19th centuries (i.e., repeaters and magazine-fed repeaters), not on their historical *prevalence*. Pekelis Decl., Ex. E at 43 (Hlebinsky Dep. 132:6–11). Nor did Hlebinsky conduct a comprehensive survey of firearms laws in the 18th or 19th centuries to identify laws that

---

my side, on our side, do not think that Judge Reinhardt has . . . been a particularly good thing to have on the courts." *Id.*, Ex. X at Y (Cramer Dep. 130:4–6).

[9] Plaintiffs' other experts are biased and unqualified. Ayoob is the president of Plaintiff Second Amendment Foundation with deep ties to the gun industry. ECF 73 ¶ 1 & pp. 21–26. Hanish has been a firearm sales executive for decades, and has strong financial incentives to oppose any regulation or restriction that might hurt sales. Hanish Decl. ¶ 3; Pekelis Decl., Ex. H at 84 (Hanish Dep. 81:8–25). Neither Ayoob's nor Hanish's resume and analysis bear the traditional indicia of expertise. Almost uniformly, Plaintiffs' experts participate in a cottage industry of supporting challenges to sensible firearm regulations. ECF 72 at 41 (listing Hlebinsky's expert witness testimony supporting challenges to firearm regulations); ECF 73 ¶ 4 (same for Ayoob); ECF 76 ¶ 8 (same for Kleck); ECF 109 ¶ 5 & p. 15 (same for Helsley).

may be analogous to modern LCM restrictions. *Id.* at 44–48, 50 (Hlebinsky Dep. 135:23–136:4, 140:7–19, 141:24–142:2, 144:7–12).

As for Cramer, the whole thrust of his report is to rebut the idea that "mass murder" was typically a "group activity" in the United States before the early 20th century, which had evidently been raised in a *different* case. ECF 75 at 8; Pekelis Decl., Ex. F at 54–55 (Cramer Dep. 17:4–18:8). Even if this issue were relevant to this case, Cramer admitted that there were fundamental errors in his analysis. Pekelis Decl., Ex. F at 56–57 (Cramer Dep. 105:19–106:20).

In sum, Plaintiffs' historical experts are biased, unqualified, and fail to provide even basic support for Plaintiffs' sweeping historical claims. By contrast, the State's historical experts are neutral and preeminent scholars who support their opinions with transparent and reliable methods and well-sourced facts and data. Any disagreement as to the history should be resolved in favor of Defendants. *See, e.g.*, *Ocean State Tactical*, 2022 WL 17721175, at *15 (finding "plaintiffs' proffered experts less credible than those of the State" and noting that the court "could resolve the historical tussle by simply crediting the latter and rejecting the former").

### 5.   Plaintiffs are unlikely to prevail on their takings and due process claims

Finally, Plaintiffs' challenge to the LCM provision based on the Takings and Due Process Clauses fails for three reasons. First, as this Court noted in its TRO Order, a takings claim generally does not provide a basis for preliminary injunctive relief. ECF 39 at 34–35. Because the Takings Clause provides that "private property" may not be "taken for public use, *without just compensation*," U.S. Const. amend. V (emphasis added), the "proper remedy for a taking" is an award of "damages—not injunctive relief." *Prof'l Beauty Fed'n of Cal. v. Newsom,* No. 2:20-cv-04275-RGK-AS, 2020 WL 3056126, at *8 (C.D. Cal. June 8, 2020). As the Supreme Court explained in *Knick v. Township of Scott*, "[a]s long as an adequate provision for obtaining just

compensation exists, there is no basis to enjoin the government's action effecting a taking." 139 S. Ct. 2162, 2176 (2019). Oregon has an adequate, effective procedure to compensate takings of property. *See* Or. Const. art. I, § 18; O.R.S. 35.015(6). Even if Plaintiffs had a viable takings claim (which they do not), their sole remedy would be damages, not injunctive relief.

Second, Plaintiffs' takings claim here has already been rejected by the en banc Ninth Circuit. *See Duncan*, 19 F.4th at 1111–13. Although *Duncan* was vacated in light of *Bruen*'s new Second Amendment standard, nothing in *Bruen* affected the court's Takings Clause analysis.[10] *See, e.g.*, *Kornahrens v. Evatt*, 66 F.3d 1350, 1356–57 (4th Cir. 1995) (finding that a decision vacated on other grounds was still "instructive" and "persuasive").

