Jessica A. Skelton, OSB #102714
jessica.skelton@pacificalawgroup.com
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
206-245-1700

*Attorney for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM *(Lead Case)* |
| Plaintiffs, | Case No. 3:22-cv-01859-IM *(Trailing Case)* |
| v. | Case No. 3:22-cv-01862-IM *(Trailing Case)* |
| KATE BROWN, et al., | Case No. 3:22-cv-01869-IM *(Trailing Case)* |
| Defendants. | CONSOLIDATED CASES |
| MARK FITZ, et al., | DECLARATION OF ZACHARY J. PEKELIS IN SUPPORT OF OREGON ALLIANCE FOR GUN SAFETY'S RESPONSE TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| KATERINA B. EYRE, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |
| DANIEL AZZOPARDI, et al., | |
| Plaintiffs, | |
| v. | |
| ELLEN F. ROSENBLUM, et al., | |
| Defendants. | |

I, Zachary J. Pekelis, declare as follows:

1.      I am a partner at Pacifica Law Group LLP, and one of the attorneys representing Intervenor-Defendant Oregon Alliance for Gun Safety in these consolidated cases. I am over the age of eighteen, competent to testify, and make this declaration based on my personal knowledge.

2.      Attached as Exhibit A is a true and correct copy of the excerpted transcript of the deposition of Massad Ayoob, which was taken on January 16, 2023.

3.      Attached as Exhibit B is a true and correct copy of the excerpted transcript of volume I of the deposition of Stephen Helsley, which was taken on January 19, 2023.

4.      Attached as Exhibit C is a true and correct copy of the excerpted transcript of volume II of the deposition of Stephen Helsley, which was taken on January 30, 2023.

5.      Attached as Exhibit D is a true and correct copy of the excerpted transcript of the deposition of Gary Kleck, which was taken on January 20, 2023.

6.      Attached as Exhibit E is a true and correct copy of the excerpted transcript of the deposition of Ashley Hlebinsky, which was taken on January 20, 2023.

7.      Attached as Exhibit F is a true and correct copy of the excerpted transcript of the deposition of Clayton Cramer, which was taken on January 19, 2023.

8.      Attached as Exhibit G is a true and correct copy of a blog post marked as Deposition Exhibit 17 during the deposition of Clayton Cramer on January 19, 2023: Clayton Cramer, *A Major Victory in California*, Apr. 2, 2019, http://claytonecramer.blogspot.com/2019/04/a-major-victory-in-california.html.

9.      Attached as Exhibit H is a true and correct copy of the excerpted transcript of the deposition of Mark T. Hanish, which was taken on January 13, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 6th day of February, 2023 at Seattle, Washington.

Zachary J. Pekelis, *Pro Hac Vice*

**Pekelis Decl. p. 3**

## CERTIFICATE OF SERVICE

I hereby certify that on this  6th day of February, 2023, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

DATED this 6th day of February, 2023.

_____
Erica Knerr

# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

————————————————————————————————————

OREGON FIREARMS FEDERATION,      )
INC., et al.,                    )
                                 )
            Plaintiffs,          ) Case Nos.
                                 ) 2:22-cv-01815-IM
      v.                         ) 3:22-cv-01859-IM
                                 ) 3:22-cv-01862-IM
KATE BROWN, et al.,              ) 3:22-CV-01869-IM
                                 )
            Defendants.          )
——————————————————————————————  )
                                 )
                                 )
        (Continued)              )

————————————————————————————————————

* VIDEOCONFERENCE *

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF EXPERT

MASSAD F. AYOOB

————————————————————————————————————

Witness located in:

Live Oak, Florida


    * All participants appeared via videoconference *



DATE TAKEN:   January 16, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CCR 2798
                        Oregon # 22-0001

492877f8-20cf-4df5-986a-2e6907f00627

Page 109

1  BY MR. PEKELIS:

2      Q.  I'm sorry, I thought you were finished.

3      A.  Okay.

4          THE WITNESS:  Where did we leave off,

5  Ms. Reidt?

6          THE COURT REPORTER:  Only the law abiding

7  will obey...

8          THE WITNESS:  If only the law abiding will

9  obey it, and we know there was -- it's most unlikely

10 the criminals will obey it, we are hampering the

11 ability of the private citizen to fight back and defend

12 themselves with no good effect to balance it --

13 (inaudible Zoom audio.)

14          (Reporter clarification.)

15          THE WITNESS:  -- no good effect to balance

16 that on the other side that I can see.

17 BY MR. PEKELIS:

18     Q.  How many different incidents of defensive gun

19 use by civilians have you studied, analyzed, read

20 about, or otherwise learned of in the course of your

21 career?

22     A.  It's got to be in the thousands.  I've done a

23 couple hundred for the -- well, over 200 in the series

24 I mentioned, American Handgunner, but some of those are

25 police and even a few military.

492877f8-20cf-4df5-986a-2e6907f00627

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Massad F. Ayoob

Page 140

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Tia Reidt, a Certified Court Reporter in and

7    for the State of Washington, do hereby certify that the

8    foregoing transcript of the deposition of MASSAD F.

9    AYOOB, having been duly sworn, on January 16, 2023, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 23rd day of January, 2023.

14

15

16        _____

17        /S/ Tia B. Reidt
          Tia B. Reidt, RPR, CCR 22-0001
18        NOTARY PUBLIC, State of
          Washington.
19        My commission expires
          5/15/2026.

20

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Pekelis Decl. p. 8

492877f8-20cf-4df5-986a-2e6907f00627

# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

_____

OREGON FIREARMS FEDERATION,        )
INC., et al.,                      )
                                   )
            Plaintiffs,            )
                                   ) Case Nos.
      v.                           ) 2:22-cv-01815-IM
                                   ) 3:22-cv-01859-IM
KATE BROWN, et al.,                ) 3:22-cv-01862-IM
                                   ) 3:22-CV-01869-IM
            Defendants.            )
_____  )
                                   )
                                   )
        (Continued)                )
_____

* VIDEOCONFERENCE *

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF EXPERT

STEPHEN C. HELSLEY
_____

Witness located in:

El Dorado Hills, California


* All participants appeared via videoconference *


DATE TAKEN:   January 19, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                    Oregon #22-0001
_____

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 90

1    symbolism.

2         Q.   I appreciate you have a range of experience

3    and opinions on these issues.  It would be more

4    helpful, especially since it's late in the day, if

5    you'd try to confine your answer to the question that

6    I'm asking.

7              Is that okay?

8         A.   Yeah.  I thought -- I thought I did.

9         Q.   Well, I was asking just specifically about

10   restrictions on magazine size and whether you would

11   characterize yourself as strongly opposed to such

12   restrictions.

13        A.   Yes.

14        Q.   Thank you.

15             Have you lobbied -- in your capacity as an NRA

16   lobbyist, did you ever lobby against restrictions on

17   magazine size?

18        A.   I did.

19        Q.   Do you recall which bills or ordinances or

20   other regulations that you lobbied against specifically

21   with respect to magazine size?

22        A.   Yes.  The first -- the first one I mentioned

23   at the beginning of the day was Senator Roberti's bill.

24   I don't remember the bill number now, but it was

25   magazine-specific.

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 91

1          Later on, in '96 or so, it turned into an
2     assault weapon, quote/unquote, ban that was no ban, but
3     it had a magazine capacity component to it.  So I
4     lobbied against -- it was Senator Perata's bill.  It
5     had a series of bill numbers because it got defeated
6     and vetoed and so forth.  And I think it was Senate
7     Bill 23 that eventually was passed and signed by Davis.
8          So between Roberti and Perata, the bills that
9     they carried were the ones that I lobbied against.
10         Q.  And both of those bills involved restrictions
11    on magazine size?
12         A.  Yes.  Roberti's was magazine only, and
13    Perata's was magazine and firearms.
14         Q.  I realize it was many years ago, but could
15    you -- let me strike that.  I'll ask you a different
16    question first.
17         Just to clarify, so it was part of your job
18    duties as an NRA lobbyist to lobby against those two
19    pieces of legislation you just mentioned?
20         A.  Yes.  We opposed those bills.
21         Q.  Could you describe some of the efforts that
22    you made in opposing those bills?
23         A.  Well, again, with the magazine bill, the
24    Roberti bill, I would visit the folks in the assembly
25    in the senate and explain to them what the real-world

Pekelis Decl. p. 12

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                Stephen C. Helsley

Page 94

1          THE COURT REPORTER:  I'm sorry.  My Zoom
2    froze for a minute.
3          The last I heard was "thousands of NRA
4    members," and them my Zoom froze.  I'm sorry.
5          THE WITNESS:  I'm sorry.
6          We have hundreds of thousands of NRA members
7    in the state, and so we were trying to get the word out
8    to them as to the technical parts of the bill and how
9    they should approach their assemblymen or senator or
10   whoever it was.
11         We were lobbying law enforcement, too,
12   because, as a group, they don't know a whole lot more
13   than civilians do.  And so basically, everything we
14   were doing was education related.
15         Q.  I noticed you just used the term "We have
16   hundreds of thousands of NRA members."  Sometimes I
17   accidentally refer to my former law firm as "we."
18         Is that what you're doing there, kind of
19   expressing a continuing affinity for NRA even though
20   you're not strictly an employee anymore?
21         A.  Well, I joined the NRA in 1960.  I became a
22   benefactor member in 1993, a life member in '72.  I
23   still am one.  And so I am not -- I am not employed,
24   but I still believe in the cause.
25         Q.  What is a life member of the NRA?  I hear that

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 97

1    close.

2          Going back to Polanco, a reporter would come

3    to me and say, "Well, why are you opposed to a bill

4    about keeping guns from blowing up?"  And I said,

5    "Polanco's bill doesn't have anything in the bill about

6    guns blowing up.  Why don't you ask him?  He's

7    deceiving you.  He says this.  It's not true.  It's not

8    in his bill, but you won't take the time to read it.

9    You'll only ask me why I oppose it.  Well, it's not

10   there."

11         And so I readily admit -- I just admitted to

12   you -- I'm biased.  And if you don't believe what I say

13   about the Borchardt pistol, look it up.  It's there to

14   find.

15         Q.  In your analysis of historical sources, what

16   did you do to account for your own bias that you say

17   you're aware of?

18         A.  Account for my biases.  Well, there's -- it's

19   difficult, in a sense, because there's not a lot --

20   there aren't a lot of folks on the flip side to talk

21   to.  But I'm very much aware, for instance, that, you

22   know, I have a -- I have an interest, a passion, in the

23   issue of slavery.  And I know that it's a very complex

24   issue.  And I can read Document A and get this opinion

25   of things and read Document B and get an entirely

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 100

1   books that I work on:  What percentage of our guns were

2   going to the cape before it became South Africa and who

3   were our retailers there?  So my pay from Powell, if

4   you will, is information.