In *Duncan*, the plaintiffs challenged an LCM regulation that allowed the owners of prohibited magazines four choices: (1) modify the magazine to accept ten rounds or fewer; (2) sell it to a firearms dealer; (3) remove it to another state; or (4) turn it over to a law enforcement agency for destruction. 19 F.4th at 1111–12. The en banc court concluded that this was neither a physical nor a regulatory taking. *Id.* at 1112 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992); *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012)). In fact, *Duncan* rejected the precise arguments raised by Plaintiffs in this case. *Compare* ECF 84 at 29–30 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982); *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015), *with Duncan*, 19 F.4th at 1112 ("We do not read the Supreme Court's decisions in *Loretto* and *Horne* as expansively as Plaintiffs do.") (cleaned up). Measure 114 affords the same options to owners of LCMs as the California law challenged in *Duncan*. Plaintiffs point to no new authority that would warrant a different result.

---

[10] Even the dissents in *Duncan* did not take issue with the majority's Takings Clause Analysis. *See Duncan*, 19 F. 4th at 1141–59 (Bumatay, J., dissenting); *id.* at 1159–73 (Vandyke, J., dissenting).

Third, Plaintiffs have no cognizable due process claim because any such claim is preempted by their takings claim. In general, "if a constitutional claim is covered by a specific constitutional provision, . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997). The Ninth Circuit has held that, where the allegations in a plaintiff's "complaint fall[] within one of th[e three] categories" of takings—i.e., permanent physical invasions, deprivation of all economically beneficial use, and regulatory takings under *Penn Central Transp. Co. v. N.Y.C.*, 438 U.S. 104 (1978)—"the claim must be analyzed under the Fifth Amendment" Taking Clause, "whether or not it proves successful." *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855–56 (9th Cir. 2007). The exception is for when a property "regulation that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005)). Measure 114's LCM provision plainly serves the powerful state interest of "enhanc[ing] the safety of residents" by restricting magazines that "increase casualties" in mass shootings and other "serious violent crimes." Measure 114, Preamble. The Ninth Circuit recognized in *Duncan* that California's LCM restriction are a "reasonable fit for the compelling goal of reducing gun violence." 19 F.4th at 1111. The *Lingle* exception does not apply, so Plaintiffs' due process claim is "subsumed by the Takings Clause." *Colony Cove Properties, LLC v. City of Carson*, 640 F.3d 948, 960 (9th Cir. 2011).

**B.      Plaintiffs Are Unlikely to Prevail in Their Challenge to the Permitting Provision**

Plaintiffs' challenge to Measure 114's permitting provision is also based on a misreading of *Bruen*. The Supreme Court was careful to describe the difference between permissible "shall issue" permitting regimes and impermissible "may issue" regimes. The plain text of Measure

114—and *Bruen* itself—establishes that it is in the former category, and therefore passes constitutional muster.

      **1.   Plaintiffs cannot demonstrate a likelihood of success under *Bruen***

Measure 114 is modeled after Oregon's existing Concealed Handgun License ("CHL") law, and uses nearly identical language and criteria. *Compare* Measure 114 § 4(3)(a) ("the permit agent shall issue the permit-to-purchase"), *with* O.R.S. 166.291(1) (the "sheriff of a county . . . shall issue the person a concealed handgun license"). The *Bruen* majority included Oregon's CHL law in a list of "shall issue" permitting regimes that do not run afoul of the Second Amendment. *Bruen*, 142 S. Ct. at 2123 n.1. Justice Kavanaugh's concurrence (joined by the Chief Justice) was even more specific: Oregon, along with 42 other states with shall-issue regimes, "may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). Unlike the New York law that *Bruen* invalidated, "those shall issue regimes to not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense." *Id.*

In dissent, Justice Breyer observed that Oregon's CHL law appears to allow "some degree of discretion" to the permitting authority. *Id.* at 2172 (Breyer, J., dissenting). Justice Breyer was certainly correct that Oregon's CHL law provides for certain situations in which the sheriff must decline to issue a permit, but has some discretion to determine whether some specific disqualifying criteria apply. *See* O.R.S. 166.291(1)(a)–(p). And those criteria are markedly similar to the criteria in Measure 114. *See* Measure 114 § 4(1)(b)(A)–(E) . Despite Justice Breyer's dissent, the majority retained Oregon's CHL law in its list of constitutionally valid "shall issue" regimes. The *Bruen*

Court evidently did not see Oregon's CHL law as, to use Plaintiffs' phrase, an "impermissible shall-issue-in-name-only regime." ECF 84 at 16.