5       Q.  Would you agree that the work you do for Rigby

6   and Powell, while it has to do with historical events

7   or products, is not what most people in common parlance

8   would call a historian?

9       A.  Right.  They would call it an archivist.  Yes.

10      Q.  Yeah.

11      A.  And most people that I would hand such a card

12  to would have no idea what an archivist was.

13      Q.  Understood.

14          So you agree that, strictly speaking, the work

15  you do for Rigby and Powell is not what a history

16  scholar normally does?

17      A.  Well, a scholar, no.  Part of the problem is

18  that there aren't records, for the most part, for some

19  of the things that I do to go and find.  Because the

20  Powell books, for instance, most of them were

21  destroyed.  And so, yes, I can get a subscription to

22  the newspaper files on the web, but Powell didn't

23  advertise much.  And so it's been very difficult trying

24  to find information.

25          So I do what I can do, but it would never --

Pekelis Decl. p. 15

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 101

1   it would never reach the standard of, you know, a

2   true -- a true historian because the information is

3   just not there.

4        Q.   And also, in addition to it being more

5   archival in nature than historian research in nature,

6   it's very specialized.  It's limited to those two

7   companies rather than a broader inquiry into firearm

8   history generally -- now, in terms of your work for

9   those companies?

10       A.   Well, yes and no.  For instance, take South

11  Africa, for instance.  When Powell was thriving in

12  South Africa, those were the days of, you know, the

13  Zulu wars and the -- you know, all manner of things

14  going on with the -- I'm blanking out on the word

15  here -- the Boers.  "Boer" being a Dutch word for

16  "farmer."

17            And so the businesses that were selling guns

18  and importing guns had something to do with the social

19  conditions in the cape at that time.  So it's not just

20  the guns.  You know, the Dutch were there first, and

21  they used slaves to make guns.  And then the British

22  came, and the Dutch moved inland.  And that caused the

23  Zulus and everybody else to be mad.

24            And so it's not just as simple as guns.  You

25  can't avoid all manner of history at the same time.

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                        Stephen C. Helsley

Page 102

1    Q.   Understood.

2         I think Mr. Wilson asked you this already, but

3    I want to follow up.

4         Do you have any formal training or education

5    as a historian?

6    A.   No.

7    Q.   And do you have any articles published in

8    historical journals or purely historical publications?

9    A.   No.

10   Q.   So you'd agree that you don't have the typical

11   credentials of a historian; right?

12   A.   I do not.

13             MR. PEKELIS:  I think all my other

14   questions concern your report, and I think it's best

15   that we have clarification on what exactly what your

16   report is before I ask those.

17        So with the same caveat that we reserve the

18   right to keep this deposition open, I don't have any

19   further questions today.

20             THE WITNESS:  Okay.

21             MR. WILLIAMSON:  I have three quick

22   follow-up questions.

23        Can we do those and adjourn?

24             THE WITNESS:  Do I have any?

25             MR. WILLIAMSON:  No.  I have three

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 106

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Tia Reidt, a Certified Court Reporter in and

7    for the State of Washington, do hereby certify that the

8    foregoing transcript of the deposition of STEPHEN C.

9    HELSLEY, having been duly sworn, on January 19, 2023, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 26th day of January, 2023.

14

15

16        _____

17        /S/ Tia B. Reidt
          Tia B. Reidt, RPR, CSR Oregon #22-0001
18        NOTARY PUBLIC, State of
          Washington.
19        My commission expires
          5/15/2026.

20

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

2d2d2168-0c87-408d-8a37-17183014be83

# EXHIBIT C

Page 107

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

_____

| | | |
|---|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case Nos. 2:22-cv-01815-IM |
| vs. | ) ) | 3:22-cv-01859-IM 3:22-cv-01862-IM |
| KATE BROWN, et al., | ) ) | 3:22-cv-01869-IM |
| Defendants. | ) ) | |

_____

| | | |
|---|---|---|
| MARK FITZ, et al., | ) ) | VIDEO-RECORDED VIDEOCONFERENCE |
| Plaintiffs, | ) ) ) | DEPOSITION OF STEPHEN HELSLEY, |
| vs. | ) ) | VOLUME II |
| ELLEN F. ROSENBLUM, et al., | ) ) | |
| Defendants. | ) ) | |

_____

| | | |
|---|---|---|
| KATERINA B. EYRE, et al., | ) ) ) | *CAPTION CONTINUES* |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| ELLEN F. ROSENBLUM, et al., | ) ) | |
| Defendants. | ) | |

_____

DATE TAKEN:   JANUARY 30, 2023

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

eca924fc-a9ca-4c74-bbda-8156300a7993

Page 136

1    and I think you're referring now to the second full

2    paragraph on that page, which reads, "Rifles with fixed

3    magazines holding 15 rounds were widely used in the

4    American Civil War.  During that same period, revolvers

5    with a capacity of 20 rounds were available but enjoyed

6    limited popularity because they were so ungainly."

7          Do you see that?

8    A.   Yes.

9    Q.   Okay.  So what is the source for your

10   assertion that 15-round fixed magazine rifles were

11   widely used in the American Civil War?

12   A.   Well, the manner in which National Guard units

13   were formed and most of the -- as I understand it, most

14   of the units in the Civil War were drawn from the

15   National Guards of the state.  They could choose the

16   weapon they wanted to use.

17          And in many cases -- I shouldn't say many

18   cases.  In some cases they decided to use a

19   lever-action Henry rifle that had a tubular magazine

20   that held 15 rounds.  And they were simply used in the

21   Civil War.

22   Q.   Understood.  My question is, what source are

23   you relying on for the assertion that those 15-round

24   rifles were widely used in the American Civil War?

25   A.   Simply I've read about them again and again in

eca924fc-a9ca-4c74-bbda-8156300a7993

Page 137

1   various documents, books, handled the firearms, talked

2   to collectors, read information on the Civil War.  I

3   couldn't give you a specific time and place because

4   it's something that I've known or considered for

5   50 years.

6          Q.  Okay.  So you can't give me a specific

7   document that supports that assertion?

8          A.  Well, I suppose I could go find one, but I

9   didn't provide one.

10         Q.  Thank you.  Let's go to the preceding

11  paragraph starting with "Firearms with a capacity..."

12  Do you see that?

13         A.  Uh-huh, I do.

14         Q.  Okay.  So you write, "Firearms with a capacity

15  exceeding 10 rounds date to the 'dawn of firearms.'  In

16  the late 15th Century, Leonardo Da Vinci designed a

17  33-shot weapon."

18             Do you see that?

19         A.  Yes.

20         Q.  What's your source for that assertion about

21  Leonardo?

22         A.  Well, again, that appears in a lot of books.

23  If I had to guess, I would just say that the Robert

24  Held book, The Age of Firearms, is probably -- if I had

25  to go find the source, that's where I would go to look.

eca924fc-a9ca-4c74-bbda-8156300a7993

Page 138

1    But --

2         Q.  Do you know -- go ahead.

3         A.  I'm sorry.

4         Q.  Please finish.

5         A.  Go ahead.

6         Q.  Do you know whether this 33-shot weapon

7    designed by Leonardo was ever built?

8         A.  I do not.  I know that there were similar

9    types of multi-shot weapons that were built, but

10   whether -- I can't recall if Da Vinci ever built one.

11        Q.  Okay.  Let's go to the next sentence.  "In the

12   late 17th Century, Michele Lorenzoni designed a

13   practical repeating flintlock rifle.  A modified 18th

14   Century version of Lorenzoni's design, with a 12-shot

15   capacity, is displayed at the NRA's National Firearms

16   Museum."

17             Do you see that?

18        A.  Yes.

19        Q.  Do you know what level of popularity the

20   Lorenzoni repeating flintlock rifle achieved in the

21   17th Century or the 18th Century?

22        A.  No.  I assume -- no, I don't.

23        Q.  Do you believe that it was widely owned or

24   used in the United States?

25        A.  I assume that it was very expensive and thus

Page 139

1    was not widely used.

2         Q.  Do you know whether there were any Lorenzoni

3    rifles known in the United States in the 18th Century

4    or before the 18th Century other than the Lewis and

5    Clark Lorenzoni rifle?

6         A.  Well, no, Lewis and Clark didn't have a

7    Lorenzoni.

8         Q.  You're right.  Excuse me.  You're right.  I'll

9    strike that question.  Okay.  Let's move on.

10         Let's go to the sources that you do cite in

11    your expert report, and this appears on page 21 of 114

12    under the references section.  So these are the four

13    sources that you're citing in your expert report,

14    correct?

15         A.  Yes.

16         Q.  And they are Silvio Calabi, Steve Helsley, and

17    Roger Sanger, The Gun Book for Boys; the U.S.

18    Department of Justice, Bureau of Alcohol, Tobacco,

19    Firearms & Explosives Report from 2012; the

20    Congressional Medal of Honor, The Names, The Deeds,

21    from 1984; and something called Jamie Frater, Top 10

22    Most Audacious Shootouts in US History; is that right?

23         A.  Yes.

24         Q.  And you cite only those four sources here?

25         A.  Correct.

eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                Stephen Helsley - Vol. II

Page 155

1    rounds as possible in as short a time as possible,

2    would you select a ten-round magazine or a magazine

3    with a larger capacity?

4         A.  Say that again.

5         Q.  If your goal were to fire as many rounds as

6    possible in as short a time as possible, would you

7    select a ten-round magazine or a larger capacity

8    magazine?

9         A.  Is this shooting just to shoot or is this a

10   combat situation?

11        Q.  Does your answer depend on whether it's

12   shooting just to shoot or whether it's a combat

13   situation?

14        A.  Well, to shoot as fast as you can as many

15   rounds as you can, you would want fewer magazine

16   changes.  And so if I was going to try to shoot 100

17   rounds, say, that would require, I don't know, seven --

18   six full Glock magazines as opposed to a lot more for a

19   seven-round capacity firearm.

20            So I would opt for higher capacity if I was --

21   if the objective was to fire as many rounds as fast as

22   I could, I would opt for a higher capacity magazine.

23        Q.  Thank you.  How long does it take to change a

24   magazine, in your experience?