Plaintiffs' contention that Measure 114 vests permit agents with "unconstitutional subjective discretion" is impossible to square with *Bruen*'s blessing of Oregon's CHL law. *Id.* at 17. The provision of Measure 114 that Plaintiffs say is too discretionary allows for denial of a permit only if there are "reasonable grounds" to find that "the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or . . . past pattern of behavior involving unlawful violence or threats of unlawful violence." Measure 114 §§ 4(1)(b)(C) , 5(2). But this requirement is nearly identical to Oregon's constitutional CHL law, which authorizes denial of a license "if the sheriff has reasonable grounds"—the same reasonableness standard as Measure 114—to find that "the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large"—the same substantive disqualifier as Measure 114—"as a result of the applicant's mental or psychological state or . . . past pattern of behavior involving unlawful violence or threats of unlawful violence"—the same criteria as Measure 114. O.R.S. 166.293(2). Thus, Measure 114 mirrors the text of a CHL law that *Bruen* approved. Plaintiffs' argument that Measure 114's permit provision runs afoul of *Bruen* is foreclosed by *Bruen* itself.

Measure 114's "danger to self or others" standard is also similar to the requirements of a permitting system in Connecticut, which the *Bruen* Court also approved. Connecticut's law mandates that the permitting agent determine whether an applicant is a "suitable person to receive a permit [to carry a pistol or revolver in the state]." Conn. Gen. Stat. § 29–28(b). The statute's "suitable person" requirement precludes permits for "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon."

*Dwyer v. Farrell*, 475 A.2d 257, 260 (Conn. 1984) (cleaned up). In *Bruen*, the majority recognized that Connecticut's law has "discretionary criteria." 142 S. Ct. at 2123 n.1; *see also id.* at 2172 (Breyer, J., dissenting). Indeed, Connecticut's "suitable person" standard appears to afford substantially more discretion than Measure 114, which requires a nexus to mental or psychological health or past violent behavior. Nevertheless, the *Bruen* Court still included Connecticut in the list of "shall-issue" states whose laws were not constitutionally suspect. *Id.* at 2123 n.1 (majority).[11]

Plaintiffs' discretion argument only makes sense if one supposes that the *Bruen* majority not only failed to read closely the text of the very statutes it cited as valid but also ignored the dissent's specific call-outs of Oregon and Connecticut. A far more likely explanation—and one supported by a text of *Bruen* and the relevant statutes—is that the majority and concurring Justices viewed the two statutes as a presumptively constitutional "shall issue" regimes, despite their allowance for a modicum of discretion to determine whether a given case satisfies the specific disqualifier standard. Measure 114 presents no meaningful distinctions from the concealed carry laws approved by the *Bruen* Court. And like those statutes, it is constitutional.[12]

---

[11] It is unsurprising the Court allows this type of discretion. The *Heller* Court held that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." 554 U.S. at 626, 627 n.26. And in *Kanter v. Barr*, then-Judge Barrett explained that regulatory schemes that consider whether an applicant's individual "history or characteristics make him likely to misuse firearms" are less suspect than categorical prohibitions. 919 F.3d 437, 468–69 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111.

[12] It is of no constitutional consequence that Measure 114 allows a permit agent—rather than a court— to make the issuance decision in the first instance. Measure 114's robust appeal provisions ensure that an aggrieved party can quickly appeal to a county circuit court, who will then (within 15 days) engage in the same de novo analysis incorporated into the CHL law. Measure 114 § 5(8) . To the extent Plaintiffs suggest that a court must make the ultimate denial decision, Measure 114's provision for immediate de novo judicial review surely suffices. *See, e.g.*, *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997) (provision for district court's de novo review of agency sanction "satisfies the strictures of procedural due process").

### 2.   Plaintiffs misunderstand the nature of their facial challenge

Plaintiffs argue that Measure 114 will create a doomsday scenario where prospective gun buyers face interminable delays that functionally deprive them of the ability to purchase any new firearms. ECF 84 at 17–20. The State explains why Plaintiffs' parade of horribles is divorced from both the text of the statute and the facts on the ground. *See* ECF 115 at 33–38. It is also irrelevant to their facial challenge, in which the statutory text alone controls. *See Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020) ("[W]hen reviewing a facial challenge, we are limited to reviewing the text of the [statute] itself . . . . How the statute has been interpreted and applied by local officials is the province of an as-applied challenge, which is not before us today."). Plaintiffs' challenge to the permitting system fundamentally misunderstands this principle.

"Facial challenges are disfavored for several reasons." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) ); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). In *Washington State Grange*, the Supreme Court highlighted three reasons why facial challenges are disfavored, all of which apply here.