25        A.  Well, it depends on how well you're trained,

eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 168

1                    REPORTER'S CERTIFICATE

2

3        I, LORRIE R. CHINN, the undersigned Certified Court
Reporter, pursuant to RCW 5.28.010 authorized to administer
4    oaths and affirmations in and for the State of Washington, do
hereby certify:

5
         That the sworn testimony and/or remote proceedings, a
6    transcript of which is attached, was given before me at the
time and place stated therein; that any and/or all witness(es)
7    were duly sworn remotely to testify to the truth; that the
sworn testimony and/or remote proceedings were by me
8    stenographically recorded and transcribed under my
supervision, to the best of my ability; that the foregoing
9    transcript contains a full, true, and accurate record of all
the sworn testimony and/or remote proceedings given and
10   occurring at the time and place stated in the transcript; that
a review of which was requested; that I am in no way related
11   to any party to the matter, nor to any counsel, nor do I have
any financial interest in the event of the cause.

12
         Reading and signing was not requested pursuant to
13   FRCP Rule 30(e).

14       WITNESS MY HAND AND DIGITAL SIGNATURE this 3rd day of
February, 2023.

15

16

17

18   LORRIE R. CHINN, RPR, CCR
Washington State Certified Court Reporter No. 1902
19   Oregon State Certified Court Reporter No. 97-0337
lorrie@buellrealtime.com

20

21

22

23

24

25

Pekelis Decl. p. 26

eca924fc-a9ca-4c74-bbda-8156300a7993

# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

_____

OREGON FIREARMS FEDERATION,      )
INC., et al.,                    )
                                 )
              Plaintiffs,        )
                                 ) Case No.
     v.                          ) 2:22-cv-01815-IM
                                 ) 3:22-cv-01859-IM
KATE BROWN, et al.,              ) 3:22-cv-01862-IM
                                 ) 3:22-cv-01869-IM
              Defendants.        )
_____  )
                                 )
                                 )
         (Continued)             )
_____


              * VIDEOCONFERENCE *
    VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
                 OF EXPERT
               GARY D. KLECK
_____


              Witness located in:

            Tallahassee, Florida


    * All participants appeared via videoconference *




DATE TAKEN:   January 25, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                    Oregon #22-0001

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Gary D. Kleck

Page 45

1  will get that marked.

2                    MR. WILLIAMSON:  How large a file is that?

3                    (Exhibit 39 marked for identification.)

4                    THE COURT REPORTER:  Exhibit 39 has been

5  marked.

6                    MR. WILLIAMSON:  I'm sorry.

7            How large a file is that?  Because it's not

8  come through on my end yet.

9                    MR. MARSHALL:  Less than a megabyte.

10                    MR. WILLIAMSON:  Okay.  Thank you.

11            It just popped up.

12  BY MR. MARSHALL:

13       Q.  Exhibit 39 is a three-page document that is an

14  article in The Morning Call.

15       A.  I don't have it yet.  It's -- I think it's --

16  it takes, like, an additional minute beyond when

17  everybody else is getting it, so I'm sure it'll come

18  through.

19            Still don't have it.

20                    MR. MARSHALL:  Okay.

21            I need to take a break anyway.  I will send

22  Exhibit 40 as well.

23            Maybe we resume in -- well, let's go off the

24  record.

25                    THE VIDEOGRAPHER:  Going off the record.

3fe9a52f-5c47-40f5-80d9-0afed9abd05b

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Gary D. Kleck

Page 46

1          The time now is approximately 10:46 a.m.

2               (Pause in the proceedings.)

3               THE VIDEOGRAPHER:  Back on the record.

4          The time now is approximately 10:57 a.m.

5     BY MR. MARSHALL:

6          Q.  Professor Kleck, during the break, did you

7     review Exhibit 39?

8          A.  Yeah, but I've just -- I think I've lost it

9     somewhere.  Let me -- let me get back to it.

10              Now I can't get it to open up again.

11              Oh, there it is.  There it is.

12              Okay.  I got it.

13         Q.  In the second paragraph of page 3, that

14    sentence ends "with multiple rounds fired and multiple

15    high-capacity magazines found at the school."  Would

16    you agree that that is a reference to high-capacity

17    magazines being used in a shooting where more than four

18    -- four or more people died?

19         A.  Only that it's possible.  They didn't specify

20    the number of rounds, and so about all you know is that

21    in the opinion of somebody or other, the police or

22    reporters, it was high capacity.  But for all we know,

23    it's eight or nine or ten rounds, rather than something

24    over ten.  So we don't really know in this case.

25         Q.  This incident is not included in the Violence

3fe9a52f-5c47-40f5-80d9-0afed9abd05b

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                Gary D. Kleck

Page 47

1    Policy Center list; correct?

2         A.   Yeah.   Probably because it's not clear that it

3    is a large-capacity magazine that was involved.

4         Q.   Even though it says "large-capacity magazine"?

5         A.   It's what they call high-capacity, but it's

6    not more than ten rounds, so -- if they had said it was

7    30 rounds or 20 rounds or even 11 rounds, there'd be a

8    basis for saying it's a large-capacity magazine,

9    according to the VPC definition.   And my definition.

10   But they didn't say that.

11              MR. MARSHALL:   Well, let's mark as

12   Exhibit 40 a four-page document that is an article from

13   The Denver Post.

14              (Exhibit 40 marked for identification.)

15              THE COURT REPORTER:   Exhibit 40 has been

16   marked.

17              THE WITNESS:   I've got it, but it's taking

18   a while to open up.

19         There it is.   Got it.

20   BY MR. MARSHALL:

21         Q.   On the bottom of page 2, the final paragraph

22   says "Police found 17 bullet casings in the mobile home

23   and a semiautomatic pistol near the suspect, as well as

24   two 15-round magazines."

25              Do you agree this is an instance of a mass

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Gary D. Kleck

Page 48

1    shooting --

2         A.   Yes.

3         Q.   -- involve- --

4              That instance is not in the VPC data; correct?

5         A.   Let me see.

6              What exhibit was it, the VPC document?   What

7    exhibit number?

8         Q.   Let's look at Exhibit 38.   And this incident

9    happened in May, 2021.   That date is reflected on -- or

10   that month is reported on the bottom of page 2 of

11   Exhibit 38.

12        A.   Okay.

13             What page was that?

14        Q.   Page 2 of Exhibit 38.   The second to last line

15   has a May, 2021 date, and this is a May, 2021 incident.

16   And I do not see a Colorado Springs incident there.

17        A.   I don't know.   Somehow I can't get back to

18   that VPC document.   Let me --

19        Q.   Okay.

20        A.   Let me work on it for --

21        Q.   We'll have Mr. Young put it on the screen for

22   you.

23             MR. MARSHALL:   Can we put up Exhibit 38,

24   page 2?

25             THE VIDEOGRAPHER:   Yes.   Just a second.

3fe9a52f-5c47-40f5-80d9-0afed9abd05b

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Gary D. Kleck

Page 49

1          THE WITNESS:  Okay.  I got it.

2    BY MR. MARSHALL:

3          Q.  Let's scroll down to the bottom of page 2 of

4    Exhibit 38.

5              You see that there's an incident listed in the

6    Violence Policy Center database, which is -- Violence

7    Policy Center document, which is in date order for May,

8    2021?

9          A.  Right.

10         Q.  You agree that the Colorado Springs incident

11    is not listed in the Violence Policy Center dataset?

12         A.  Yes, they missed one.

13              MR. MARSHALL:  Let's pull this exhibit

14    down.

15    BY MR. MARSHALL:

16         Q.  You agree, Professor Kleck, that the data

17    support the conclusion that more people are killed in

18    mass shooting incidents when a large-capacity magazine

19    is used?

20         A.  Yes.  But not necessarily because of

21    large-capacity magazine use.

22         Q.  You agree there's a correlation?

23         A.  Yes.

24         Q.  You disagree that there is causation?

25         A.  I disagree that there's -- causation has been

Pekelis Decl. p. 33

3fe9a52f-5c47-40f5-80d9-0afed9abd05b

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Gary D. Kleck

                                                                              Page 151

1                    C E R T I F I C A T E

2

3     STATE OF WASHINGTON

4     COUNTY OF PIERCE

5

6          I, Tia Reidt, a Certified Court Reporter in and

7     for the State of Washington, do hereby certify that the

8     foregoing transcript of the deposition of GARY D. KLECK,

9     having been duly sworn, on January 25, 2023, is true and

10    accurate to the best of my knowledge, skill and ability.

11         Reading and signing was requested pursuant to

12    FRCP Rule 30(e).

13         IN WITNESS WHEREOF, I have hereunto set my hand

14    and seal this 1st day of February, 2023.

15

16

17

18    _____

19                           /S/ Tia B. Reidt
                             Tia B. Reidt, RPR, CSR #22-0001
20                           NOTARY PUBLIC, State of
                             Washington.
21                           My commission expires
                             5/15/2026.

22

23

24

25

3fe9a52f-5c47-40f5-80d9-0afed9abd05b

# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

---

OREGON FIREARMS FEDERATION,      )
INC., et al.,                    )
                                 )
          Plaintiffs,            )   Case Nos.
                                 )   2:22-cv-01815-IM
     vs.                         )   3:22-cv-01859-IM
                                 )   3:22-cv-01862-IM
KATE BROWN, et al.,              )   3:22-cv-01869-IM
                                 )
          Defendants.            )
_____ )
MARK FITZ, et al.,               )   VIDEO-RECORDED
                                 )   VIDEOCONFERENCE
          Plaintiffs,            )   DEPOSITION OF
                                 )   ASHLEY HLEBINSKY
     vs.                         )
                                 )
ELLEN F. ROSENBLUM, et al.,      )
                                 )
          Defendants.            )   *CAPTION
_____ )    CONTINUES*
KATERINA B. EYRE, et al.,        )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )
                                 )
ELLEN F. ROSENBLUM, et al.,      )
                                 )
          Defendants.            )
_____

DATE TAKEN:  JANUARY 20, 2023

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Ashley Hlebinsky

Page 27

1    member of the NRA?

2        A.   I paid a life membership years ago, so I've

3    not given any money since then.

4        Q.   Okay.  Do you know about when that was?

5        A.   Oh, goodness, maybe five years ago, maybe six.

6        Q.   So when you say you paid a life membership,

7    does that just mean that you paid one sum and that gets

8    you a membership for life?

9        A.   Correct.

10       Q.   Have you been featured on an NRA website?

11       A.   Yes.  Right at the beginning of my career,

12   they did an article about me.  Ironically I wasn't an

13   NRA member.  And then recently I think NRA Women did an

14   interview with me.

15       Q.   Are you a member of any other Second Amendment

16   advocacy organizations?

17       A.   I don't think so.  I don't think so.  I'm

18   trying to think.  The museum held certain memberships,

19   but then I didn't pay for them myself.

20       Q.   Do you have a personal opinion on whether

21   permit requirements to purchase a firearm are effective

22   at reducing firearm injuries?