First, "[c]laims of facial invalidity often rest on speculation." *Wash. State Grange*, 552 U.S. at 450. Plaintiffs' challenge is rife with exactly such speculation. *See* ECF 84 at 16–18. They argue that a "permit agent can sit on the application for 30 days after making a determination." ECF 84 at 17. Their hypothetical imagines that a permitting agent would intentionally slow the review of applications and distorts a provision with the very opposite purpose—to ensure that applications are processed promptly. Plaintiffs' cynicism runs counter to the rule that "[g]overnment officials are presumed to act conscientiously in the discharge of their duties." *See*

*Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) (cleaned up) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."). It also overlooks that many states provide far longer time limits for issuance of concealed carry licenses. *See, e.g.*, Colo. Rev. Stat. § 18-12-206(1) (90-day limit); Fla. Stat. § 790.06(6)(c) (same).

Second, "[f]acial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Wash. State Grange*, 552 U.S. at 450 (cleaned up). Plaintiffs ask this Court to declare a regulatory scheme invalid based on baseless speculation as to how it will operate in practice. Their fact-specific arguments are premature. Justice Kavanaugh underscored this principle in *Bruen*, along with the appropriate remedy for an alleged violation: "[S]hall-issue licensing regimes are constitutionally permissible, subject of course to an *as-applied challenge* if a shall-issue licensing regime does not operate in that manner in practice." 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (emphasis added).

Last, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 451. The Constitution exists to provide a structure for democratic governance, as well as to protect individual rights. "A ruling of unconstitutionality frustrates the intent of the elected representatives of the people," or, as in this case, the people themselves. *Id.* at 450 (cleaned up). Before a single person can plausibly claim an actual constitutional deprivation stemming from the permit system, Plaintiffs ask this Court to enjoin a law supported a majority of Oregon voters, who determined that its common-sense provisions will help keep their loved ones safe from gun violence. Plaintiffs' facial challenge should be rejected.

C.    **Plaintiffs Have Failed to Show They Face An Immediate, Irreparable Injury**

Separate from the merits, the Court should also deny Plaintiffs' Motions because they have failed to establish "any present or imminent risk of likely irreparable harm." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010); *see, e.g.*, *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 947 (9th Cir. 2014) (affirming denial of motion for preliminary injunction where "there is no immediate risk of irreparable injury justifying a preliminary injunction"). Plaintiffs rely primarily on a theory of *presumed* irreparable harm flowing from alleged constitutional violations. *See, e.g.*, Dkt. 83 at 24 (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Am. Trucking Ass'ns v. City of L.A.*, 559 F.3d 1046, 1059 (9th Cir. 2009)). Plaintiffs also contend that the firearm retailers among them will "lose revenue if Measure 114 takes effect." ECF 84 at 33. Neither theory satisfies the irreparable injury requirement.

First, Plaintiffs' presumed irreparable harm argument fails for the obvious reason that they have not established a likelihood of success on their constitutional claims. *See, e.g.*, *Valdez v. Lujan Grisham*, 559 F. Supp. 3d 1161, 1181 (D.N.M. 2021), *aff'd*, No. 21-2105, 2022 WL 2129071 (10th Cir. June 14, 2022) (plaintiffs "failed to demonstrate the requisite likelihood of success on their constitutional claims and, as a result, they are not entitled to a presumption of irreparable injury") (cleaned up). In other words, the fact that Plaintiffs are merely "asserting" constitutional violations "does not automatically require a finding of irreparable injury." *Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983) (Breyer, J.).

Even if Plaintiffs had stronger claims on the merits, they are wrong that they would be "enough in and of themselves to satisfy the second injunctive relief factor" in this circuit. ECF 84 at 33. As this Court has previously explained, "[i]n the past decade or so, the Ninth Circuit has required more than a constitutional claim to find irreparable harm." *Great N. Res., Inc. v. Coba*, No. 3:20-cv-01866-IM, 2020 WL 6820793, at *2 (D. Or. Nov. 20, 2020) (distinguishing

*Melendres*, 695 F.3d at 997, 1002, and *Am. Trucking Ass'ns*, 559 F.3d at 1057–59, among other cases). First Amendment claims present perhaps the singular exception to this rule, which makes sense given the often non-compensable nature of denials of free speech, free exercise, and other such dignitary rights. *See generally Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)). *But see Cuviello v. City of Vallejo*, 944 F.3d 816, 831 (9th Cir. 2019) (while a "colorable speech claim certainly raises the specter of irreparable harm, we must still examine . . . irreparable harm" separately) (cleaned up). Other constitutional injuries are usually more readily compensable. *See Aref v. Lynch*, 833 F.3d 242, 264 (D.C. Cir. 2016) ("[C]ourts frequently allow plaintiffs in Section 1983 actions to recover damages for constitutional violations that fall outside the domain of common-law injuries.") (collecting cases). The same goes for Plaintiffs' claimed burden on their ability to buy or sell firearms and LCMs. Requiring an independent showing of irreparable harm does not render the Second Amendment a "second-class right." ECF 83 at 25 (cleaned up). It just puts the right on par with others, recognizing that the irreparable harm requirement usually "do[es] not collapse into the merits question" in constitutional cases. *Cuviello*, 944 F.3d at 831.