23       A.   Well, I don't give my personal opinion on many

24   things as it's irrelevant to what I've been asked to

25   do.  You know, my job is to give you history, and then

Page 92

1      Q.   And when you say clients, you mean your

2  consulting clients?

3      A.   Correct.

4      Q.   And are you including expert testimony as part

5  of that, or would that be a separate category in your

6  mind?

7      A.   It would include that.  Although, I'm not sure

8  if I was doing any in 2020.

9      Q.   Since leaving Cody, would you say more income

10 that you've earned has come from scholarly work or

11 expert testimony?

12     A.   More from museum work, which I consider

13 scholarly, but...

14     Q.   Let me clarify.  When I say scholarly work, I

15 mean written submissions, written publications.

16     A.   For academic journals, no.

17     Q.   Correct.

18     A.   However for popular magazines, I do write for

19 popular magazines, but I wouldn't say it's the bulk of

20 my income.  It doesn't pay very well.

21     Q.   So expert testimony would be more than any

22 writing or any scholarly work that you've done?

23     A.   It depends on the year.  I go long periods of

24 time without doing it, so I would just have to look at

25 the year to be honest.

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 93

1    Q.   Since leaving Cody?

2    A.   Like I said, the expert testimony goes in

3  waves, so I have to look at how much I was actually

4  making on expert testimony versus writing.  Because of

5  my schedule with museums, I haven't written as much in

6  the past six months.  But I was writing a lot for about

7  a year there.

8    Q.   Do you have any equity interests or other

9  financial stakes in any firearms industry companies?

10    A.   No.

11    Q.   You're married to another expert witness for

12  Plaintiffs in this case, are you not?

13    A.   I am.

14    Q.   And that's Mr. Hamish?

15    A.   Hanish, yeah.

16    Q.   Hanish.  And Mr. Hanish testified earlier in

17  this case that he holds 600,000 shares in Ammo, Inc.?

18    A.   Oh, sorry.  I don't -- we never commingled our

19  bank accounts, so I always don't think about it that

20  way.  But, yes, he has that, but I've never had

21  anything to do with any of that.

22    Q.   Is that his separate property, or would that

23  be community property?

24    A.   It would be community property.  I just didn't

25  think about it like that.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                          Ashley Hlebinsky

Page 94

1    Q.   Understood.   You and Mr. Hanish are business
2  partners, correct?
3    A.   You could say that.   I mean, he really
4  hasn't -- I added his name to the consulting business
5  when I founded it in the state of Arizona because I
6  knew at some point he would want to be doing
7  consulting.   But he hasn't really -- I mean, until
8  recently he hasn't utilized that at all.   I put it
9  there because I knew at some point, so I put his name,
10 but he hasn't really done anything until recently.
11   Q.   And you're referring to The Gun Code, your
12 consulting company?
13   A.   Correct.
14   Q.   But you advertise it as kind of a husband/wife
15 duo of a consulting company, right?
16   A.   Yes.   I put that on the website.
17   Q.   And you also advertise your services as an
18 expert witness on your website, right?
19   A.   I do.
20   Q.   You don't advertise your services as a history
21 scholar, though, on the website, do you?
22   A.   No.   To be honest, the website is just
23 something that's there.   Most of my work comes through
24 word of mouth.   So I put it up, but I will admit that I
25 did not really spend a lot of time doing that.

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 100

1    There's a big gun collector segment to that show, so

2    it's a lot of gun collectors, a lot of gun history

3    focused people are there.  So it's a good opportunity

4    to be able to go and see the historic firearms.

5         Q.  Any other NRA events that you've attended?

6         A.  Possibly, sure, maybe events within those

7    trade shows, possibly a few luncheons as a speaker.

8    But I can't -- I don't want to say no, but I also can't

9    think of anything other than really the trade shows.

10        Q.  That's fine.  Have you ever received any

11   compensation or remuneration from the NRA?

12        A.  No.

13        Q.  You've appeared on Gun Freedom Radio before?

14        A.  Yes.

15        Q.  What is that?

16        A.  It's a radio show that's -- radio show that's

17   local to Arizona.

18        Q.  And what's the subject matter of the show?

19        A.  They talk about all things firearms.  Anytime

20   I'm there I just talk about firearms history, but they

21   cover a range of topics.

22        Q.  And last year you were a featured speaker at

23   Gun Freedom Radio's Celebrate and Protect the Second

24   Amendment Rally at the Arizona State Capitol?

25        A.  Correct.

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 116

1    also try to cross-reference it with people that I know
2    outside the community that have differing opinions.
3           And so I recognize that I've worked with
4    firearms.  I recognize that I've shot firearms.  I
5    recognize that obviously you're influenced by things
6    that you know, hear, people who are scholars and not
7    scholars that have, you know, opinions and research.
8    But I also try to always counteract it with very hard.
9    I've always maintained relationships across the board.
10          But, I mean, obviously it's -- you learn in
11   grad school 101 that obviously completely -- you know,
12   being unbiased is not completely possible.  But as long
13   as you're weighing in all of the different components,
14   you can get yourself as close as possible.
15         Q.   Understood.  I believe you testified earlier
16   that you do consider yourself part of the broader guns
17   community?
18         A.   Yeah, I guess so.  Being a gun owner, I know
19   that I'm also critical sometimes of components of the
20   gun community, as well -- you know, I don't -- just
21   because I own guns doesn't mean I agree with everything
22   those goes on in various segments of the community.
23         Q.   Do you think that to some extent you are
24   siloed within that community such that it might affect
25   the opinions you reach in this work?

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 132

1    resources that have summaries of the laws.  But I do

2    think I searched repeating when I was doing that, but I

3    was also trying to be creative to make sure that I was

4    covering other firearms-based verbiage that they could

5    have used.

6         Q.  Did you examine the prevalence of repeaters or

7    magazine-fed repeaters among civilians in the Founding

8    Era?  I think I asked you that already.

9         A.  The prevalence of it, no, not comprehensively.

10   But of the ones I mentioned I do reference that they're

11   one-offs or if they've been made.

12        Q.  So just as kind of a common sense matter,

13   might the lack of widespread existence of those

14   technologies be a reason why you didn't find laws

15   mentioning them?

16        A.  Not necessarily.  Because in terms of

17   repeating, possibly.  But in terms of regulations on

18   specific firearms, I mean, there were many firearms

19   around there, and I didn't necessarily find through my

20   searching things about firearms features in the

21   timeframe either.  It's more focused, like I said, on

22   groups.

23            And then there are some other categories of

24   things that are more with, you know, gunsmith

25   relationships that I saw a few on on stamping and that

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 135

1    the American Civil War."

2         Do you see that, right?

3    A.   I do.

4    Q.   Okay.  And the source you're citing there is

5    Eckwall?

6    A.   Correct.

7    Q.   And that's the only source for that assertion

8    there?

9    A.   Just for that summary he had a good succinct

10   listing of that, but it would reflect that as well in

11   Duke.  I just knew that that was a good kind of

12   succinct area, so that's why I footnoted that instead

13   of footnoting a lot of other areas.

14   Q.   Did you try to compare the number of racially

15   restrictive firearm laws with race neutral firearm laws

16   in the 19th century?

17   A.   I did not do a full comparison like that, no.

18   Q.   Okay.  Paragraph 39, the next paragraph,

19   starts as follows:  "During this period in between

20   ratifications of the Second and the Fourteenth

21   Amendments, some laws emerged restricting carry by any

22   person."

23        Did you conduct a comprehensive survey of 19th

24   century laws restricting carry by any person?

25   A.   No.  I also -- although, I did not reference

Page 136

1    it in this, Randolph Roth's declaration in a few cases

2    talks about this pretty extensively.  I probably could

3    have cited him on that, but that was one of the other

4    places that I looked.

5        Q.  Would you say you relied on Mr. Roth's

6    declaration?

7        A.  No.  I just knew it had good information in it

8    on some of the cases, so that was one of other places

9    where I did -- in addition to the websites and David

10   Yamane's scholarship -- and I believed -- well, for

11   that I didn't really look at the Johnson series as

12   much, but I took it from several other places just to

13   kind of confirm what I had seen.

14       Q.  So your testimony is that Rolfe's dec -- or,

15   excuse me, Roth's declaration has some of this material

16   in it, but you didn't rely on it for creating your

17   declaration in this case?

18       A.  I mean, I utilized it, but I wouldn't say I

19   relied on it.

20       Q.  What's the difference?

21       A.  Utilizing it would be taking his research and

22   seeing validity in it based on an evaluation and then

23   also putting it in here, but I wouldn't say it's the

24   only thing I looked at.

25       Q.  I don't mean rely as like that's the only

Page 140

1  transition of that and having defense -- let me

2  rephrase it.  So it's a part of that transition of

3  race-based laws to not using that terminology anymore,

4  but then it's also a little bit on citizenship and

5  applying Second Amendment to African Americans once

6  they received their citizenship.

7      Q.  So in terms of the 1860s era, did you conduct

8  any kind of survey or comprehensive examination of

9  state laws or local laws regulating firearms in that

10 period?

11     A.  In the 1860s in terms of before and after?

12     Q.  Yes.

13     A.  I've looked into it a lot, but a comprehensive

14 survey of every single one, no.

15     Q.  And you didn't do that for the purposes of

16 your declaration here?

17     A.  Correct.  A lot of it was based on work that

18 we had done when we were doing the timeline in Cody

19 then a little bit of extra research for this.

20     Q.  Okay.  In paragraph 42, I guess, the primary

21 subject is the Colfax Massacre.  Again, kind of what

22 was your main point in your discussion of the Colfax

23 Massacre here?

24     A.  I think it was a couple of things.  I'm just

25 rereading it here.  I know one point was about the

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 141

1   argument that the government could protect you from

2   violence towards a specific race after the Civil Rights

3   Act, after the Freedmen's Bureau Act, after the

4   Fourteenth Amendment with the Enforcement Act.

5          So there's the component of -- there's a

6   component of this argument that the government was able

7   to protect you, that you didn't necessarily need to

8   protect yourself and that failing within the Colfax

9   Massacre and then the Supreme Courts kind of

10  overturning of the effectiveness of the Enforcement

11  Act.

12         So that was one component of it.  It was also

13  a component of the use of firearms for violent terms

14  against a certain group of people and the need for that

15  certain group of people to have more proficient

16  firearms or, you know, advanced firearms in order to

17  protect themselves.

18     Q.  Okay.  So this doesn't really relate to the

19  kind of purpose you set out at the beginning of your

20  declaration to identify historical firearms laws that

21  may be analogous to modern LCM restrictions?

22     A.  That's correct.  It was more of a context, but

23  you are correct in that.

24     Q.  Okay.  And, again, you didn't do a survey of

25  state laws regulating firearms in the 1870s either,

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                 Ashley Hlebinsky

Page 142

1    right?