Second, Plaintiffs have failed to establish that the firearm retailers will face an immediate and irreparable economic injury. As the State notes, it is gun purchasers—not *sellers*—whose Second Amendment rights are at issue and who must therefore show some imminent irreparable harm to warrant injunctive relief. ECF 115 at 40 (citing *Teixeira*, 873 F.3d at 686–87). Any monetary loss to gun retailers is irrelevant, not to mention entirely speculative. For example, Plaintiffs fail to explain how Measure 114 would lead to a "constriction" of the market for firearm magazines. ECF 84 at 33. With Oregon customers unable to buy LCMs, common sense suggests

that they would opt to purchase 10-round magazines instead. Far from harming retailers, that would almost certainly redound to their economic *benefit*. Not only would many customers likely buy *more* 10-round magazines to attain the same total capacity as an LCM. But according to Plaintiffs' own industry expert, 10-round magazines generally command the same or *higher* prices as—and generate equivalent profit margins to—LCMs. Pekelis Decl., Ex. H at 81–83 (Hanish Dep. 51:15–53:11, 109:4–110:14). Even if the dealer-Plaintiffs' alleged economic injury were relevant (and it isn't), they have failed to establish any actual harm—let alone an irreparable one.[13]

### D.    The Balance of the Equities and Public Interest Weigh Against an Injunction

"Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up). The same is true for statutes enacted directly by its citizens. Here, Oregon's voters adopted Measure 114 to protect themselves and their communities from "horrific deaths and devastating injuries due to mass shootings, homicides and suicides." Measure 114, Preamble. Those dangers are real, as are the fears of parents sending their children to school, of worshippers attending their church, synagogue, or mosque, and of ordinary people going to concerts, malls, or political rallies. Social science research shows that permit and LCM provisions are effective at reducing the risk of these dangers. *See* ECF 115 at 42; Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am.

---

[13] Generally, economic harm alone is not irreparable because a party may seek complete relief through damages. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974). Some courts have held that "monetary losses may constitute irreparable injury if the plaintiff cannot recover damages from the defendant because a claim would be barred by the Eleventh Amendment." *Ariz. Hosp. & Healthcare Ass'n v. Betlach*, 865 F. Supp. 2d 984, 998 (D. Ariz. 2012). But under those cases, "to show irreparable harm, Plaintiff[s] must establish not only that [they] will lose revenues that cannot be recuperated because of the Eleventh Amendment, but also that lost revenues will be 'considerable.'" *Id.* at 998–99 (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1114 (9th Cir. 2010), *vacated on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012)). As explained above, Plaintiffs have made no such showing.

Med. Ass'n 1191, 1192 (2022)). The State and the Alliance, which actively supported Measure

114's enactment, have strong interests in the law's implementation and preservation.

Conversely, Plaintiffs' constitutional rights will not be diminished at all by Measure 114.

Law-abiding citizens will still be able to obtain firearms with magazines accepting up to 10

rounds—more than sufficient for effective self-defense. While it is "in the public interest to

prevent violation of a party's constitutional rights," *Melendres*, 695 F.3d at 1002, here Plaintiffs

have failed to establish a likelihood of success on their constitutional claims. *See, e.g.*, *Camelot

Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 651 (7th Cir. 2022) ("Because the

government is likely to prevail on the merits [of plaintiffs' constitutional claims], denying

plaintiffs an injunction serves the public interest by implementing the policy chosen by

Congress."). Weighed against Defendants' interests in implementing policies chosen by the voters

and in protecting Oregonians from gun violence, the minimal economic or practical burdens

Plaintiffs allegedly face from Measure 114 cannot carry the day. The balance of equites and public

interest weigh strongly against preliminarily enjoining Measure 114.

## IV.    CONCLUSION

The Alliance asks the Court to deny Plaintiffs' Motions for Preliminary Injunction.

DATED this 6th day of February, 2023.

PACIFICA LAW GROUP LLP

*s/ Jessica A. Skelton*

Jessica A. Skelton, OSB #102714
Zachary J. Pekelis, *Pro Hac Vice*
Kai A. Smith, *Pro Hac Vice*
W. Scott Ferron, *Pro Hac Vice*

*Attorneys for Intervenor-Defendant
Oregon Alliance for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February, 2023, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

DATED this 6th day of February, 2023.

_____
Erica Knerr