2         A.   No, not a full survey.

3         Q.   So paragraph 43, so this paragraph is

4    basically about -- this jumps back in time to the 1850s

5    to the kind of Bleeding Kansas Era, if my Civil War

6    history comes back to me.  Is that right?

7         A.   That is correct.

8         Q.   So what point were you trying to convey in

9    discussing Bleeding Kansas and the Caning of Charles

10   Sumner and those kind of college history survey type

11   events?

12        A.   Yeah.  What was the page again?  Sorry.

13        Q.   Sorry.  It's page 32.

14        A.   Okay.

15        Q.   It starts on 31 at the very last line and then

16   goes on to 32.

17        A.   Okay.  Perfect.  Sorry.  Double-sided,

18   sometimes I get the wrong page in the wrong spot.  I

19   think it was still to kind of communicate -- and this

20   was partially towards when I did respond, it was

21   looking directly at Mr. Vor -- or Dr. Vorenberg's

22   testimony on a previous case.

23             As I mentioned, this is a modification of

24   several other testimonies.  And so this was more of a

25   conversation about the availability of superior

Page 143

1    firearms technology and the constitutionality of that.

2    So it's not per se in looking at the analogous

3    comparison, but it was kind of just an overarching look

4    at that timeframe in terms of firearms and defense and

5    what people could and could not access.

6         Q.   I see.  So is this a kind of holdover from an

7    earlier iteration of this declaration in another case

8    that was responsive to an expert declaration submitted

9    in that case?

10        A.   Yes.  A lot of that was specific to that.

11        Q.   Got it.  Okay.  So same question, it isn't

12   really relevant to the analogy question that Bruen

13   prompts, right?

14        A.   No, not necessarily.

15        Q.   And then finally -- well, I guess actually

16   there are two final -- you discuss the Wounded Knee

17   Massacre, right?  This is lower in the same paragraph

18   43.

19        A.   Yes.

20        Q.   And is this also responsive to Vorenberg's

21   declaration from the other case?

22        A.   So it was -- I mean, it's not a direct

23   response or else I would have had him cited.  It was

24   more trying to provide more context of things that we

25   were talking about.  I added that in because it was

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 144

1    thematic to the conversation of protecting yourself

2    with firearms and the availability of those firearms in

3    the time period.  So it was just an additional example.

4         Q.  Okay.  So this isn't part of a search for

5    analogous historical firearms laws, is it?

6         A.  No, not necessarily.

7         Q.  Okay.  And, again, you didn't conduct a survey

8    of potentially analogous historical firearms laws later

9    into the 19th century, in the 1870s, 1880s, or 1890s,

10   did you?

11        A.  No, no.  Some spot-checking within the Duke

12   system, but, no, I did not go that far.

13        Q.  Okay.  Finally, paragraph 44, this is about

14   private vigilantism, particularly in the South.  So is

15   this part and parcel of kind of the same discussion,

16   partly responsive to Vorenberg, carryover from another

17   case's declaration?

18        A.  Correct.  When I was hired for this, it was to

19   take this report and just modify it.  So there are some

20   hangover -- holdovers, sorry, from that.

21        Q.  Understood.  So I just have to ask the same

22   question again.  This isn't really relevant to

23   analogizing historical firearms laws with modern LCM

24   restrictions, is it?

25        A.  No.

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 151

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, LORRIE R. CHINN, the undersigned Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
 4   oaths and affirmations in and for the State of Washington, do
     hereby certify:
 5
          That the sworn testimony and/or remote proceedings, a
 6   transcript of which is attached, was given before me at the
     time and place stated therein; that any and/or all witness(es)
 7   were duly sworn remotely to testify to the truth; that the
     sworn testimony and/or remote proceedings were by me
 8   stenographically recorded and transcribed under my
     supervision, to the best of my ability; that the foregoing
 9   transcript contains a full, true, and accurate record of all
     the sworn testimony and/or remote proceedings given and
10   occurring at the time and place stated in the transcript; that
     a review of which was requested; that I am in no way related
11   to any party to the matter, nor to any counsel, nor do I have
     any financial interest in the event of the cause.
12
     Reading and signing was not requested pursuant to FRCP
13   Rule 30(e).

14        WITNESS MY HAND AND DIGITAL SIGNATURE this 26th day
     of January, 2023.
15

16

17

18   LORRIE R. CHINN, RPR, CCR
     Washington State Certified Court Reporter No. 1902
19   Oregon State Certified Court Reporter No. 97-0337
     lorrie@buellrealtime.com
20

21

22

23

24

25
```

Pekelis Decl. p. 51

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

# EXHIBIT F

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

_____

OREGON FIREARMS FEDERATION,      )
INC., et al.,                    )
                                 )
            Plaintiffs,          )
                                 ) Case Nos.
      v.                         ) 2:22-cv-01815-IM
                                 ) 3:22-cv-01859-IM
KATE BROWN, et al.,              ) 3:22-cv-01862-IM
                                 ) 3:22-CV-01869-IM
            Defendants.          )
_____ )
                                 )
                                 )
            (Continued)          )
_____

* VIDEOCONFERENCE *
VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF EXPERT
CLAYTON CRAMER
_____

Witness located in:

Middleton, Idaho


* All participants appeared via videoconference *



DATE TAKEN:  January 19, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                   Oregon #22-0001

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 17

1    at, Mr. Cramer?

2         A.  Yes, I am.

3         Q.  Okay.

4         A.  This particular declaration was originally

5    created for a case in California.  And I handed it to

6    Mr. Williamson, and he indicated that the defendants

7    were making the same claim, essentially, about the

8    impact of firearms technological advancement.

9         Q.  Okay.

10            So that actually clears up the question I was

11   going to ask, which is that the defendant referred to

12   there is the defendant in the California action?

13        A.  Yes.

14        Q.  And the court order there is -- okay.  Thank

15   you.  I wanted to make certain that it was clear that

16   those were referring to the California actions.

17            And then you stated in there that there's a

18   claim being made.  Is it also fair to assume that that

19   claim that you lay out there, where it says from the

20   claim and then it cites to it, that that is a claim

21   that was in the California action?

22        A.  Yes, it was.

23        Q.  Okay.

24            And do you know whether or not that claim is

25   raised here?

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 18

1        A.  From emails back and forth from

2    Mr. Williamson, he indicated that the defendants were

3    making essentially the same claim.

4        Q.  Okay.

5            So your understanding of the claims the

6    defendants are making here is based on conversations

7    that you've had with him?

8        A.  Yes.

9        Q.  Okay.

10           So if you could go down to the very last

11   sentence of that paragraph, and it starts with -- it

12   says "Even without Large Capacity Magazines..." and

13   then --

14               (Reporter requests to please read slowly

15   when reading.)

16               MS. DAWSON:  Yes.  I will do that.

17   BY MS. DAWSON:

18       Q.  So last sentence of that paragraph you state

19   "Even without Large Capacity Magazines..." and then

20   in -- the parentheses it says "...( LCMs) mass murder

21   was common and often individual in nature."

22           Do you see that?

23       A.  Yes.

24       Q.  Okay.

25           What time period are you describing with that

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 105

1          THE VIDEOGRAPHER:  We are back on the

2  record.

3          The time is 11:51 a.m.

4

5                     EXAMINATION

6  BY MR. PEKELIS:

7      Q.  Good morning, Mr. Cramer.  My name is Zach

8  Pekelis, and I represent Intervenor-Defendant Oregon

9  Alliance for Gun Safety in this matter.

10         I just have a few questions for you.

11         To pick up on Ms. Dawson's line of

12  questioning -- oh, let me say just out of the gate, the

13  exact same guidelines that Ms. Dawson went over at the

14  beginning of her questioning apply to this questioning

15  as well.

16         Does that make sense?

17     A.  Yes.

18     Q.  Okay.

19         So would you agree that in Ms. Dawson's

20  questioning and analysis of your declaration,

21  Exhibit 11, that she identified and you together

22  identified some fairly significant flaws in the data

23  contained in that declaration?

24     A.  I would agree that some of the data there is

25  inconsistent and definitely requires some repair.  And

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 106

1  although the general theme that a non-firearm

2  [indecipherable] is actually quite common in American

3  history --

4           (Reporter clarification.)

5           THE WITNESS:  That non-firearm mass

6  murders are actually quite common in American history,

7  they've become more common -- firearm mass murders have

8  become more common in the last century or so.  But

9  there's all sorts of horrible ways that people have

10 committed mass murder in American history without guns.

11 BY MR. PEKELIS:

12    Q.  Understood.

13        Would you want the court to rely on the data

14 in your declaration, Exhibit 11?

15    A.  Well, I can understand why they might be

16 reluctant to accept the data exactly as -- as it is

17 presented.  Although, some of the larger themes that

18 I'm presenting, the problem with the fact that mental

19 illness is a major factor in what causes these mass

20 murders is, I think, still a valid point.

21    Q.  Understood.

22        You mentioned when discussing your educational

23 backgrounds that you have a master's degree and a

24 bachelor's degree; is that right?

25    A.  Correct.

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 107

1      Q.  And you earned your bachelor's in 1994; is

2   that right?

3      A.  Yes.

4      Q.  And your master's in 1998?

5      A.  Yes.

6      Q.  Were you a full-time master's student during

7   that period, from '94 to '98?

8      A.  No.  I --

9      Q.  What else were you doing?

10      A.  I was working full time for a startup.  I

11   worked for a couple of startups during that time out in

12   the area just north of San Francisco.

13      Q.  Understood.

14          So it was a part-time master's program?

15      A.  Yeah.  It was definitely one of these things

16   where I had -- I had dropped out of college at the end

17   of my freshman year at USC.  I was having trouble

18   coming up with money to pay the bills, and so I took

19   the only job I could actually get, which was working

20   for [indecipherable].

21              (Reporter clarification.)

22              THE WITNESS:  For Jet Propulsion Labs on

23   the Voyager mission.  And that started me on working as

24   a software engineer, which is what I did for most of my

25   life.

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 108

1          Basically, when I reached a point where I no

2    longer figured I was going to have to worry too much

3    about long-term employment and income, I went ahead and

4    switched my major from computer science to history

5    because I could take two history classes and get As in

6    them with less effort than one computer science class.

7          Q.  And currently you're adjunct instructor at the

8    College of Western Idaho; is that right?

9          A.  Correct.

10          Q.  And what type of college is that?

11          A.  It is a community college.

12          Q.  What type of degrees does it offer?

13          A.  An AA.  But really, what most students are

14    doing there is they're preparing to go on to Boise

15    State University, taking advantage of the fact that our

16    tuition is a little bit -- a little bit less expensive

17    than Boise State.

18          Q.  So for a history student there, are they

19    limited to an AA degree?

20          A.  Yes.

21          Q.  And that's an associates of arts degree?

22          A.  I -- yes.

23          Q.  Turning to a different subject, would you

24    agree, Mr. Cramer, that there is a sharp political or

25    policy divide in the United States over the regulation

Pekelis Decl. p. 59

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 109

1    of firearms?

2         A.  Multiply that by about a thousand, yes.

3    There's a profound disagreement about what the correct

4    solution is to the severe problems that show up when

5    these mass murders happen.

6         Q.  And is it fair to say that on one side of that

7    disagreement are organizations like my client, the

8    Oregon Alliance for Gun Safety, that advocate for gun

9    violence protection -- prevention laws, and then on the

10   other side of that disagreement are organizations like

11   the NRA, the Oregon Firearms Federation, and the Second

12   Amendment Foundation, to name a few that oppose such

13   laws?

14        A.  I think it's accurate to say that they are --

15   that there is a very severe divide between two sides

16   about what the correct solution to these problems are.

17            People on one side think that the core problem

18   is related to the presence of firearms, sometimes of a

19   particular type.  On the other side, they say that

20   there are bigger problems at the core of why these

21   incidents happen that tend to be ignored.

22        Q.  Understood.

23            And do you yourself identify with one side of

24   that divide?

25        A.  Yeah.  The article you attached makes that

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                          Clayton Cramer

Page 110

1    pretty clear.  I definitely -- what happens in 1989

2    when a mentally ill drifter committed a mass murder in

3    Stockton, he managed to take a law that was really

4    originally aimed at inner city gang members and managed

5    to make it into a law that can actually pass

6    legislature.  The crime was so horrendous.  And yet

7    what's interesting is that, as I discovered when I was

8    digging around through the California Attorney

9    General's reports, even they acknowledged that the core

10   problem was that this guy needed mental healthcare, and

11   the State of California, in their estimation, was too

12   cheap to provide mental healthcare.

13           And that has been -- as I think I mentioned

14   earlier, that has been a source of much of my

15   frustration about this issue is that this core problem

16   of sufficient mental healthcare has driven an awful lot

17   of the pursuit of various types of gun regulation that

18   in many cases has relatively little to do with the

19   actual problems.

20       Q.   Thank you, Mr. Cramer.  I appreciate your

21   answer.  It would be better, given our limited time, if

22   you could focus on the question that I ask and answer

23   just --

24       A.   Okay.

25       Q.   -- the question I ask.

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 111

1       A.  Okay.

2       Q.  And Plaintiffs' counsel will give you an

3   opportunity, of course, to elaborate on any answers if

4   you wish.

5           So what I'd asked is whether you, yourself,

6   identify on one side or the other --

7       A.  Absolutely.

8       Q.  -- of that political divide, and you said

9   "yes."

10      A.  Yes.

11      Q.  My question is:

12          Which side would that be?

13      A.  The side that thinks that gun regulation is

14  not intrinsically a bad thing but that some of the

15  measures that proposed are, in fact, excessive.

16      Q.  So would that be the same side as, for

17  example, the NRA?

18      A.  Yes.

19      Q.  Okay.

20          Do you consider yourself a neutral witness on

21  matters concerning firearm regulation?

22      A.  I would not call myself neutral witness, no.

23  I have a -- I have some fairly strong opinion on the

24  subject of what is an affective strategy for public

25  safety, and I'm pretty sure it does not agree with

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                   Clayton Cramer

Page 112

1   yours.

2        Q.  Fair enough.

3            So for the purposes of this case, which

4   concerns, among other subjects, whether magazines

5   holding over 10 rounds of ammunition should be

6   restricted, do you consider yourself a neutral witness

7   on that issue?

8        A.  No, I'm not a neutral witness on that issue.

9        Q.  And you're, in fact, a strong opponent of what

10  you call the gun control movement, aren't you?

11       A.  Yeah.  Although, I would say gun ban movement

12  is probably a better description of what I am opposed

13  to.

14           For example, there are a number of safety

15  regulations, which if they were passed would have --

16  would not be objectionable.  For example -- go ahead.

17       Q.  Let's turn to the first exhibit, which I've

18  circulated, and which is marked as Exhibit 13.

19               (Exhibit 13 marked for identification.)

20  BY MR. PEKELIS:

21       Q.  This is an article with the headline "Navy

22  Yard Shooting Leaves Gun Control Out of Excuses."

23           It's dated September 24th, 2013.

24           Did you write this article?

25       A.  Absolutely, I did.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 125

1      Q.   And thank you for that correction.

2           Were you involved in this case in any way?

3      A.   No, I was not.

4      Q.   Okay.

5           I want to direct your attention to the first

6   paragraph here, the second sentence.  You write "In

7   this case, our side requested summary judgment, which

8   means the case is so clearly on one side that there is

9   no need to go to trial."

10          Do you see that?

11     A.   Yes.

12     Q.   Okay.

13          And by "our side," who were you referring to?

14     A.   Those of us that believe that there's nothing

15  intrinsically wrong with firearms ownership.

16     Q.   And in the second-to-last paragraph you write

17  "Of course, the state will next appeal to the Ninth

18  Circus where the results are obvious.  This is why, as

19  much as many people dislike Trump, he is the best

20  chance of restoring the rule of law."

21          Do you see that?

22     A.   Yes.

23     Q.   What did you mean when you wrote "The Ninth

24  Circus"?

25     A.   They've made a number of decisions over the

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 126

1    years that seemed a lot -- to be on the really
2    unbelievably silly side.
3         Q.  You were referring to the Ninth Circuit Court
4    of Appeals?
5         A.  Absolutely.  And, yes, I suppose it could be
6    considered sort of a nasty swipe at them, but I'm --
7    they're big boys.  They've got to be used to things a
8    lot worse than that said about them.
9         Q.  I'm sure they have.
10            Why did you believe that Trump was the best
11   chance of restoring the rule of law?
12        A.  Well, look at the Bruen decision that the
13   Supreme Court made.  That is at least in part because
14   of his appointments to the Supreme Court.
15        Q.  And then at the very bottom of this blog post,
16   you write "Want to help fund suits like this?  Make a
17   contribution to CalGuns foundation, (a 501(c)(3))."
18            Do you see that?
19        A.  Yes.
20        Q.  And this includes a link to the California Gun
21   Rights Foundation website; is that right?
22        A.  Correct.
23        Q.  What is the California Gun Rights Foundation?
24        A.  They are one of a couple of organizations in
25   California that have challenged quite a number of the

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 130

1    Q.  Why did you write that Judge Reinhardt had

2  been demoted to hell?

3    A.  There's definitely a rhetorical flourish.  The

4  clear implication is that many people on my side, on

5  our side, do not think that Judge Reinhardt has not

6  been a particularly good thing to have on the courts.

7  His viewpoint has been so contrary to ours regarding --

8  it's sort of an evil -- evil set of assumptions he

9  carries into these things.

10    Q.  Okay.

11        Would you agree that that language is quite

12  inflammatory?

13    A.  I would say it would be inflammatory if he was

14  still alive.  I mean, it could be considered a threat

15  if he were still alive, but he was sort of well past

16  that point by that point.  I would say it was a

17  strongly worded expression of my feelings about Judge

18  Reinhardt and his decisions.

19    Q.  Understood.

20        You next write "A great victory from my friend

21  Chuck Michel."

22        Who's Chuck Michel?

23    A.  He is an attorney who has represented gun

24  rights in California for a number of years and with

25  whom I'm working on some cases down there.

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 131

1    Q.  How do you know Mr. Michel?

2    A.  Well, I mean, after a while everyone who's

3    involved in gun rights gets to know each other.  I

4    mean, you meet at events or you meet by email usually.

5    Q.  This is the same as Carl D. Michel, who

6    represented the plaintiffs in the Duncan case?

7    A.  I wasn't aware that Carl was his actual name.

8    I've always known him as Chuck Michel.

9    Q.  Okay.

10    But he represented the plaintiffs in the

11    Duncan case?

12    A.  I believe so, yes.

13    Q.  Okay.

14    Let's move to the next exhibit, which

15    Mr. Ferron has circulated.  And we'll mark it as

16    Exhibit 18 when the court reporter's ready.

17    THE COURT REPORTER:  One moment.

18    (Exhibit 18 marked for identification.)

19    THE COURT REPORTER:  Exhibit 18 has been

20    marked.

21    BY MR. PEKELIS:

22    Q.  Mr. Cramer, do you have Exhibit 18 in front of

23    you?

24    A.  Yes.  An article that I wrote.

25    Q.  Yes.  It's headlined "An Unfavorable

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 132

1    California Decision that May Later Bear Fruit"?

2         A.  Yes.

3         Q.  And this was published in

4    americas1stfreedom.org; is that right?

5         A.  Yes.  That's an NRA publication.

6         Q.  And it's called "An Official Journal of the

7    NRA" at the top there, isn't it?

8         A.  Yes.  You can reasonably assume that if

9    anything appears in there, it will represent values and

10   beliefs that the NRA considers appropriate and

11   sensible.

12        Q.  And does it represent values and beliefs that

13   you have too?

14        A.  Generally.  I have, on several occasions,

15   tried to interest them in an article about the major

16   problem that mental illness has played in the mass

17   murder problem in general, and in murder overall.  I've

18   not gotten a very positive response.  NRA is terribly

19   concerned about not appearing to be anything other than

20   a one-issue cause, one-issue organization.  I mean, I

21   understand the logic behind that, even though I don't

22   agree with the particular results.

23        Q.  About how many articles have you written for

24   this NRA publication?

25        A.  I'd say probably -- maybe 12 to 20.  I've

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 133

1   written quite a number of them over the last few years.

2        Q.   Understood.

3             And this particular article, Exhibit 18, is an

4   article about the Ninth Circuit's en banc decision in

5   Duncan; right?

6        A.   Yes.  Down at the bottom it does mention that

7   the en banc appeal went the other way.

8        Q.   Right.

9             And so that decision upheld as constitutional

10  California's LCM restrictions; right?

11       A.   Right.

12       Q.   Now, why did you call it an unfavorable

13  decision?

14       A.   Well, the Ninth Circuit -- the en banc

15  decision overturning the District Court and the initial

16  appellate court decision meant that the high-capacity

17  magazines were again banned for sale.

18       Q.   So it was unfavorable to your side?

19       A.   Absolutely.

20            You know, if you're going to -- if the whole

21  point of this series of discussions is to demonstrate

22  that I'm an opponent of gun bans and attempts to ban

23  large-capacity magazines, hey, I've been very blunt

24  about that throughout my entire time involved with this

25  issue.  I consider these to be not terribly sensible

Pekelis Decl. p. 69

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 135

1    "What is it Like to be a California Gun Owner"?

2         A.  Yep.

3         Q.  And you wrote this?

4         A.  Yes, I did.

5         Q.  I'd like you to turn to the second to last

6    paragraph, which is on page 3 of 4.

7         A.  Yes.

8         Q.  Where you write "So why pass laws that do not

9    work?  Because this is a war on our rights.

10   California's legislative bodies are sending a message

11   to gun owners: you are not welcome here."

12        Do you see that?

13        A.  I'm scrolling down to that.  Oh, yes, I see it

14   here.  Yes.

15        Q.  Do you believe that firearm regulations like

16   California's represent a war on our rights?

17        A.  Yes.  They're a war on the rights that the

18   Bruen decision recognized, the right to -- of

19   law-abiding people to own firearms.

20        Q.  And would you say the same about Oregon

21   Measure 114, that it's part of a war on our rights?

22        A.  Yes.  To some extent what we're seeing here is

23   a culture war.  People who have one set of values about

24   a whole bunch of things perceive the other side as

25   deplorables, sort of beneath them.

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 136

1      Q.  Would you consider yourself on one side of

2    that, quote, "culture war"?

3      A.  Absolutely.

4      Q.  Let's go to the next exhibit.

5              THE COURT REPORTER:  One moment.

6              MR. PEKELIS:  Which should be marked as

7    Exhibit 20.

8              (Exhibit 20 marked for identification.)

9              THE COURT REPORTER:  Exhibit 20 has been

10   marked.

11             THE WITNESS:  I'm looking at it.

12   BY MR. PEKELIS:

13     Q.  Okay.

14         And Exhibit 20 is an article written by you;

15   is that right?

16     A.  Absolutely.

17     Q.  And the headline is "Why Oregon Ballot

18   Measure 114 is Unconstitutional"; right?

19     A.  Yes.

20     Q.  And you wrote this shortly after Measure 114

21   was voted into law?

22     A.  Yes.  I was following the voting record --

23   news about Measure 114 because I recognized how

24   dramatic of a change it really is for Oregon.

25             Oregon has traditionally been fairly friendly

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 170

1                        C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Tia Reidt, a Certified Court Reporter in and

7    for the State of Washington, do hereby certify that the

8    foregoing transcript of the deposition of CLAYTON

9    CRAMER, having been duly sworn, on January 19, 2023, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 26th day of January, 2023.

14

15

16   _____

17   /S/ Tia B. Reidt
     Tia B. Reidt, RPR, CSR Oregon #22-0001
18   NOTARY PUBLIC, State of
     Washington.
19   My commission expires
     5/15/2026.

20

21

22

23

24

25

c7729379-a7ba-4d7b-a41b-460b439ff5d3

# EXHIBIT G

|  | More |  | Create Blog  Sign In |

# Clayton Cramer.

Conservative. Idaho. Software engineer. Historian. Trying to prevent *Idiocracy* from becoming a documentary.

Email complaints/requests about copyright infringement to clayton @ claytoncramer.com. Reminder: the last copyright troll that bothered me went bankrupt.

"And we know that all things work together for good to them that love God, to them who are the called according to his purpose." -- Rom. 8:28

Home    About    Popular Articles    Scholarly Journals    Books    Upcoming Events

Tuesday, April 2, 2019

## A *Major* Victory in California

Duncan v. Becerra, (S.D.Cal. 2019) struck down California's large capacity magazine ban for violating the Second Amendment.  It points to examples where victims with large capacity magazines successfully used them against multiple attackers and one where the victim had a low capacity magazine, and the other hand using a cellphone to call 911.  I've never been trained on how to change magazines without a free hand: have you?  A number of nice touches:

> Individual liberty and freedom are not outmoded concepts. "The judiciary is — and is often the only — protector of individual rights that are at the heart of our democracy." -- Senator Ted Kennedy, Senate Hearing on the Nomination of Robert Bork, 1987.

The decision points to how rare mass murders are relative to other crimes:

> Who has not heard about the Newtown, Connecticut, mass shooting at Sandy Hook Elementary School, or the one at a high school in Parkland, Florida? But an individual
> victim gets little, if any, media attention, and the attention he or she gets is local and short-lived. For example, who has heard about the home
> invasion attack on Melinda Herman and her twin nine-year old daughters in Georgia only one month after the Sandy
> Hook incident?15 Who has heard of the attacks on Ms. Zhu Chen or Ms. Gonzalez and her husband?16 Are the lives of these victims worth any less than those lost in a
> mass shooting? Would their deaths be any less tragic? Unless there are a lot of individual victims together, the tragedy goes largely unnoticed.

And this little dig:

> The magazine ban admits no exceptions, beyond those for law enforcement officers, armored truck guards, and movie stars.

Quoting a decision calling a 10 round limit only a minor burden because there are other options:

> Accordingly, a prohibition on possession of magazines having a capacity to accept more than ten rounds applies only the most minor burden on the Second Amendment."). But describing as minor, the burden on responsible, law-abiding citizens who may not possess a 15-round magazine for self defense because there are other arms permitted with 10 or fewer rounds, is like saying that when government closes a Mormon church it is a minor burden because next door there is a Baptist church or a Hindu temple.

Of course the 9th Circuit will hear the appeal, but Judge Reinhardt has recently been demoted to Hell, so who knows?  A great victory from my friend Chuck Michel.  The deeper I  read, the more impressed I get.  On appeal, California's argument is going to be reduced to "It's not fair!"

Posted by Clayton Cramer at 1:43 PM  ✉️  🔗 📧 🅱️ 🐦 📘 📌
Labels: gun rights

Ammo to Go



Amazon Search

As an Amazon Associate I earn from qualifying purchases. Use this link to get there, and it will put some money in my pocket.

Ammo.com





PayPal Button


Donate

Labels

2012 Presidential candidates (126)  abortion (47)  astrophotography (96)  cars (169)  child

2/6/23, 4:26 PM                                    Clayton Cramer.: A Major Victory in California

## 2 comments:



**Andy in San Diego and Elsewhere**  April 3, 2019 at 8:52 AM

Once the decision was handed down, the floodgates here in California opened up and everyone went nuts buying "standard capacity" magazines. They're sold out everywhere now. the Attorney General for CA is asking for a "Status Quo Stay" but the genie is already out of the bottle on this.

Reply



**Eskyman**  April 3, 2019 at 11:18 AM

What a wonderful victory! May many more such victories come our way, and it's likely to happen since President Trump has been putting HONEST judges on the bench, evening up the playing field that has been so tilted against us for so long!

Who knows, perhaps even the 9th Circus Court of Clowns may end up rendering judgements that are within proximity of what the Constitution specifies. How great that would be!

This Honorable Judge's opinion is sweeping, bold and well-researched; it will be very hard for the opposition forces to overturn it, as it's extremely well-reasoned & grounded in firm caselaw as well as Constitutional law. I found it delightful to read; it tells a clear story with plenty of examples.

Here it is in pdf, read it and you'll see what I mean. Even the title is beautiful: "ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARING CALIFORNIA PENAL CODE § 32310 UNCONSTITUTIONAL and ENJOINING ENFORCEMENT" That's music to my eyes!

https://d3uwh8jpzww49g.cloudfront.net/sharedmedia/1510684/2064261_2019-03-29-order-granting-plaintiffs_-msj.pdf

Reply

To leave a comment, click the button below to sign in with Google.

SIGN IN WITH GOOGLE



23 Figures With A Deadly Sense
lastnighton.com

Newer Post                          Home                          Older Post

Subscribe to:  Post Comments (Atom)

---

abuse (81)  concealed carry (136)  crony capitalism (42)  decline and fall of the West (61)  Democratic Party corruption (38)  drug laws (69)  economics (60)  education (40)  environmentalism (58)  films (80)  global warming (182)  gun rights (369)  health care (148)  healthy living (129)  history (542)  homosexuality (240)  humor (120)  Idaho politics (32)  immigration (185)  Java (20)  litigation (72)  machining (365)  mental illness (259)  my books (45)  PCs (246)  scenic (122)  Idaho  telescopes (169)  terrorism (268)  the dread poison gluten (10)

**Total Pageviews**

 7,266,274

**Popular Posts**

**Mirror Cell**
Traditional mirror cells hold the mirror in place with clips that are flat metal with a 90 degree bend. One part is held to the outside of t...

**Thank Biden's DOJ**
1/14/23 NPR : It's been more than five years since the mass shooting in a church in Sutherland Springs, Texas where 25 people, includi...

**How Stupid Do You Have to Be?**
YouTube video titled "When Pirates Attacked 2 American Warships." Yes, Somali pirates opened fire on a USN destroyer and cruiser....

**Windows 10 Had a Very Useful File Search**
In Windows Explorer you could search all files at the current directory and below for Word files containing a word or words. It does not wor...

**I Really Like the Idea of Electric Cars**
Even if they are in many places coal-powered. This 1/27/23 Motor Trend article is why I do not expect to ever buy an EV although hybrids se...

**Search This Blog**

[                    ] Search



23 Figures With A Deadly Sense C
lastnighton.com

**Followers**

---

**Pekelis Decl. p. 75**

2/6/23, 4:26 PM                                    Clayton Cramer.: A Major Victory in California

**Followers** (84) **Next**



[ Follow ]

**Blog Archive**

▶ 2023 (78)
▶ 2022 (1199)
▶ 2021 (926)
▶ 2020 (821)
▼ 2019 (689)
　▶ December (32)
　▶ November (49)
　▶ October (82)
　▶ September (65)
　▶ August (43)
　▶ July (66)
　▶ June (60)
　▶ May (76)
　▼ April (43)
　　Every Tragedy Has a Life Lesson
　　"It takes a good guy with a gun to stop a bad guy …
　　Why Do I Doubt This Will Get Much Coverage?
　　Ammo Giveaway
　　Things You Do and Do Not Want to See
　　So Much for Poverty Causes Islamic Terrorism
　　Optional Reality
　　This Should Be Enough Reason for Trump to Call Up …
　　The Federal Government Should Cut Off Funding to C…
　　Typesetting
　　Limited Blogging: I Am Grading Papers
　　Spoiler Alert
　　Ever Had a Really Bad Date?
　　Florida Man News Stories
　　Finally, Created the Piece I Needed
　　Should Not Be Surprised
　　Backtick in bash
　　Philosophy Does Attract Some Odd Birds.
　　A Year Ago, I Had a Student Who Was a Graduate of …
　　Are You a C & E Christian?
　　Gee, I Cannot Imagine Why
　　Today's Argument Against Centralized Control
　　The Murders Democrats Ignore
　　The Funniest Thing Today
　　That Sine Table Issue
　　Clearly Too Stupid to Live
　　Another Victory
　　Spring Has Sprung
　　Whoever Sent Me the Magnetic Stripping for My Para...
　　To Quote Mr. Bean: "I Concentrated on the Trigonom...

Pekelis Decl. p. 76

2/6/23, 4:26 PM                                          Clayton Cramer.: A Major Victory in California

How to Handle Buck Passing

The Most Impressive Piece of Journalism That I
Hav...

An Awesome Debugger for Linux

Need the Idaho Enhanced Concealed Weapon
License?

Size Matters

Needed to Compare Two PDF Documents

Oppressing the Third World

More Evil From That Man!

The CreateSpace to KDP Conversion

Why, We Have a First Amendment

Wow! Bad Laws Have Consequences

A Major Victory in California

Copy Cat Crimes

► March (64)

► February (52)

► January (57)

► 2018 (1389)

► 2017 (1443)

► 2016 (1384)

► 2015 (1048)

► 2014 (949)

► 2013 (871)

► 2012 (1091)

► 2011 (731)

► 2010 (285)

► 2009 (4)

► 2008 (5)

► 2007 (8)

► 2006 (8)

► 2003 (1)

**Blog Posts Before August, 2010**

• Clayton Cramer's Blog Archive (pre-Ambulance
  Chasers)

**About Me**                          **World Climate Widget**

Clayton Cramer

View my complete
profile



**My Blog List**

Climate Etc.
My interview with Jordan Peterson
*2 hours ago*

Watts Up With That?
Wind Turbines out Northwest
*2 hours ago*

The College Fix
Home appraiser countersues professors who
accused him of racism
*9 hours ago*

Pekelis Decl. p. 77

2/6/23, 4:26 PM                                    Clayton Cramer.: A Major Victory in California

**Common Cents Blog**
#1 Trending Video · HBO Mario Kart Trailer · SNL
*10 hours ago*

**The Adventures of Roberta X**
Wishful Thinking?
*11 hours ago*

Show All

---

JustAnswers



**Ask a Consultant Now**
**Jon, Firearms Consultant**
978 Satisfied Customers

**Pearl Wilson, Consultant's Assistant**

Welcome! How can I help with your firearms
question?

[ Type your message... ]    [ Send ]

**Copyright Notice**

© Clayton E. Cramer 2016 All Rights Reserved

Copying of less than 200 words or 10% of a posting (whichever is less) is
encouraged as long as you link back to the posting.

Simple theme. Powered by Blogger.

Pekelis Decl. p. 78

# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

---

OREGON FIREARMS FEDERATION,      )
INC., et al.,                    )
                                 )
          Plaintiffs,            )
                                 ) Case Nos.
     v.                          ) 2:22-cv-01815-IM,
                                 ) 3:22-cv-01859-IM,
KATE BROWN, et al.,              ) 3:22-cv-01862-IM,
                                 ) 3:22-CV-01869-IM,
          Defendants.            )
                                 )
_____  )
                                 )
                                 )
        (Continued)              )

---

* VIDEOCONFERENCE *
VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF EXPERT
MARK T. HANISH

---

Witness located in:

Phoenix, Arizona


* All participants appeared via videoconference *




DATE TAKEN:   JANUARY 13, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                       Oregon #22-0001

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

3a1315ad-3d63-4af9-ba9b-c58c534eb6ab

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                      Mark T. Hanish

Page 51

1    do terminology first, and then I'll ask the question.

2        A.  Okay.

3        Q.  Are assault rifles and modern sporting rifles,

4    are those equivalent terms?

5        A.  No.  I mean, an assault rifle is a technical

6    term that refers to a machine gun.  So, no, that is not

7    the same.

8        Q.  Okay.  Okay.

9            So is an AR-15 a modern sporting rifle?

10       A.  Yes.

11       Q.  Okay.

12           Is the AK format a modern sporting rifle?

13       A.  It's a -- I mean, it's a rifle.  It's not very

14   modern, but, yeah.

15       Q.  For an AR-15-pattern weapon, what would the

16   cost of a 10-round magazine be?

17       A.  I would have to look up a specific one, but I

18   would guess they're probably in the $15 to $20 range as

19   well.  They -- the -- your high-capacity or

20   standard-capacity magazines, you know, from a Magpul or

21   somebody is going to be in that $15 to $25 range.  The

22   10-round magazines, manufacturers make less of those,

23   so I would expect their price to be a little higher if

24   they're -- if they're not the same.

25       Q.  So you -- for an AR-15, what would you expect

Pekelis Decl. p. 81

3a1315ad-3d63-4af9-ba9b-c58c534eb6ab

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                      Mark T. Hanish

Page 52

1   the price range to be for a high-capacity magazine?

2          A.   Anywhere from, you know, $12 to $25.

3          Q.   And for an AR-15, what would a 10-round

4   magazine cost?

5          A.   I would have to look, but it's going to be --

6   I would guess it would be in the, you know, $15 to $25

7   range.

8          Q.   And for a handgun that is popular like a

9   Glock, what would a magazine cost?

10          A.   I would say they're roughly $20.

11          Q.   And what about for a 10-round magazine?

12          A.   For the models that are available in that, I

13   believe from Glock, they're either the same or slightly

14   more.

15          Q.   Slightly more being $20, $25, $30?

16          A.   I mean, maybe $5 or $10 more if they're more.

17   So I would say they're probably comparable, but

18   possibly more simply because they make less of them.

19          Q.   Is it typical to purchase additional magazines

20   beyond the one magazine -- well, first of all, let's

21   start back from -- how many magazines does a firearm

22   when it is sold new usually come with?

23          A.   Most come with two, one and a spare.  Some

24   come with the one that are in it and others come with,

25   you know, two additional.

3a1315ad-3d63-4af9-ba9b-c58c534eb6ab

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Mark T. Hanish

Page 53

1    Q.   And is it typical for consumers to purchase
2    additional magazines?
3    A.   Yes.
4    Q.   Why do they do that?
5    A.   For a multitude of reasons.  I mean, if
6    they're carrying it, it has more ammunition readily
7    available to them.  For shooting at the range,
8    practicing, training, you want to use through several
9    magazines.  When you're training with them, you can
10   damage magazines.  So it's always a good idea to have
11   extra available.
12   Q.   What is the typical lifespan of a magazine?
13   A.   It depends upon the use of it.  But, you know,
14   springs wear out.  The followers and the feed lips and
15   so forth, you know, wear over time.  So depending upon
16   how much it's used, it can dictate the length of time.
17        But then there's also just, like I mentioned,
18   when firing doing reloads, inserting magazines into the
19   gun, you can, you know, damage feed lips.  Dropping
20   them on the ground, they can break, crack, damage feed
21   lips and so forth.  So I've, you know, seen magazines
22   break the first time they have come out of a gun, and
23   I've seen others go for years.  So it's not a
24   definitive time frame.
25   Q.   How often do -- in your experience do

3a1315ad-3d63-4af9-ba9b-c58c534eb6ab

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Mark T. Hanish

Page 81

1     A.  Yes, sir.

2     Q.  Thanks.

3         And, again, if you need a break, just let me

4   know and we can do it.  I know you just had one, and

5   I'll just ask you to answer the question if there's a

6   question pending before we take one.

7     A.  Sounds good.

8     Q.  So Mr. Marshall began his questioning by

9   asking you kind of about your career and resume.  And

10  one thing I took away from that questioning is that in

11  many of the jobs that you have worked, it seems like a

12  significant part involved the sale of large-capacity

13  magazines.

14        Would you agree with that?

15    A.  Yes.

16    Q.  Okay.

17        And in the various companies that you worked

18  for, do you currently hold any equity in those

19  companies?

20    A.  I have equity in Ammo, Inc.  I'm a -- it's a

21  public company listed on the Nasdaq under POW, and I am

22  a shareholder.

23    Q.  Could you estimate how many shares or the

24  value of your shares owned for Ammo, Inc.?

25    A.  Shares would be about 600,000 shares.

3a1315ad-3d63-4af9-ba9b-c58c534eb6ab

Page 109

1          Does that make sense?

2     A.  I understand what you're saying.

3     Q.  Okay.  Thanks.

4          So you testified earlier that in general,
5     large-capacity magazines cost less than
6     standard-capacity magazines; is that right?

7     A.  They will be less or the same.  They could be,
8     you know, from some manufacturers that make enough
9     10-rounders, they'll be a comparable price.

10    Q.  Okay.

11         And the reason you -- one reason you mentioned
12    was essentially economies of scale, that there are more
13    orders for large-capacity magazines, enabling the
14    manufacturers to make them for less money; is that
15    right?

16    A.  That would be the logical reasoning behind if
17    somebody is selling the 10-round magazine for more
18    money than a large-capacity magazine, that would be the
19    reason.

20    Q.  Any other reason that you can think of?

21    A.  Not that I can think of right now.

22    Q.  Okay.

23         In terms of a company's profit margin, do you
24    have any knowledge of what the profit margin would be
25    for a large-capacity magazine versus a

3a1315ad-3d63-4af9-ba9b-c58c534eb6ab

Page 110

1    standard-capacity magazine?

2        A.   They would be -- again, in generalities, the

3    company would want to have a similar profit margin on

4    the two magazines, hence why it's possible or plausible

5    that a lower-capacity magazine would be more money to

6    the retail consumer if that manufacturer is not being

7    able to take advantage of economy of scale and

8    purchasing at the same volume.

9            The other item would be if they had to take

10   their standard large-capacity magazine and do secondary

11   operations to modify it to meet a legislative

12   requirement to hold less.  So then you would have more

13   work and/or specific parts that are required.  So that

14   could drive the cost higher to make the margin less.

15       Q.   Understood.

16           I think you testified that you're a very

17   experienced shooter; right?

18       A.   Mm-hm.  Yes.

19       Q.   So how long -- and when you reload a firearm

20   with a detachable magazine, basically, that involves

21   extracting the old magazine and inserting the new

22   magazine; right?

23       A.   Yes.

24       Q.   Okay.

25           So for a handgun with a detachable magazine,

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Mark T. Hanish

Page 127

1                    C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Tia Reidt, a Certified Court Reporter in and

7    for the State of Washington, do hereby certify that the

8    foregoing transcript of the deposition of MARK T.

9    HANISH, having been duly sworn, on January 13, 2023, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 20th day of January, 2023.

14

15

16   _____

17        /S/ Tia B. Reidt
          Tia B. Reidt, RPR, CSR #22-0001
18        NOTARY PUBLIC, State of
          Washington.
19        My commission expires
          5/15/2026.

20

21

22

23

24

25