**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM (lead case) |
| | 3:22-cv-01859-IM (trailing case) |
| | 3:22-cv-01862-IM (trailing case) |
| Plaintiffs, | 3:22-cv-01869-IM (trailing case) |
| v. | **DEFENDANTS' TRIAL BRIEF** |
| TINA KOTEK, et al., | |
| Defendants, | |
| and | |

**DEFENDANTS' TRIAL BRIEF**

OREGON ALLIANCE FOR GUN SAFETY,

                                    Intervenor-Defendant.

MARK FITZ, et al.,

                                    Plaintiffs,

                v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants.

KATERINA B. EYRE, et al.,

                                    Plaintiffs,

                v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants,

                and

OREGON ALLIANCE FOR GUN SAFETY,

                                    Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

                                    Plaintiffs,

                v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants.

**DEFENDANTS' TRIAL BRIEF**

# TABLE OF CONTENTS

Introduction .................................................................................................................. 1

Background ................................................................................................................... 2

I.     Measure 114 ......................................................................................................... 2

II.    This Case ............................................................................................................. 2

III.   Procedural History .............................................................................................. 3

IV.   Development of the Permit-to-Purchase Program ............................................. 4

Argument ..................................................................................................................... 6

I.     Measure 114's permit-to-purchase requirement complies with the Second
Amendment. ........................................................................................................ 6

      A.    *Bruen* expressly allows states to enact shall-issue permit regimes. ........................ 7

      B.    Measure 114's mental-health-review provision is consistent with *Heller*
and *Bruen*. ...................................................................................................... 12

      C.    The permit to purchase is not duplicative of the background check at
the point of sale. .............................................................................................. 16

      D.    The permit and training fees are not unconstitutionally high. ............................. 16

II.    Plaintiffs' facial and as-applied challenge to the implementation of
Measure 114's permitting requirement will fail. ............................................. 16

      A.    Permit agents and OSP are ready to issue permits and implement the
permit to purchase program. ............................................................................ 17

      B.    Plaintiffs will be unable to prove that they will suffer unconstitutional
delays when seeking permits to purchase. ........................................................ 20

III.   Measure 114's restrictions on LCMs are consistent with the Second
Amendment. ...................................................................................................... 23

      A.    LCMs are not "arms" protected by the Second Amendment. ............................. 24

      B.    LCMs are not "in common use" for self-defense. ............................................... 25

      C.    Restrictions on LCMs are consistent with this country's "historical
tradition" of arms regulation. ........................................................................... 28

            1.    LCMs are a dramatic technological change and implicate new
societal concerns. ..................................................................................... 28

            2.    Restrictions on LCMs are consistent with this country's
historical tradition of regulating dangerous weapons associated
with violence and crimes. ......................................................................... 32

a.      Restrictions on LCMs are comparable to historic restrictions on other dangerous weapons associated with violence and crimes..................................................... 33

b.      Restrictions on LCMs pose a comparable burden as other historic arms regulations..................................................... 35

IV.    **Measure 114's restrictions on LCMs do not violate the Takings Clause.................. 37**

V.     **Measure 114's restrictions on LCMs are not unconstitutionally vague. .................. 38**

VI.    **Measure 114's restrictions on LCMs are not impermissibly retroactive. ................. 40**

VII.   **In the unlikely event plaintiffs prove any claim, the Court should narrowly tailor any relief. .................................................................. 41**

A.      The Court must consider public safety when determining the scope of an injunction and Measure 114 will protect public safety. ................................. 41

B.      The Court should not enter any relief that enjoins absent parties......................... 42

**Conclusion ............................................................................................................. 43**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apple Inc. v. Psystar Corp.*,
  673 F. Supp. 2d 943 (N.D. Cal. 2009).................................................................. 41
*Arnold v. Kotek*,
  2022 WL 17495052 (Or. Cir. Ct., Harney Cnty.)................................................. 4
*Barnett v. Raoul*,
  2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) ........................................................ 23
*Bevis v. City of Naperville, Illinois, No. 22 C*,
  2023 WL 2077392 (N.D. Ill. Feb. 17, 2023)................................................. 23, 35
*Buffin v. City & Cnty. of San Francisco*,
  2016 WL 6025486 (N.D. Cal. Oct. 14, 2016) ...................................................... 42
*Cf. United States v. Stewart*,
  451 F.3d 1071 (9th Cir. 2006)........................................................................ 39, 40
*Colony Cove Props., LLC v. City of Carson*,
  888 F.3d 445 (9th Cir. 2018) ............................................................................... 37
*Commonwealth v. Guardado*,
  206 N.E.3d 512 (2023) ........................................................................................ 23
*Concealed Handgun License for Stanley v. Myers*,
  276 Or. App. 321 (2016) ..................................................................................... 14
*Dahl v. HEM Pharms. Corp.*,
  7 F.3d 1399 (9th Cir. 1993)........................................................................... 47, 48
*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*,
  2023 WL 2655150 (D. Del. Mar. 27, 2023).................................................Passim
*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .............................................................................................Passim
*Duncan v. Bonita*,
  19 F.4th 1087 (9th Cir. 2021)..............................................................................Passim
*E.E.O.C. v. Peabody W. Coal Co.*,
  610 F.3d 1070 (9th Cir. 2010) ............................................................................. 43
*Edge v. City of Everett*,
  929 F.3d 657 (9th Cir. 2019)............................................................................... 38
*Friedman v. City of Highland Park*,
  784 F.3d 406 (7th Cir. 2015) ......................................................................... 25, 28
*Fyock v. Sunnyvale*,
  779 F.3d 991 (9th Cir. 2015)............................................................................... 24
*Galvez v. Jaddou*,
  52 F.4th 821 (9th Cir. 2022)................................................................................ 41
*Hanson v. D.C.*,
  2023 WL 3019777 (D.D.C. Apr. 20, 2023)..................................................... 23, 34

*Herrera v. Raoul*,
  2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) .................................................................... 10, 23

*Hughes v. State*,
  314 Or. 1 (1992) ............................................................................................................... 20

*Jackson v. City & Cnty. of S.F.*,
  746 F.3d 953 (9th Cir. 2014) ............................................................................................ 24

*Kolbe v. Hogan*,
  849 F.3d 114 (4th Cir. 2017) ............................................................................................ 25

*Kuck v. Danaher*,
  822 F. Supp. 2d 109 (D. Conn. 2011) ............................................................................. 15

*Kwong v. Bloomberg*,
  723 F.3d 160 (2d Cir. 2013) ............................................................................................. 16

*Landgraf v. USI Film Prod.*,
  511 U.S. 244 (1994) ......................................................................................................... 40

*Laurel Park Cmty., LLC v. City of Tumwater*,
  698 F.3d 1180 (9th Cir. 2012) ......................................................................................... 37

*Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992) ....................................................................................................... 37

*McCullen v. Coakley*,
  573 U.S. 464 (2014) .................................................................................................... 20, 21

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010) ......................................................................................................... 12

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) ................................................................................................Passim

*Nat'l Audubon Soc'y, Inc. v. Davis*,
  307 F.3d 835 (9th Cir.) ..................................................................................................... 42

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) ......................................................................................................... 25

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ............................................................................................. 40

*Ocean State Tactical, LLC v. State of Rhode Island*,
  2022 WL 17721175 (D.R.I. Dec. 14, 2022) .............................................................. 23, 26

*People v. Bocanegra*,
  2023 WL 3142421 (Cal. Ct. App. Apr. 28, 2023) ........................................................... 23

*Silvester v. Harris*,
  843 F.3d 816 (9th Cir. 2016) ...................................................................................... 21, 22

*State v. Briney*,
  345 Or. 505 (2008) ........................................................................................................... 39

*Thomas v. Chi. Park Dist.*,
  534 U.S. 316 (2002) ......................................................................................................... 22

*United States v. Harris*,
  705 F.3d 929 (9th Cir. 2013) ............................................................................................ 38

*United States v. Holton*,
  2022 WL 16701935 (N.D. Tex. Nov. 3, 2022) .................................................................. 9

*United States v. Lucero*,
  989 F.3d 1088 (9th Cir. 2021) .......................................................................................... 39

*White v. Illinois State Police*,
  482 F. Supp. 3d 752 (N.D. Ill. 2020) .................................................................................. 15

## **Statutes**

18 U.S.C. § 922(w) ............................................................................................................... 34
18 U.S.C. § 921(31) .............................................................................................................. 39
430 Ill. Comp. Stat. 65/1 – 65/15a ....................................................................................... 12
C.R.S. § 18-12-302(1) .......................................................................................................... 34
Cal. Penal Code §§ 16370, 16670, 26840-26859, 31610-31700 ........................................ 11
Cal. Penal Code § 32310, 16350, 16740 .............................................................................. 34
Colo. Rev. Stat. Ann. § 18-12-301 ....................................................................................... 39
Conn. Gen. Stat. § 53-202w(a)-(c) ....................................................................................... 34
Conn. Gen. Stat. §§ 29-33, 29-36f – 29-36i, 29-37a, 29-38g – 29-38j ............................... 11
Conn. Gen.Stat. § 53–202w(a)(1) ......................................................................................... 39
D. C. Code Ann. §§ 7-2502.01 – 7-2502.10 ........................................................................ 11
D.C. Code Ann. § 7-2506.01 ................................................................................................ 39
D.C. Code § 7-2506.01(b) .................................................................................................... 34
Del. Code Ann. tit. 11, §§ 1465, 1466 ................................................................................. 34
Haw. Rev. Stat. Ann. §§ 134-2, 134-13 .............................................................................. 11
Haw. Rev. Stat. § 134-8(c) ................................................................................................... 34
Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P .......................... 12
Mass. Gen. Laws ch. 140, §§ 131M, 121 ............................................................................ 34
Md. Code Ann. Pub. Safety § 5-117.1 ................................................................................. 12
Md. Code Ann., Crim. Law § 4-305(b) ................................................................................ 34
Mich. Comp. Laws §§ 28.422, 28.422a ............................................................................... 12
Mo. Ann. Stat. § 571.101(2)(7) ............................................................................................ 14
Mont. Code Ann. § 45-8-321(2) ........................................................................................... 14
N.J. Stat. Ann. § 2C:58-3 ..................................................................................................... 12
N.J. Stat. Ann. §§ 2C:39-3(j), 2C:39-1(y) ........................................................................... 34
N.Y. Penal Law § 265.00(23) ............................................................................................... 39
N.Y. Penal Law §§ 265.01(1), 265.20(a)(3) ........................................................................ 11
N.Y. Penal Law §§ 265.10(1)-(3), (6), 265.36, 265.00(23) ................................................. 34
N.Y. Penal Law §§ 400.00 – 400.01 .................................................................................... 12
Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409 .......................................................... 12
ORS § 166.293(2) ................................................................................................................. 13
R. I. Gen. Laws §§ 11-47-35 – 11-47-35.1 .......................................................................... 12
R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3 .............................................................................. 34
Rev. Code Wash. (ARCW) § 9.41.090(2) ............................................................................ 12
Vt. Stat. Ann. tit. 13, § 4021 ................................................................................................ 39
Wyo. Stat. Ann. § 6-8-104 .................................................................................................... 14

## **Rules**

Federal Rule of Civil Procedure 19(a)(1)(B)(i) .................................................................. 43
Federal Rule of Civil Procedure 19(b)(1)(2)(B) ................................................................. 43

## **Other Authorities**

52 Cong. Ch. 159 .......................................................................................................... 11

1913 Or. Laws 497.......................................................................................................... 11

1921 Mo. Laws 691 ........................................................................................................ 11

1927 N.J. Laws 742 ........................................................................................................ 11

## INTRODUCTION

In November, Oregon voters passed the Reduction of Gun Violence Act, more commonly known as Measure 114.  Measure 114 is Oregon's response to the sharp increase in gun violence in Oregon, including the 2015 mass shooting at Umpqua Community College that left 10 dead and seven wounded and the 2012 mass shooting at Clackamas Town Center that left two dead and one wounded.  Measure 114 includes three components, two of which have been challenged in this litigation.  First, Measure 114 requires gun purchasers to obtain a permit to purchase before purchasing new firearms in most circumstances.  Second, Measure 114 prohibits the sale, possession, or transfer of large-capacity magazines ("LCMs"), with certain exceptions.  Third, Measure 114 amends the state's existing background check laws to ensure that prospective transferors of firearms not only request but also receive approval from the Oregon State Police before transferring a firearm.  Plaintiffs challenge the first and second components.  Evidence at trial will demonstrate that those components of Measure 114 are consistent with the Second Amendment.

The Supreme Court recently held that shall-issue permit regimes, like Measure 114's permit-to-purchase program, are consistent with the Second Amendment.  *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022); *see also id.* at 2161 (Kavanaugh, J., concurring joined by Roberts, C.J.) (same).  Indeed, in *Bruen*, the Court explicitly cited the Oregon concealed handgun statute that Measure 114 is based on as a permissible shall-issue regime.  *Id.* at 2123 n.1.  Here, the Oregon State Police ("OSP") is prepared to fulfill its role in issuing permits, as are local permit agents.

At trial, evidence also will demonstrate that plaintiffs' challenge to Measure 114's LCM restrictions fails as a matter of law.  LCMs are not arms protected by the Second Amendment because LCMs are not necessary for firearms to function for lawful purposes.  Furthermore,

LCMs are almost never used in self-defense and were unknown in the Founding Era.  Plaintiffs'

own experts testified that the handful of guns at the Founding capable of accepting more than

one round of ammunition without reloading were "one-offs" and "highly unusual" to where

"very few people" would have even known that they existed.  For that exact reason, since this

Court denied plaintiffs' motion for a temporary restraining order and preliminary injunction on

the issue, federal district and state appellate courts across the country have rightly held that LCM

restrictions pass constitutional muster under the Second Amendment.

**BACKGROUND**

I.    **Measure 114**

       The Court's December 6, 2022 Opinion and Order (ECF 39 ("TRO Order")) and

defendants' Response to the Emergency Motion for Preliminary Injunction and Supporting

Memorandum of Law (ECF 15) summarize Measure 114 and its provisions.  Defendants

incorporate those summaries here.  In sum, Measure 114: (1) prohibits the purchase and restricts

the use of large-capacity magazines; (2) requires a permit to purchase firearms; and (3) closes the

so-called "Charleston Loophole" by requiring the completion of a background check before a

firearm transfer.

II.    **This Case**

       This consolidated action involves four lawsuits challenging the constitutionality of

Measure 114.  Plaintiffs are individuals, businesses, sheriffs, and special interest groups.

Defendants are Governor Tina Kotek, Attorney General Ellen Rosenblum, and Superintendent of

the Oregon State Police Casey Codding in their official capacities.[1]  Across their four

---

[1] The Court dismissed individual-capacity claim against the defendants.  (ECF 162.)

complaints, plaintiffs advance fifteen overlapping claims comprising seven distinct legal

theories:

- Large-capacity magazines:

  - The LCM provisions violate the Second Amendment (*Oregon Firearms*, *Fitz*, *Eyre*);
  - The LCM provisions violate the Takings Clause (*Oregon Firearms*, *Eyre*);
  - The definition of a "large-capacity magazine" violates the Due Process Clause because it is vague (*Oregon Firearms*, *Eyre*); and
  - The LCM provisions violate the Due Process Clause because they are retroactive (*Oregon Firearms*, *Eyre*).

- Permit to purchase:

  - The permit requirement violates the Second Amendment on its face (*Oregon Firearms*, *Eyre*, *Azzopardi*);
  - The permit provisions violate the Due Process Clause as applied because the permitting process is "arbitrary government action" (*Oregon Firearms, Eyre*); and
  - The permit provisions violate the Second Amendment as applied or facially because defendants and Oregon's sheriffs and police chiefs (who are not defendants) cannot presently implement them (*Oregon Firearms*, *Eyre*, *Azzopardi*).[2]

- Charleston Loophole:

  - None.[3]

## III.    Procedural History

Initially, plaintiffs filed motions seeking temporary restraining orders preventing Measure

114 from going into effect.  On December 6, 2022, this Court denied plaintiffs' motions.  As to

---

[2] For the reasons stated in defendants' motion for summary judgment (ECF 163), the Court should dismiss all claims that address the implementation of Measure 114's permit-to-purchase program.

[3] Plaintiffs have not challenged Measure 114's revisions to Oregon's existing background check statutes in their complaints.  The complaints request that the Court find the "permitting provisions" unconstitutional, not the revisions to Oregon's existing background check provisions. (*Eyre* 1st Am. Compl. ¶ 98 (ECF 67); *Oregon Firearms* 3rd Am. Compl. ¶ 133 (ECF 133)). No claim in any of plaintiffs' complaints requests the Court declare Measure 114's revisions to Oregon's background check statutes unconstitutional separate and apart from the permit-to-purchase provisions.  The revisions to Oregon's background check statutes can be implemented separately from the permit provisions.  To the extent plaintiffs have alleged a challenge to closing the Charleston Loophole, the challenge should be dismissed because it has

LCMs, the Court preliminarily ruled that such magazines did not constitute "firearms" within "the plain text of the Second Amendment." (TRO Order at 20.) In addition, the Court found that LCMs are not in common use for lawful purposes like self-defense "such that they fall within the plain text of the Second Amendment." (*Id*. at 24.) Regardless, the Court ruled that LCMs were a "dramatic technological change" not contemplated by the Founders and, further, Measure 114's restrictions on LCMs were analogically consistent with "historical regulations" of arms "[i]n light of the evidence of the rise in mass shooting incidents and the connection between mass shooting incidents and large-capacity magazines[.]" (*Id*. at 26, 31.)

On permit to purchase, the Court similarly rejected plaintiffs' challenges. The Court explained that Measure 114 created an "objective shall-issue licensing regime[]" consistent with the Supreme Court's guidance in *Bruen*, 142 S. Ct. 2111. (*Id*. at 31 (quoting *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring joined by Roberts, C.J.)).)

Separately, a state circuit court has preliminarily enjoined enforcement of Measure 114 pending a trial on the merits in a state-law challenge to Measure 114. *Arnold v. Kotek*, No. 22CV41008, 2022 WL 17495052 (Or. Cir. Ct., Harney Cnty.) A five-day trial is set to begin in that case on September 18, 2023. The state court enjoined enforcement of Measure 114 but allowed permit agents and OSP to move forward with implementing the permit-to-purchase program, including processing any permit applications permit agents receive.

## IV. Development of the Permit-to-Purchase Program

As will be detailed at trial, OSP and local permit agents (police chiefs and sheriffs) have spent the past six months working to implement Measure 114's permit-to-purchase program.

---

not been applied to any plaintiff and plaintiffs cannot demonstrate it will be applied unconstitutionally in every circumstance. (Defs' Mot. for Summ. J. (ECF 163) at 7 n.1.)

OSP is prepared to implement their functions under Measure 114. OSP has formally adopted a permit application form. In addition, OSP is working with a technology vendor to allow local law enforcement departments to transmit fingerprints electronically. Although this transmission system is not yet operational for permit applications, OSP expects that it will be ready be within 30 business days after Measure 114 enforcement goes into effect, should enforcement ultimately occur. Until that date, the electronic transmission system is not necessary to process applications: OSP can receive fingerprints on fingerprint cards through the United States mail or by courier. Once OSP receives applications, it will run background checks on applicants using existing state and federal systems, including an Oregon fingerprint database, and report the outcomes to permit agents.

The Oregon State Sheriffs Association ("OSSA") and the Oregon Association of Chiefs of Police ("OACP") also have been working to help permit agents implement their functions under Measures 114. OSSA and OACP have developed and circulated a 60-page process manual that provides step-by-step guidance on the permit application process for local permit agents. OSSA also has developed an online firearms safety course that fulfills the requirements of Measure 114 § 4(8)(c)(A)-(C). That course is available now to would-be applicants and, as of January 2023, more than 900 people have completed it. In addition, OSSA and OACP adopted and circulated a nine-page outline of "Best Practices" for conducting the in-person training component required in Measure 114 § 4(8)(c)(D). This document provides step-by-step guidance to permit agents and certified instructors on how to conduct an in-person demonstration. For example, the guidance explains that the in-person demonstration contemplated by Measure 114 can be conducted with live firing, dummy rounds, or even

inoperable firearms.  Furthermore, OSSA and OACP have adopted and circulated a formal

certificate that applicants can receive upon completion of an in-person training course.

## ARGUMENT

Plaintiffs raise seven distinct legal theories to challenge Measure 114: three against the

permit provisions, four against the LCM restrictions, and none against the closure of the

Charleston Loophole.  Evidence at trial will demonstrate that none has merit.

**I.      Measure 114's permit-to-purchase requirement complies with the Second
         Amendment.**

Measure 114 establishes a "shall issue" permit-to-purchase system that creates few new

limitations on firearms acquisition.  *Bruen* made clear that it did not prohibit "shall issue" permit

systems:

> To be clear, nothing in our analysis should be interpreted to
> suggest the unconstitutionality of the 43 States' "shall-issue"
> licensing regimes, under which a general desire for self-defense is
> sufficient to obtain a [permit.] . . . [I]t appears that these shall-issue
> regimes, which often require applicants to undergo a background
> check or pass a firearms safety course, are designed to ensure only
> that those bearing arms in the jurisdiction are, in fact, law-abiding,
> responsible citizens.  And they likewise appear to contain only
> narrow, objective, and definite standards guiding licensing
> officials, . . . rather than requiring the appraisal of facts, the
> exercise of judgment, and the formation of an opinion[.]

142 S. Ct. at 2138 n.9 (quotation marks and citations omitted); *see also id.* at 2161 (Kavanaugh,

J., concurring joined by Roberts, C.J.) (same sentiment) (quotation marks and citations omitted).

Here, Measure 114 provides for precisely what *Bruen* allows.  It:

1. Requires a person to present a permit to acquire a firearm;

2. Requires the person to pass a background check to obtain the permit;

3. Requires the person to provide fingerprints to OSP for its use in the background
   check;

4. Requires the person to complete a firearm safety course;

5. Requires the person to pay a fee, capped at $65; and

6.   Requires law enforcement to determine whether there are reasonable grounds to conclude that the applicant's mental state or behavioral history makes the applicant a risk to self, others, or the community.

As this Court correctly ruled, "Measure 114's permit-to-purchase requirements track squarely with the objective regime outlined in *Bruen*: they require applicants to undergo a background check, fingerprinting, a mental health check, and training in firearms."  (TRO Order at 32.)

### A.   *Bruen* expressly allows states to enact shall-issue permit regimes.

*Bruen* expressly allows states to enact shall-issue permit regimes that "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens."  142 S. Ct. at 2138 n.9 (quotation marks and citations omitted).  Plaintiffs wrongly contend that the Court should disregard *Bruen*'s express words and, instead, determine whether Measure 114's permit requirement is consistent with this nation's historical tradition of firearm regulation.  (Pls.' Mot. for Summ. J. or, in the Alternative, Trial Br. ("Pls.' Trial Br.") (ECF 165) at 24-27.[4])  But *Bruen* and its predecessor, *District of Columbia v. Heller*, 554 U.S. 570 (2008), have already determined that permit requirements are constitutional.

In *Heller*, the Supreme Court invalidated a District of Columbia law that prohibited the possession of handguns, either at home or in public.  554 U.S. at 574.  In doing so, the Supreme Court held that the Second Amendment historically protected "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 635.  But the Court also stated that its opinion did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]"  *Id.* at 626.

---

[4]  All page numbers for Court-filed documents are to the Court's docket page numbers at the top of the page.

In *Bruen*, the Supreme Court confirmed that firearm permits do not violate the Second Amendment because they are consistent with the historic tradition of limiting firearm usage to "law-abiding, responsible" citizens.  142 S. Ct. at 2138 n.9.  Justice Kavanaugh's concurrence, joined by Chief Justice Roberts, emphasized that shall-issue permit programs are constitutional: "[T]he Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense."  *Id.* at 2161 (Kavanaugh, J., concurring).  Justice Kavanaugh explained that "43 States employ objective shall-issue licensing regimes.  Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements."  *Id.* at 2162.  And he reiterated that, "shall-issue licensing regimes are constitutionally permissible[.]"  *Id.*  As such, this Court need not determine whether permit requirements are consistent with the nation's historical tradition; the Supreme Court has already clearly stated that they are.

Plaintiffs also unconvincingly argue that Measure 114's permit to purchase is unconstitutional because it implicates a person's right to *keep* arms, while the concealed carry licensing requirements discussed in *Bruen* implicate the right to *bear* arms.  (Pls.' Trial Br. 25-26.)  But the Supreme Court has not established different tests for keeping and bearing arms and the Constitution makes no distinction.  Instead, as the *Heller* Court explained, the Second Amendment does not forbid "longstanding prohibitions on the *possession* of firearms by felons and the mentally ill[.]"  554 U.S. at 626 (emphasis added).  Clayton Cramer, a witness for plaintiffs, testified that licenses to "possess" and "carry" firearms were "scarce" before 1868.  (First Decl. of Clayton Cramer (Permit System) at 9 (ECF 74).)  But if plaintiffs were correct that the absence of permits and background checks at the founding barred them today, that would

necessarily mean that permit requirements for the concealed carrying of firearms are unconstitutional as well, a proposition the *Bruen* Court explicitly rejected.  Permit requirements are constitutional under *Bruen* and *Heller*.

Regardless, the historical record confirms that permit requirements are consistent with the nation's historic tradition of firearm regulation.  At the Founding, firearms regulations controlled and traced the sale of firearms and ensured that individuals perceived as dangerous did not obtain them.  *United States v. Holton*, No. 3:21-CR-0482-B, 2022 WL 16701935, at *5 (N.D. Tex. Nov. 3, 2022).  A 1631 Virginia law required that commanders take a yearly recording of all "arms and munitions" in the colony.  Virginia Act of Feb. 27, 1631.

More generally, many jurisdictions in the Founding Era either forbade the firing of firearms outright or required a special license from the government to discharge firearms.  In 1713, Philadelphia prohibited "firing a Gun without license."[5]  Many other jurisdictions enacted discharge license requirements throughout the 1800s.[6]  Similarly, as Dr. Spitzer will testify, throughout the 1700s and 1800s, states and municipalities regulated the commercial sale of gunpowder, due to the fear of unsafe handling and storage of this combustible material.  (Spitzer Decl. ¶¶ 78-83, Exs. I, J.)  These regulations included licensing requirements for gunpowder sellers.  For instance, the 1862 Portland City Charter prohibited keeping gunpowder for sale "without having first obtained a license therefor."  (Spitzer Decl. Ex. J at 35-36.)  Indeed, an

---

[5] https://firearmslaw.duke.edu/laws/pennsylvania-archives-selected-and-arranged-from-original-documents-in-the-office-of-the-secretary-of-the-commonwealth-conformably-to-acts-of-the-general-assembly-february-15-1851-march-1-1852/

[6] *See, e.g.*, https://firearmslaw.duke.edu/laws/laws-of-the-state-of-new-york-relating-to-the-city-of-schenectady-and-the-laws-and-ordinances-of-the-common-council-of-the-city-of-schenectady-page-58-image-58-1824-available-at-the-making-of-mod/; https://firearmslaw.duke.edu/laws/the-act-of-incorporation-and-the-ordinances-and-regulations-of-the-town-of-marietta-washington-county-ohio-page-17-18-image-17-18-1837-available-at-the-making-of-modern-law-primary-sources/

1851 Chicago ordinance required a permit from the city council or mayor to "keep" gunpowder in "any quantity."[7]

In addition, in the 1800s, numerous states regulated firearm transfers by taxing firearm sales. *See* Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, Law & Contemp. Probs., 2017, at 55, 76 (compiling statutes); *see also Herrera v. Raoul*, No. 23 CV 532, 2023 WL 3074799, at *9 (N.D. Ill. Apr. 25, 2023) (same). As Dr. Rivas will explain at trial, an 1838 Florida law taxed commercial dealers of pocket pistols and other deadly weapons. (Decl. of Brennan Rivas (ECF 121) ("Rivas Decl.") ¶ 19). Pre-Civil War era statutes in the South also taxed sales of pistols and other deadly weapons. (*Id.* at ¶ 19 & n. 20). Similarly, in the late 1800s, states and municipalities forbade the sale of firearms to minors. For instance, in pre-Civil War statutes, Alabama and Kentucky barred the sale of pistols to minors. George Washington Stone, The Penal Code of Alabama, Montgomery, 1866 Page 63.[8] Many states enacted similar laws forbidding the sales of weapons to minors in the years that followed the Civil War and into the early 1900s. *See* Spitzer at 55, 76.

In the post-Civil War period, states and municipalities also required permits for the public carrying of firearms. For instance, an 1871 Missouri law required a license for the concealed carrying of handguns and other named weapons in St. Louis.[9] Many other jurisdictions enacted

---

[7] https://firearmslaw.duke.edu/laws/george-manierre-the-revised-charter-and-ordinances-of-the-city-of-chicago-to-which-are-added-the-constitutions-of-the-united-states-and-state-of-illinois-page-123-125-image-131-133-1851-available/

[8] https://firearmslaw.duke.edu/laws/george-washington-stone-the-penal-code-of-alabama-montgomery-1866-page-63-image-63-1866-available-at-the-making-of-modern-law-primary-sources/

[9] https://firearmslaw.duke.edu/laws/everett-wilson-pattison-the-revised-ordinance-of-the-city-of-st-louis-together-with-the-constitution-of-the-united-states-and-of-the-state-of-missouri-the-charter-of-the-city-and-a-digest-of-the/

similar laws in the late 1800s.[10]  Indeed, Congress itself enacted a permit requirement for the

District of Columbia in 1892 that prohibited the carrying of weapons such as pistols and air guns

without first obtaining "a written permit to carry such weapon or weapons by any judge of the

police court of the District of Columbia."[11]  (*See also* Spitzer Decl. ¶ 73) (stating that prior to

1938 nearly every state restricted the carrying of pistols and guns, *inter alia*, through licensing

requirements.)  Similarly, in the late 1800s and early 1900s, states enacted laws requiring

firearms purchasers to submit certain information to firearms sellers as a condition of the sale.[12]

Consistent with this tradition, in 1911, New York enacted a permit-to-purchase regime

that required a permit at the point of purchase.  *See, e.g.*, 1 Sullivan Dangerous Weapons Act,

1911 N.Y. Laws ch. 195, sec. 1, § 1897 (codified as amended at N.Y. Penal Law §§ 265.01(1),

265.20(a)(3)).  Many other jurisdictions enacted similar laws during this same time period.[13]

Indeed, Oregon enacted its first permit-to-purchase requirement in 1913.  *See* 1913 Or. Laws

497, ch. 256, § 1 ("An Act Forbidding the sale, barter, giving away, disposal of or display for

sale of pocket pistols and revolvers, and fixing a penalty for violation thereof").  This regulatory

method endures today.  Not counting Oregon, 13 states and the District of Columbia have

---

[10] *See, e.g.*, https://firearmslaw.duke.edu/laws/george-r-donnan-annotated-code-of-criminal-procedure-and-penal-code-of-the-state-of-new-york-as-amended-1882-5-page-172-image-699-1885-available-at-the-making-of-modern-law-primary-sources/; https://firearmslaw.duke.edu/laws/ordinances-of-jersey-city-passed-by-the-board-of-aldermen-since-may-1-1871-under-the-act-entitled-an-act-to-re-organize-the-local-government-of-jersey-city-passed-march-31-1871-and-the-supplem/.

[11]*See* An Act To punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes., 52 Cong. Ch. 159, July 13, 1892, 27 Stat. 116 (1892).

[12] *See, e.g.*, https://firearmslaw.duke.edu/laws/merritt-starr-russell-h-curtis-annotated-statutes-of-the-state-of-illinois-in-force-1885-criminal-code-ch-38-para-90/; 1911 Colo. Sess. Laws 408, Section 3.

[13] *See, e.g.*, 1927 N.J. Laws 742 (requiring a "permit to purchase a pistol or revolver"); 1921 Mo. Laws 691, 692 (requiring "permit to acquire" pistol, revolver, or other dangerous weapon).

**Page 11 - DEFENDANTS' TRIAL BRIEF**

enacted laws that require some form of license, permit, or training certificate to possess or purchase a firearm.[14]  In sum, the nation has a rich history of regulating the sale of firearms and in particular restricting firearms sales to "law-abiding, responsible citizens."  *Bruen*, 142 S. Ct. at 2138 n.9 (quotation marks and citation omitted).

### B. Measure 114's mental-health-review provision is consistent with *Heller* and *Bruen*.

Measure 114's mental-health-review provisions also comport with the Second Amendment.  Measure 114 § 4(1)(a)(C).  Plaintiffs argue that this "provision on its face allows permit agents to deny permits based on the exercise of judgment and formation of an opinion about the applicant's suitability to own a firearm."  (Pls.' Trial Br. at 28.).  Plaintiffs are mistaken.

The Second Amendment protects "the right of law-abiding, *responsible* citizens" to keep and use arms.  *Bruen*, 142 S. Ct. at 2118 (quoting *Heller*, 554 U.S. at 635) (emphasis added).  All three of the Supreme Court's major Second Amendment decisions since 2008 note that governments may prohibit persons suffering from mental illness from possessing firearms. *Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill"); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J. concurring) (reemphasizing *Heller*'s circumspection regarding "felons and the mentally ill"); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (same).

---

[14] Cal. Penal Code §§ 16370, 16670, 26840-26859, 31610-31700; Conn. Gen. Stat. §§ 29-33, 29-36f – 29-36i, 29-37a, 29-38g – 29-38j; D. C. Code Ann. §§ 7-2502.01 – 7-2502.10; D.C. Mun. Regs. tit. 24, D.C. Mun. Regs. tit. 24, §§ 2311 – 2320; Haw. Rev. Stat. Ann. §§ 134-2, 134-13; 430 Ill. Comp. Stat. 65/1 – 65/15a; Md. Code Ann. Pub. Safety § 5-117.1. 2013 Md. SB 281; Mass. Gen. Laws ch. 140, §§ 121, 129B, 129C, 131, 131A, 131E, 131P; Mich. Comp. Laws §§ 28.422, 28.422a; Neb. Rev. Stat. Ann. §§ 69-2404, 69-2407, 69-2409; N.J. Stat. Ann. § 2C:58-3; N.Y. Penal Law §§ 400.00 – 400.01; R. I. Gen. Laws §§ 11-47-35 – 11-47-35.1; Rev. Code Wash. (ARCW) § 9.41.090(2).

Measure 114's mental health review is an objective inquiry permissible under *Heller* and

*Bruen*.  Measure 114 states that a person "is qualified" to obtain a permit to purchase if, among

other things, the person:

> Does not present reasonable grounds for a permit agent to conclude
> that the applicant has been or is reasonably likely to be a danger to
> self or others, or to the community at large, as a result of the
> applicant's mental or psychological state or as demonstrated by the
> applicant's past pattern of behavior involving unlawful violence or
> threats of unlawful violence[.][15]

Consistent with *Bruen*, the permit agent then "shall issue" a permit if the applicant is so

qualified.

This is not a "pure judgment call" that subjects Second Amendment rights to "the whims

of government officials."  (Pls.' Trial Br. at 12, 17.)  The permit agent must have "reasonable

grounds" to believe that the person is "a danger to self or others."  The permit process guidance

circulated by OSSA and OACP explains that permit agents should consult "State and Federal

databases" and "local records and databases" to determine whether an applicant is a danger to

themselves and others.

Several local permit agents are plaintiffs in this case.  As those plaintiffs explained, the

mental-health-review provision of Measure 114 mirrors the requirements of the existing CHL

statute.  (Decl. of Harry B. Wilson ("Wilson Decl."), Ex. 8 (Dep. of Brad Lohrey Dep. at Tr.

67:6-68:24).); ORS 166.293(2) (same "reasonable grounds" standard for CHL).  Sheriff Pixley

explained that he and his office rely on training, a reference manual, court documents, and

statements from doctors, medical providers, and family members to make a determination.  (*Id.*,

---

[15] Measure 114 § 4(1)(b)(C).

Ex. 10 (Dep. of Brian Pixley at Tr. 64:8-66:18).)  At trial, no sheriff plaintiff will testify that they

and their colleagues intend to deny applications without justification based on "whims."

To the extent that a permit agent does deny a permit on a "whim," Measure 114 has

express judicial review provisions to challenge such a denial.  After reviewing the databases

described above, the permit agent must explain the reasons for a denial in writing, and an

applicant can immediately pursue an expedited appeal of any denial in Oregon Circuit Court.

Measure 114 § 5(5).  On appeal, the circuit court reviews *de novo* the evidence on which the

permit agent relied in denying the application and any countervailing evidence offered by the

applicant to determine if the denial was appropriate.  *Id.* § 5(10).  When construing the nearly

identical CHL provision, the Oregon Court of Appeals has held that a reviewing court should

consider the "evidence on which the sheriff relied in evaluating" the applicant's dangerousness.

*Concealed Handgun License for Stanley v. Myers*, 276 Or. App. 321, 331 (2016).  Because the

reviewing court must conduct a *de novo* review of the *evidence* supporting a permit denial,

plaintiffs are simply wrong as a matter of state law that Measure 114 authorizes permit agents to

deny permit application based on "subjective" beliefs and "whims."

*Bruen* cited Oregon's concealed carry statute as an example of a "'shall-issue' licensing

regime[]" that does "not necessarily prevent law-abiding, responsible citizens from exercising

their Second Amendment right to public carry."  142 S. Ct. at 2138 n.9 (quotation marks

omitted); *see id*. at 2123 n.1 (citing Oregon law).  Similarly, like Oregon, concealed carry

statutes in Missouri, Montana, North Dakota, and Wyoming all allow for permit denial if a

permit agent reviews available evidence and forms a "reasonable" belief that the applicant is a

danger to himself or others.[16]  The *Bruen* Court endorsed each of these statutes as permissible as well.  *Id*.

By contrast, plaintiffs do not cite, and defendants have not found, a single case striking down a similar mental-health-review provision as facially unconstitutional.  Instead, federal courts uphold mental health reviews by permit agents against Second Amendment challenges, even in states with more broadly worded statutes.  *See Kuck v. Danaher*, 822 F. Supp. 2d 109, 128 (D. Conn. 2011) (upholding statute that required permitting agent to determine whether applicant was "suitable" to carry a handgun in public); *White v. Illinois State Police*, 482 F. Supp. 3d 752, 764-65 (N.D. Ill. 2020), *aff'd as modified*, 15 F.4th 801 (7th Cir. 2021) (upholding statute that required permitting agent to determine whether concealed-carry applicant "pose[d] a danger"); *see also Bruen*, 142 S. Ct. at 2123 n.1, 2138 n.9 (endorsing constitutionality of the Connecticut and Illinois statutes upheld in *Kuck* and *White*).  In sum, the mental-health-review provision in Measure 114 is not a "pure judgment call":  It is the type of objective inquiry explicitly endorsed in *Bruen*.

---

[16] See, Mo. Ann. Stat. § 571.101(2)(7) (requiring license to issue if applicant has "not engaged in a pattern of behavior, documented in public or closed records, that causes the sheriff to have a *reasonable belief* that the applicant presents a danger to himself or others") (emphasis added); Mont. Code Ann. § 45-8-321(2) ("The sheriff may deny an applicant a permit to carry a concealed weapon if the sheriff has *reasonable cause* to believe that the applicant is mentally ill, mentally disordered, or mentally disabled or otherwise may be a threat to the peace and good order of the community . . . .") (emphasis added); N.D. Cent. Code Ann. § 62.1-04-03 (West) ("The bureau may deny approval for a license if the bureau has reasonable cause to believe that the applicant or license holder has been or is a danger to self or others as demonstrated by evidence . . . ."); Wyo. Stat. Ann. § 6-8-104 ("The written report shall . . . establish reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to himself or others, or to the community at large as a result of the applicant's mental or psychological state, as demonstrated by a past pattern or practice of behavior, or participation in incidents involving a controlled substance, alcohol abuse, violence or threats of violence as these incidents relate to criteria listed in this section.").

**C.    The permit to purchase is not duplicative of the background check at the point of sale.**

Plaintiffs further contend that requiring a background check both to acquire a permit and to purchase a firearm is "duplicative" and, therefore, facially invalid.  (Pls.' Trial Br. at 31.)  Not so.  The permit remains valid for five years; a second background check at the point of purchase thus determines whether a disqualifying event has occurred in the intervening time since the purchaser acquired their permit.

**D.    The permit and training fees are not unconstitutionally high.**

Plaintiffs also assert that it is unconstitutional to require them to pay for a permit and firearms training.  But evidence at trial will demonstrate that the fees contemplated by Measure 114 are constitutional.  OSSA-OACP guidance states that the fee for the in-person demonstration should be no more than $30.  The fee to receive a certificate following OSSA's online safety course is $60.  And the application fee for the permit to purchase is the permit agent's actual costs, not to exceed $65.  The permit to purchase lasts five years.  Thus, the total fee for a five-year permit to purchase will be no more than $155 (or $31 per year).  This modest annual expense for a permit to purchase firearms is constitutional.  *See, e.g.*, *Kwong v. Bloomberg*, 723 F.3d 160, 165-66 (2d Cir. 2013) (upholding $340 fee for handgun license, which lasted three years) (citations omitted).

**II.    Plaintiffs' facial and as-applied challenge to the implementation of Measure 114's permitting requirement will fail.**

Three of the four consolidated cases raise facial or as-applied challenges to the implementation of Measure 114's permit-to-purchase program.  (*Azzopardi* Am. Compl. ¶¶ 44-49[17]; *Eyre* Am. Compl. ¶¶ 83-105 (ECF 67); and *OFF* 3d. Am. Compl. ¶¶ 118-136 (ECF 158).)

---

[17] Filed only in *Azzopardi, et al. v. Rosenblum, et al.*, U.S. District Court for the District of Oregon Case No. 3:22-cv-01869 (ECF 112).

Defendants have separately moved for summary judgment and to dismiss these challenges. (ECF 163.) Because plaintiffs cannot show that implementation of Measure 114 would be unconstitutional in every circumstance, their facial challenges must fail. And because their as-applied theories necessarily depend on speculation about (1) when the state courts will lift the Harney County circuit court's injunction and (2) what the status of permit implementation looks like at that time, their as-applied challenges must fail as well. (*Id.*) The Court should decline to speculate that the state will violate plaintiffs' rights, particularly given that the outcome of the permit application process (including a failure to respond within 30 days) is explicitly subject to review by the state courts.

Even if the Court denies defendants' motion, plaintiffs cannot prevail at trial on their implementation challenges.

### A. Permit agents and OSP are ready to issue permits and implement the permit to purchase program.

The evidence will show that the permit-to-purchase system is ready to be implemented now and enforced when the state court lifts its injunction in September. Evidence at trial will demonstrate that the permit-to-purchase program is ready to be implemented and that permit applications can be processed when they are received. OSP's Criminal Justice Information Systems Division Director Wendy Landers will testify that OSP is prepared to implement its functions under Measure 114. (*See also,* Decl. of Commander Rebecca ("David Decl.") ¶ 3 (ECF 117).) Ms. Landers will testify that OSP has created an application form for local law enforcement to use. OSP can receive completed applications collected by local law enforcement by fax or U.S. mail. Once OSP receives applications, it will run background checks on applicants using existing state and federal systems. Although OSP's electronic fingerprint transmission system is not yet operational for permit applications, OSP can receive fingerprints

on fingerprint cards through the U.S. mail.  (*Id.* ¶ 5.)  OSP has already made arrangements with

its vendor to begin receiving fingerprints electronically once the state court injunction is lifted.

Local law enforcement—whom plaintiffs have not named as defendants in these cases—

can also issue permits to applicants now.  Kevin Campbell, Executive Director of the Oregon

Association of Chiefs of Police ("OACP"), was clear in deposition that his members will

implement Measure 114: "When a law is passed, we implement the law."  (2/06/2023 Decl. of

Rebecca Dodd ("Dodd Decl.") Ex. 7, 1/17/23 Campbell Dep. ("Campbell Dep.") at 16:4 (ECF

126-7).)  In fact, other than the FBI fingerprinting issue, Mr. Campbell could not identify any

other "legal obstacle to implementing" Measure 114.  (*Id.* at 32:12-13; Dodd Decl. Ex. 8, 2/1/23

Myers Dep. ("Myers Dep.") at 75:24-76:1 (identifying fingerprint issue as only legal

impediment) (ECF 126-8).)  Although Mr. Campbell testified that some police departments

could face resources challenges, he was not aware of any particular police department that would

flatly refuse to implement Measure 114.  (Dodd Decl. Ex. 7, Campbell Dep. at 104:13-

14.)  Similarly, Sheriff Pixley, a plaintiff in the *Oregon Firearms* case, testified that he would

implement the permit-to-purchase program if Measure 114 goes into effect. (Pixley Dep. at

37:21-25, attached to Second Decl. of Rebecca Dodd ("2nd Dodd Decl.") as Ex 1. (ECF 164-1).)

Sheriff Rowan, another plaintiff, testified that his county would "be ready to go" with in-person

demonstrations if the state court injunction is lifted. (*Id.*, Ex. 2, Rowan Dep. at 85:18-23 (ECF

164-2).)

Sheriff Jason Myers, Executive Director of the Oregon State Sheriffs Association

("OSSA") testified in his deposition in February that a joint OSSA-OACP workgroup was

developing a "process map" for implementing Measure 114 at the local level.  (Dodd Decl. Ex.

8, Myers Dep. at 31:22-32:2 (ECF 126-8).)  In addition, OSSA and OACP developed guidance

for permit agents on how to perform the in-person demonstration portion of Measure 114's training, which has been distributed.  (2nd Dodd Decl. Ex. 1, Pixley Dep. at 59:2-23 (ECF 164-1); Ex 3 (Dep. Ex. 113) (ECF 164-3).)  Sheriff Pixley testified that he intends to certify in-person demonstration instructors if Measure 114 goes into effect.  (*Id.,* Ex. 1, Pixley Dep. at 60:13-18.) Sheriff Bowen also confirmed that he would certify instructors, testifying that if Measure 114 "goes into effect and it's the responsibility of my office and that's a service that I have to provide to citizens to lawfully purchase a firearm, yes, I will do everything I possibly can to facilitate those steps needed to purchase a firearm."  (*Id.*, Ex. 4, Bowen Dep. at 95:17-24 (ECF 164-4).) Under Measure 114, every law enforcement agency can perform the in-person demonstration component of the firearm training by certifying their own staff.  Measure 114 § 4(8)(c)(D).  The online portion of the training has been available since January, and many would-be applicants have already completed it.  (2nd Decl. of Jason Myers (ECF 77) ¶ 12.)  In sum, there is no statewide, structural impediment to the implementation of the permit-to-purchase program.

Plaintiffs argue that the FBI's refusal to perform fingerprint checks will make it impossible to issue permits and implement Measure 114.  (Pls.' Trial Br. at 37.)  Not so. Measure 114 requires (1) the permit agent to "request [OSP] to conduct a criminal background check, including . . . a fingerprint identification[] through the Federal Bureau of Investigation"; (2) OSP to determine whether the applicant is qualified or disqualified based on the background check; and (3) OSP to "report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent."  Measure 114, § 4(1)(e).  OSP will meet these requirements.  OSP can and will report the outcome of each of its background checks, including of the FBI fingerprint-based background check, just as the law requires.

At this point in time, the outcome from the FBI would be that they declined to run the check.  (David Decl. ¶ 8.)  OSP's other background checks will provide a basis to determine whether the applicant is qualified or disqualified, while the refusal of the FBI to conduct a fingerprint-based check provides no basis for a decision either way.  The request by a permit agent, the determination by OSP, and the report from OSP to the permit agent are all possible despite the FBI's current declination to conduct a fingerprint-based background check.

But even if the Court determines that Measure 114 requires the FBI to run a criminal background check before a permit agent can issue a permit—a requirement that does not appear in the law's plain text—such a ruling would not invalidate Measure 114.  An Oregon law cannot compel the FBI—a federal agency—to run background fingerprint checks, and any interpretation that would impose such a requirement would create a legal nullity.  *See Hughes v. State*, 314 Or. 1, 31 (1992) (unconstitutional legislative act is a nullity).  Specifically, Measure 114 requires that any invalid or ineffective sections, subsections, sentences, or clauses be severed, rather than declaring the entire act invalid or unconstitutional.  Measure 114 § 12.  Accordingly, the FBI fingerprint check should be severed if the Court concludes that the law cannot be implemented as written.

### B.   Plaintiffs will be unable to prove that they will suffer unconstitutional delays when seeking permits to purchase.

Contrary to plaintiffs' assertion, Measure 114 does not impose an unconstitutional delay to obtain a firearm.  In *Bruen*, the Supreme Court recognized that a shall-issue permitting scheme could be unconstitutional if it subjected applicants to "lengthy wait times" or "exorbitant fees." 142 S. Ct. at 2138 n.9.  Plaintiffs assert that Measure 114's permit-to-purchase requirement is unconstitutional because "[d]elay is baked into the new regime at every turn."  (Pls.' Trial Br. at 13.)

As a threshold matter, plaintiffs' as-applied challenge fails because Measure 114's permit requirement has not been applied to any plaintiff, and they will not be able to show that it has at trial.  A state court injunction currently prohibits the state from requiring permits to purchase firearms.  It is impossible to know when that injunction might be lifted, but it will not be until late September at the earliest.  In general, a plaintiff "cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him."  *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014) (emphasis in original).  Moreover, there is no allegation or evidence that any plaintiff has applied for a permit, and it is unclear when they might do so.  To evade the obvious fact that the law has not been applied to plaintiffs, they describe as an "as-applied" challenge their speculation about harms that might occur when permits are required, and plaintiffs try to obtain them.  (*Azzopardi* Am. Compl. ¶¶ 30-32; *OFF* 3rd Am. Compl. ¶¶ 125-131, 136; *Eyre* Am. Compl. ¶¶ 90-96, 101.)  This is not, in fact, an as-applied challenge.  And the harms that they envision are speculative at best and thus inappropriate for this Court to adjudicate.  At a minimum, this Court should conclude that the harms are not fit for judicial review and there is no hardship to plaintiffs of requiring plaintiffs wait until the "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out[.]"  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

Even if plaintiffs could establish a ripe claim, plaintiffs' evidence will not demonstrate that unconstitutional wait times are "baked into" Measure 114.  Plaintiffs cannot and will not show that they will necessarily face lengthy wait times because they have not applied for permits.  Even if they had, Measure 114 requires permit agents to issue permits "within 30 days."

Measure 114 § 4(3)(a).  And even if the permit agent had not met the deadline, plaintiffs could petition the circuit court for review.  Measure 114 § 5(1).

Furthermore, as the Ninth Circuit has explained, wait times for firearm purchases are not constitutionally suspect.  Indeed, they were common at the Founding:

> There is . . . nothing new in having to wait for the delivery of a weapon.  Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one.  As a purely practical matter, delivery took time.  Our 18th and 19th century forebears knew nothing about electronic transmissions.

*Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016).  Furthermore, the Supreme Court has countenanced similar wait times to exercise First Amendment rights.  *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 324 (2002) (upholding a 28-day period to process application for permit to hold rally in a public park).  Accordingly, the OSP background check does not "bake" unconstitutional delay into the permit process.

Plaintiffs further raise the specter of delay by positing unlikely hypotheticals.  Plaintiffs speculate that rogue permit agents will intentionally "sit on the application" even for clearly eligible applicants.  (Pls.' Trial Br. at 13.)  That is despite the fact that some of the plaintiffs are permit agents, though none of the defendants are.  Plaintiff sheriffs presumably are well positioned to say whether they or their colleagues are likely to behave in such an improper manner, yet in depositions they have suggested precisely the contrary.  At trial, plaintiffs will not put forth any evidence in support of this theory that local law enforcement agencies—which already administer Oregon's CHL program—will capriciously deny or delay permit applications without justification.  If plaintiffs could prove such a hypothetical, there would still be no basis to issue an injunction against state officials, who do not issue permits; at most, it would be grounds for an injunction against local permit agents, who plaintiffs have not sued.

**Page 22 - DEFENDANTS' TRIAL BRIEF**

**III.    Measure 114's restrictions on LCMs are consistent with the Second Amendment.**

The Second Amendment provides that "the right of the people to keep and bear Arms,

shall not be infringed."  But "like most rights, the right secured by the Second Amendment is not

unlimited."  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626 (alterations omitted)).  To

determine whether a regulation passes constitutional muster under *Bruen*, a court first asks

whether "the Second Amendment's plain text covers" the regulated conduct.  *Id.* at 2129.  If so,

the conduct is "presumptively" protected.  *Id.* at 2130.  The government may rebut that

presumption by "demonstrating that it is consistent with the Nation's historical tradition of

firearm regulation," in which case the conduct is outside the scope of the Second Amendment.

*Id.*  Analogizing to historical arms regulations is "neither a regulatory straightjacket nor a

regulatory blank check."  *Id.* at 2133.  Thus, the government need only identify a well-

established or representative "historical analogue," not a "historical twin."  (*Id.* (emphasis

omitted).)  Even if a modern-day regulation is not a "dead ringer" for historical precursors, it still

may be analogous enough to pass constitutional muster.  *Id.*

In its TRO Order, this Court correctly determined that LCMs are not covered by the

Second Amendment's plain text and, regardless, Measure 114's restrictions on LCMs are

consistent with the nation's historic tradition of arms regulation.  Since this Court rendered its

preliminary decision, federal district courts in Delaware, Rhode Island, and the District of

Columbia, as well as two district judges in the Northern District of Illinois, have also rejected

post-*Bruen* challenges to large-capacity magazine restrictions.[18]  Similarly, last month, appellate

---

[18] *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *14 (D.R.I. Dec. 14, 2022); *Hanson v. D.C.*, No. CV 22-2256 (RC), 2023 WL 3019777, at *17 (D.D.C. Apr. 20, 2023); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, No. CV 22-951-RGA, 2023 WL 2655150, at *14 (D. Del. Mar. 27, 2023); *Bevis v. City of Naperville, Illinois*, No. 22 C 4775, 2023 WL 2077392, at *14 (N.D. Ill. Feb. 17, 2023); *Herrera v. Raoul*, No. 23 CV 532, 2023 WL 3074799, at *6 (N.D. Ill. Apr. 25, 2023).  The Southern District of Illinois issued a preliminary injunction enjoining that

courts in Massachusetts and California upheld convictions for LCMs and assault weapons possession, expressly rejecting the argument that *Bruen* rendered the laws at issue unconstitutional.[19]

### A.    LCMs are not "arms" protected by the Second Amendment.

LCMs are not covered by the Second Amendment.  The Second Amendment covers firearms and items "'necessary to use' those firearms."  (TRO Order at 19 (quoting *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014)).)  As the Court previously ruled, LCMs are not "necessary to use" firearms at all, never mind for self-defense.  (*Id.*)  Copious evidence confirms the Court's conclusion.  The parties have stipulated that "[a]ll ten of the highest-selling pistols in the U.S. in 2022 can function with magazines with a maximum capacity of 10 or fewer rounds" and "[m]ost major firearm manufacturers offer models that come standard with a magazine with a maximum capacity of 10 rounds or fewer."  (Pls.' and Defs.' Consolidated Proposed Pretrial Order (ECF No. 161) ("Pretrial Order") at 5 (Stipulated Facts ##69-70).)  Furthermore, according to Jim Yurgealitis, an expert on firearm mechanics who will testify at trial, "any firearm capable of accepting a detachable magazine holding more than 10 rounds will also accept a magazine with a maximum capacity of ten rounds or fewer."  (Decl. of James Yurgealitis ("Yurgealitis Decl.") ¶ 39 (ECF 125).)  Because LCMs are not "necessary to use" firearms, Measure 114's restriction on LCMs is not covered by the plain text of the Second Amendment.

---

state's LCM regulation, but the Seventh Circuit promptly stayed the order.  *Barnett v. Raoul,* 3:23-cv-00209-SPM, 2023 WL 3160285 at *13 (S.D. Ill. Apr. 28, 2023); Order, *Barnett v. Raoul*, Case No. 23-1825 (7th Cir. May 4, 2023) (Easterbrook, J.).  The Southern District of Illinois plaintiffs' application for an injunction pending appeal is pending before the U.S. Supreme Court (No. 22A948).

[19] *Commonwealth v. Guardado*, 206 N.E.3d 512, 541 (2023); *People v. Bocanegra*, No. C095234, 2023 WL 3142421, at *13 (Cal. Ct. App. Apr. 28, 2023).

In response, plaintiffs contend that magazines are an integral part of a firearm.  (Pls' Trial Br. at 31.)  Plaintiffs are mistaken.  The Ninth Circuit has never held that accessory components constitute an arm; rather, any right to an accessory is a "corollary" to the right to bear arms that is limited to accessories "necessary to render [protected] firearms operable."  *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).  Thus, a ban on all bullets would be covered by the Second Amendment, not because bullets are arms, but because bullets are necessary to operate arms.  Here, by contrast, *large-capacity* magazines are not necessary to operate firearms for self-defense—virtually all firearms can operate with magazines that hold 10 rounds or fewer. Accordingly, LCMs are not "arms" protected by the Second Amendment.

     **B.**     **LCMs are not "in common use" for self-defense.**

LCMs are not protected by the Second Amendment for the separate reason that they are not "in common use for lawful purposes like self-defense."  (TRO Order at 20.)  Under *Heller*, the "arms" covered by the Second Amendment include only weapons "typically possessed by law-abiding citizens for lawful purposes"—in particular, weapons "in common use" for self-defense.  554 U.S. at 624-625.  By contrast, the "arms" covered by the Second Amendment do not include military-grade weapons, like "M-16 rifles."  *Id.* at 627.  As a result, prohibitions against civilians possessing military weapons are "fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons."  *Id.* (quotation marks omitted); *see also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that *Bruen* does not change limitations on "the kinds of weapons that people may possess").

Persuasive authority from the federal courts of appeals confirms that LCMs are not commonly used for self-defense.  In *Kolbe v. Hogan*, the Fourth Circuit held that LCMs are outside the scope of the Second Amendment because they are "most useful in military service." 849 F.3d 114, 137 (4th Cir. 2017) (*en banc*), *abrogated on other grounds by Bruen*, 142 S. Ct.

2111 (2022). LCMs "enable a shooter to hit multiple human targets very rapidly." *Id.* (quotation

marks omitted). That "uniquely military feature" makes them "most suitable for military and

law enforcement applications." *Id.* (quotation marks omitted). In *Friedman v. City of Highland

Park*, the Seventh Circuit held that a ban on LCMs left residents with "adequate means of

defense." 784 F.3d 406, 411 (7th Cir. 2015). And in *Duncan v. Bonta*, the Ninth Circuit, sitting

*en banc*, reasoned that "large-capacity magazines provide significant benefit to soldiers and

criminals who wish to kill many people rapidly. But the magazines provide at most a minimal

benefit for civilian, lawful purposes." 19 F.4th 1087, 1106 (9th Cir. 2021) (*en banc*), *vacated

and remanded*, 142 S. Ct. 2895 (2022).[20]

      Similarly, a week after this Court rendered its TRO Order, a federal district court denied

a preliminary injunction in a challenge to Rhode Island's ban on large-capacity feeding

devices. That court concluded that such magazines do not constitute arms within the meaning of

the Second Amendment and, regardless, LCMs are not "weapons of self-defense" protected by

the Second Amendment. *Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS,

2022 WL 17721175, *14 (D.R.I. Dec. 14, 2022).

      At trial, the record in this case will confirm that LCMs are not in "common use" for self-

defense. Lucy Allen, a nationally recognized expert in the intersection of statistics, economics,

and public policy, analyzed the National Rifle Association's Armed Citizen database, which

compiles stories of private citizens who have successfully defended themselves, or others, using

a firearm. (Decl. of Lucy Allen (ECF 116) ("Allen Decl.") ¶¶ 8-20.) Out of 736 reported

incidents, there were just two incidents (0.3% of all incidents), in which the defender reported

---

[20] The Supreme Court vacated *Duncan* for reconsideration in light of *Bruen*, but the *en banc* opinion remains persuasive authority to the extent that its reasoning does not conflict with *Bruen*. Nothing in *Bruen* undermined *Duncan*'s discussion of the characteristics of LCMs.

having fired more than 10 bullets.  (*Id.* ¶ 10.)  Dr. Allen also analyzed a random sample of news stories from 2011 to 2017 and found no reported incidents of more than 10 shots being fired in self-defense.  (*Id.* ¶¶ 13-20.)  The defensive use of LCMs occurs exceedingly rarely, if at all; such uses are not "common."  Dr. Allen will explain her research and findings at trial.

Plaintiffs' evidence is not to the contrary.  Plaintiffs rely on the "ubiquity" of LCMs for the proposition that LCMs are prevalent in society.  (Pls' Trial Br. at 46.)  But as this Court correctly concluded, "The Second Amendment . . . requires a court to not only consider the prevalence of a particular firearm, but also the nature of that firearm's use among civilians." (TRO Order at 21 n.13.)  Specifically, "the question is whether the weapon is in common use . . . *for lawful purposes* like self-defense."  (*Id.* at 21 (quoting *Heller*, 554 U.S. at 624) (quotation marks omitted; emphasis in original).)  As the Court ruled previously, the answer is "no."

Plaintiffs will offer two witnesses on the present-day use of LCMs: Mark Hanish and Massad Ayoob.  Neither provides any basis for the Court to revise its previous decision. Mr. Hanish's source for data on defensive gun use is an unpublished 2021 survey conducted by William English, who is not a witness in this case.  Another of plaintiffs' witnesses conceded that the survey was unreliable because it relies on a "self-selected" group of respondents, and Mr. Hanish acknowledged in deposition that he is not qualified to assess the survey's reliability. (*Compare* Dodd Decl. Ex. 3, 1/25/23 Kleck Dep. at 76:5-77:11 (ECF 126-3) *with* Ex. 2, Hanish Dep. at 57:16-58:17, 85:7-10, 86:7-10 (ECF 126-2).)

Mr. Ayoob will testify that restricting LCMs will limit the ability of citizens to protect themselves from crime "in certain situations."  (Decl. of Massad Ayoob ("Ayoob Decl.") ¶ 6 (ECF 73).)  At his deposition, Mr. Ayoob testified that he is not a statistician and has no opinion on how "common" it is for a civilian to use a large-capacity magazine in self-defense.  (Dodd

Decl. Ex. 4, Ayoob Dep. at 23:12-24:11; *see also id.* at 76:1-5 (ECF 126-4).)  Mr. Ayoob's

declaration identifies just four anecdotes in which a private citizen fired more than ten rounds in

self-defense.  (Ayoob Decl. ¶¶ 14-17.)  Mr. Ayoob's anecdotal deposition testimony confirms

that the use of LCMs for self-defense purposes is exceptional, not common.

     **C.**     **Restrictions on LCMs are consistent with this country's "historical tradition" of arms regulation.**

          **1.**     **LCMs are a dramatic technological change and implicate new societal concerns.**

       Even if the Second Amendment's plain text covers LCMs, Measure 114 would still be

constitutional because it is consistent with the "historical tradition" of arms regulation.  As the

Court previously explained, when faced with "dramatic technological changes or unprecedented

societal concerns," the Court is to consider "historical analogues" to determine whether a given

law is consistent with this country's historical tradition of arms regulation.  (TRO Order at 24

(*citing Bruen*, 142 S. Ct. at 2132).)  LCMs are an example of "dramatic technological changes"

that explain the absence of precise "founding-era historical precedent."  *Bruen*, 142 S. Ct. at

2131-32.  They "were not common in 1791."  *Friedman*, 784 F.3d at 410.  In fact, "[m]ost guns

available then could not fire more than one shot without being reloaded[.]"  *Id.*

       Testimony at trial will confirm that in 1791, guns capable of firing ten or more shots were

"experimental" and "vanishingly rare."  (Decl. of Brian DeLay ("DeLay Decl.") ¶ 7 (ECF 118).)

These weapons were not on the market until 1860s and, even then, they accounted for less than

0.002% of guns in the U.S.  (*Id.*)  Most gun owners during the 1700s "possessed and used single-

shot, muzzle-loading, flintlock firearms."  (Decl. of Kevin Sweeney ("Sweeney Decl.") ¶ 5 (ECF

124); Pretrial Order at 5 (Stipulated Fact #58).)  A review of historical records from the

eighteenth century confirms that repeating firearms were "extraordinarily rare."  (Sweeney Decl.

¶ 22; *see* DeLay Decl. ¶ 14.)

**Page 28 - DEFENDANTS' TRIAL BRIEF**

Defendants' experts will explain that these experimental repeating firearms of the 1790s were not only rare, they were dangerous, inaccurate, difficult to use, and unreliable.  (DeLay Decl. ¶¶ 14-15, 20-21; Sweeney Decl. ¶ 47; Decl. of Roger Pauly ("Pauly Decl.") ¶¶ 33, 64 (ECF 120).)  For instance, to refire the Cookson "repeating" rifle, the user needed to point the gun barrel towards the ground and push on a lever between each shot.  (Sweeney Decl. ¶ 26.)  The gun was heavy and prone to catastrophic failure.  (*Id.*)  Similarly, Belton's repeating firearm— which only held seven shots—weighed close to 11 pounds and required the user to cock and prime the gun between each shot.  (*Id.* ¶¶ 32-33.)  As a result, managing the Belton was a "a three-handed job."  (*Id.* ¶ 33.)  Girardoni's air rifle used a different firing mechanism entirely.  It had to be pumped 1,500 times, using a device similar to a bike bump, to pressurize air used to accelerate the projectile.  (DeLay Decl. ¶ 26.)  Moreover, the air gun had several precision components—pumps, valve housings, valve seats—that were prone to failure and that required specialized tools and machinery to repair.  (*Id.*)  These weapons bear no resemblance to modern weaponry that use LCMs.

Repeating firearms slowly entered the market in the late 1800s, but they were different than the semiautomatic weapons of today.  According to Brennan Rivas, who will testify at trial, "[w]hile there are a handful of examples of . . . fixed tubular magazines capable of holding more than ten cartridges during" the period after the Civil War, the operator had to engage a lever "between each shot . . . to discharge the spent shell and load a fresh cartridge from the magazine into the chamber."  (Decl. of Brennan Rivas ("Rivas Decl.") ¶ 52 (ECF 121).)  Measure 114 does not apply to these sorts of lever-action weapons.  Measure 114 § 11(1)(d)(C).  Furthermore, these weapons were slow to reload: "Winchester lever-action rifles and their high-capacity competitors in the last third of the nineteenth century had fixed magazines. Once the magazine was empty,

the shooter had to reload each round, one by one." (DeLay Decl. ¶ 63.) "[T]his round-by-round reload process put a ceiling on the damage a single shooter could inflict on a group of people." (*Id.*)

Plaintiffs' own witnesses will not support plaintiffs' arguments that multi-shot repeaters were common in the Founding Era. Plaintiffs contend that "firearms capable of firing more than one round without reloading existed" in the eighteenth century. (Pls.' Trial Br. at 22.) Plaintiffs witness Ashley Hlebinsky, however, characterized founding-era repeating firearms as "one-off examples" that were "unsuccessful by modern and/or historic standards." (Decl. of Ashley Hlebinsky ("Hlebinsky Decl.") ¶ 22 (ECF 72).) At her deposition, Ms. Hlebinsky could not state how many of these weapons existed in America at the founding but agreed that fewer than ten was a possibility. (Dodd Decl. Ex. 5, Hlebinsky Dep. at 76:22-77:7; *see also id.* at 43:11-24, 50:4-52:10, 60:23-62:24, 72:15-23, 73:24-74:18 (ECF 126-5).).

Plaintiffs' other historical firearms expert, Michael Carrick, agreed that no more than 10 repeating firearms existed in America at the Founding. Mr. Carrick testified that the Girardoni air rifle, which is not a firearm, was "highly unusual" and that "[a]nyone in America in 1803 would be astonished to see a rifle that could fire 20 projectiles in one minute without reloading!" (Decl. of Michael F. Carrick ¶ 18 (ECF 149).). Mr. Carrick elaborated that most Americans in 1791 would not have ever seen a repeating firearm and that, in the Founding Era, "there are very few people that know [repeating firearms] exist." (Wilson Decl., Ex. 3 (Dep. of Michael Carrick at Tr. 11:4-5).) Mr. Carrick testified that there is "really no comparison" between the velocity and firepower of a modern rifle equipped with an LCM and the Girardoni air rifle. Mr. Carrick agreed that modern rifles are a "dramatic technological advancement" as compared to the Girardoni air rifle. (*Id.* at 40.)

LCMs also implicate societal concerns that have no Founding Era precedent, precisely due to their unprecedented firing capabilities. Louis Klarevas will testify at trial that mass shootings by a single individual that resulted in 10 or more deaths were unknown in U.S. history until 1949 and rare until 2007. (Decl. of Louis Klarevas ("Klarevas Decl.") ¶¶ 16-19, tbl. 4, figs. 6-7 (ECF 119).) LCMs are "often used in public mass shootings." (Allen Decl. ¶ 26; *see also* Klarevas Decl. ¶ 20.) Indeed, they operate as "force multipliers." (Klarevas ¶¶ 15, 20.) Casualties are nearly three times higher in mass shootings that involve weapons with LCMs than in other mass shooting: an average of 25 fatalities or injuries with a large-capacity magazine versus an average of 9 without. (Allen Decl. ¶ 27.) Every mass shooting since 1991 that resulted in more than 15 deaths involved LCMs. (Klarevas Decl. ¶ 14.)

Plaintiffs' contrary evidence is unpersuasive. Plaintiffs' declaration on the history of mass murder, submitted by Clayton Cramer, was so error-laden that he later disavowed it during his deposition. (Second Decl. of Clayton Cramer (Magazine Issue) (ECF 75).) When questioned, Mr. Cramer admitted that his quantitative analysis was "clearly wrong." (Dodd Decl. Ex. 6, 1/19/23 Cramer Dep. at 87:18-20 (ECF 126-6).) He testified that he would need to "lure" an actual "expert to assist me to verify the accuracy of the results." (*Id.* at 165:22-166:2.) He agreed that this Court should be "reluctant to accept the data" he presented given his errors and lack of expertise. (*Id.* at 106:13-17.)

Plaintiffs subsequently filed a "corrected" declaration, and Mr. Cramer presumably will seek to testify at trial. (Corrected Decl. of Clayton Cramer (Magazine Issue) (ECF 111).) But the "corrected" analysis also has serious flaws: It is "incomplete" after 1960 (*id.* at 20-21) when LCMs became more available to the general public and it relies on a non-standard definition of

"mass murder" that uses a smaller number of deaths.  (*Id.* at 7.)  The Court should disregard Mr. Cramer's analysis.

In any event, Mr. Cramer's testimony will be unhelpful.  Mr. Cramer compiles various examples of mass killings prior to 1960.  Mr. Cramer posits that because mass murder is technically possible using "primitive" weaponry (*e.g.*, axes, blunt objects, explosives, multiple pistols), LCM regulations are unnecessary.  But because Mr. Cramer's research ends in 1960, he never compares Founding Era mass murder to modern-day mass shootings, the latter of which can result in dozens of fatalities in a manner of seconds.  Nothing in Mr. Cramer's testimony will contradict defendants' evidence that LCMs have increased the frequency and lethality of mass murders to the point where mass murders have tragically become commonplace.

> **2.      Restrictions on LCMs are consistent with this country's historical tradition of regulating dangerous weapons associated with violence and crimes.**

The social concern of massacres perpetrated by single shooters has no precedent in neither 1791 nor 1868, at the time of the Founding or the ratification of the Fourteenth Amendment, respectively.  In such cases, *Bruen* instructs the courts to look for "a well-established and representative historical *analogue*, not a historical *twin*."  142 S. Ct. at 2133 (emphasis in original).  Although analogical reason is not a "regulatory blank check," it also is not a "regulatory straightjacket."  *Id*.  What matters is not how comparable a modern law is to historical analogues in form or substance, but how comparable it is in "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.*  "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and

whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id.* (quotation marks, citation, and emphasis omitted).

> **a.    Restrictions on LCMs are comparable to historic restrictions on other dangerous weapons associated with violence and crimes.**

Under this framework, restricting LCMs is analogous to well-established prohibitions against unusually dangerous weapons that are associated with unlawful activities rather than lawful self-defense. Defendants' experts will demonstrate that at least four types of dangerous weapons were restricted in the eighteenth and nineteenth centuries when they became associated with violent crimes. First, restrictions on blunt weapons were well known at the Founding. Seven states enacted laws barring the carrying of clubs in 1600s and 1700s. (Spitzer Decl. ¶ 68.) Twelve state laws restricted bludgeons in the 1700s and 1800s. (*Id.* ¶ 66.) Similarly, 16 states enacted anti-billy club laws in the 1800s. (*Id.* ¶ 67.)

Second, Bowie knives were widely prohibited in the 1800s.[21] (TRO Order at 28 n.19; Rivas Decl. ¶ 15.) Bowie knives increased in notoriety and sales in the 1830s. (Spitzer Decl. ¶ 56.) In the 1830s, at least six states enacted laws barring the carrying of Bowie knives. (*Id.* ¶ 62.) By the end of the century, every state plus the District of Columbia (with the exception of New Hampshire) restricted Bowie knives. (*Id.*) Third, slungshots were created in the 1840s and became widely used by criminals. (*Id.* ¶ 69.)[22] Anti-slungshot laws were enacted by 43 states in the 1800s and 1900s. (*Id.*; Rivas Decl. ¶ 32 n.46.) Fourth, trap guns (*i.e.*, guns fired by trip wire) were associated with the loss of innocent life. (Spitzer Decl. ¶¶ 74-76.) Sixteen states enacted anti-trap gun laws between the 1700s and 1900s, the earliest in 1771. (*Id.* ¶ 77.)

---

[21] "Bowie knives were often associated with long blades that curved and became double-edged near the tip." (Rivas Decl. ¶ 20.)

[22] A slungshot is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle. (Decl. of Spitzer ¶ 69.)

Similarly, with one exception, every state in the country enacted one or more gunpowder laws from the 17th century through the start of the 20th century.  (*Id.* ¶ 78.)  In sum, at the Founding, it was common for states to restrict weapons associated with loss of innocent life even where those weapons had defensive uses as well.

Automatic and semiautomatic firearms appeared in the early 1890s.  (DeLay Decl. ¶ 71.) And in the 1920s, the "Tommy gun," a lighter-weight, reliable, handheld, fully automatic weapon, began to circulate.  (*Id.* ¶ 72.)  Defendants' expert will testify about the response: Between 1925 and 1933, at least 28 states passed laws against fully automatic firearms.  (DeLay Decl. ¶ 73; Spitzer Decl. Exs. B, D.)  At least 11 of these states regulated fully automatic firearms capable of holding a certain number of rounds or capable of accepting certain detachable magazines. (Spitzer Decl. ¶ 32, tbl. 1, Exs. B, D.)  Between 1917 and 1934, at least ten states and the District of Columbia regulated semiautomatic and fully automatic firearms capable of holding a certain number of rounds. (*Id.*)  In 1934, Congress passed the National Firearms Act, regulating fully automatic weapons along with several other kinds of guns. (DeLay Decl. ¶ 73.)  In 1994, Congress passed the Public Safety and Recreational Firearms Use Protection Act, commonly known as the Assault Weapons Ban.  This law banned the possession and transfer of LCMs nationally from 1994 until its expiration in 2004.[23]  Today, 14 states prohibit large-capacity magazines.[24]  In short, regulating unusually dangerous weapons and

---

[23] Former 18 U.S.C. §922(w).

[24] Cal. Penal Code §§ 32310, 16350, 16740; C.R.S. § 18-12-302(1); Conn. Gen. Stat. § 53-202w(a)-(c); Del. Code Ann. tit. 11, §§ 1465, 1466; Haw. Rev. Stat. § 134-8(c); Md. Code Ann., Crim. Law § 4-305(b); Mass. Gen. Laws ch. 140, §§ 131M, 121; N.J. Stat. Ann. §§ 2C:39-3(j), 2C:39-1(y); N.Y. Penal Law §§ 265.10(1)-(3), (6), 265.36, 265.00(23); R.I. Gen. Laws. §§ 11-47.1-2, 11-47.1-3; 13 V.S.A. § 4021(a); 2021 WA S 5078 (to be codified); D.C. Code § 7-2506.01(b)).

weapons associated with violent crime, up to and including LCMs, is part of this nation's

longstanding "historic tradition" of the right to bear "arms" under the Second Amendment.

Consistently, following this Court's lead, federal district courts across the country have

applied *Bruen* to LCM regulations and held that such regulations are consistent with the historic

tradition of firearm regulation.  *See, e.g.*, *Hanson v. D.C.*, No. CV 22-2256 (RC), 2023 WL

3019777, at *17 (D.D.C. Apr. 20, 2023) ("[T]here is a historical tradition of severe restrictions, if

not outright bans, on these high-capacity weapons."); *Delaware State Sportsmen's Ass'n, Inc. v.*

*Delaware Dep't of Safety & Homeland Sec.*, No. CV 22-951-RGA, 2023 WL 2655150, at *13

(D. Del. Mar. 27, 2023) (holding that Delaware's LCM prohibition is "consistent with the

Nation's historical tradition of firearm regulation" directed at weapons that "violence, harm, or

contributed to criminality"); *Bevis v. City of Naperville, Illinois*, No. 22 C 4775, 2023 WL

2077392, at *16 (N.D. Ill. Feb. 17, 2023) ("Because assault weapons are particularly dangerous

weapons and high-capacity magazines are particularly dangerous weapon accessories, their

regulation accords with history and tradition.").

> **b.    Restrictions on LCMs pose a comparable burden as other historic arms regulations.**

Any burden on the right of armed self-defense posed by Measure 114's restriction on

LCMs is comparable to the burden posed by Founding Era regulations.  Ten-round magazines

that comply with the limits of Measure 114 are widely available and most firearms

manufacturers offer models that come standard with 10-round magazines.  (Yurgealitis Decl. ¶

46; Pretrial Order at 5 (Stipulated Fact #70).)  Firearms that accept magazines with a capacity

exceeding 10 rounds can also accept a magazine with capacity of 10 or fewer.  (Yurgealitis Decl.

¶ 39; Pretrial Order at 5 (Stipulated Fact #69).)  Furthermore, firearms incorporating magazines

that already comply with the restriction are widely available.  (Yurgealitis Decl. ¶¶ 46-50.)  And

nearly all self-defense uses of firearms involve fewer than ten shots.  (Allen Decl. ¶¶ 10, 12.)

In addition, Measure 114 also allows permanent alterations to reduce magazine capacity.

Measure 114 § 11(1)(d)(A).  Owners who decline to alter their LCMs will be allowed to use

them in restricted ways and can avoid those restrictions if they use a lower capacity magazine in

situations where a high-capacity magazine is unlawful.  Measure 114 § 11(5).

      This is, at most, a "minimal burden" on plaintiffs' use of firearms, given that they can

continue to use any firearm.  *Duncan*, 19 F.4th at 1104.  As explained by the Ninth Circuit: "The

law has no effect whatsoever on which firearms may be owned; as far as the challenged statute is

concerned, anyone may own any firearm at all.  Owners of firearms also may possess as many

firearms, bullets, and magazines as they choose."  *Id.*; *see also, Delaware State Sportsmen's

Ass'n, Inc.* 2023 WL 2655150, at *12 ("[T]he burden that the challenged regulations impose is

slight. . . . [I]ndividuals in self-defense situations rarely fire even 10 rounds, and the record does

not reflect that any firearms require LCMs to operate." (internal citations omitted)).  By contrast,

Founding Era prohibitions completely disallowed certain weapons with particularly dangerous

features, while leaving other arms available for self-defense.

      Plaintiffs' countervailing arguments will be unconvincing.  They contend that there is no

historical analogue to Measure 114's LCM restrictions because, according to Ms. Hlebinsky,

"repeating and firing capacity are not mentioned" in Founding-era regulations.  (Hlebinsky Decl.

¶ 26.)  But this testimony will be of minimal probative value.  As this Court already found, and

as evidence at trial will confirm, multi-shot firearms "were experimental, designed for military

use, rare, defective, or some combination of these features" during the Founding Era.  (TRO

Order at 25.)  It is therefore unsurprising that Founding Era regulations did not regulate rare,

one-off weapons.

Founding Era regulations restricted the use of weapons associated with violence and criminality.  Measure 114's restrictions on LCMs, which are associated with mass shootings, are analogous.  Accordingly, Measure 114 is consistent with the nation's historic tradition of arms regulation.

For all of those reasons, plaintiffs' Second Amendment challenge to Measure 114's restrictions on LCMs fails: LCMs are not "arms" covered by the Second Amendment.  LCMs are also analogous to dangerous weapons that have historically been regulated.

## IV.    Measure 114's restrictions on LCMs do not violate the Takings Clause.

The Takings Clause of the Fifth Amendment states that private property shall not be taken "for public use, without just compensation."  As this Court has already ruled, "property seized pursuant to the police power is not taken for public use and is not compensable under the Fifth Amendment."  (TRO Order at 33.)  Furthermore, this Court explained that an injunction is not an appropriate remedy to a Takings Clause claim "because the appropriate remedy for a Fifth Amendment takings violation is ordinarily not injunctive relief, but rather damages."  (*Id.* at 35.)

Plaintiffs have since amended their complaints to include a new regulatory takings theory.  But this theory also fails.  Exercises of police power are not compensable under the Takings Clause.  *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless[.]").  And a damages suit is an adequate remedy for a regulatory takings claim.

On top of this fundamental problem with plaintiffs' theory, establishing a regulatory taking requires plaintiffs to show "the economic impact of the regulation on the claimant and, particularly . . . the extent to which the regulation has interfered with distinct investment backed

expectations." *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir.

2012) (quotation marks, citation omitted; alteration in original).  To establish a regulatory taking,

plaintiffs must show a sharp decrease in "the total value of the affected property…"; the Ninth

Circuit has held that "diminution in property value[s] because of governmental regulation

ranging from 75% to 92.5% do[ ] not constitute ... taking[s]." *Colony Cove Props., LLC v. City

of Carson*, 888 F.3d 445, 451 (9th Cir. 2018) (citation omitted).  In addition, to succeed on their

facial challenge, plaintiffs must demonstrate that a regulatory taking "necessarily occurred with

respect to every owner of a large-capacity magazine." *Duncan*, 19 F.4th at 1112.

> Plaintiffs cannot make that showing.  Measure 114 allows the current owner of an LCM

to keep or modify it rather than to surrender it.  Measure 114 § 11(1)(d)(A).  Firearms dealers

similarly have a 180-day transition period to sell LCMs to licensed, out-of-state buyers.  *Id.* §

11(3)(a)(A).  Plaintiffs admit that they have not conducted any analyses or estimates of the effect

of Measure 114 on their revenues.  In depositions, plaintiffs acknowledged that "[d]emand

increased because of Measure 114" due to individuals attempting to purchase LCMs prior to the

effective date of the law.  (Wilson Decl., Ex. 2 (Dep. of Adam Braatz at Tr. 43:14-15).)

Plaintiffs, therefore, have not demonstrated that anyone has suffered an interference with

"investment backed expectations," let alone that such an interference would occur in every case,

or that the short-term increase in demand does not offset any longer term decrease in demand.

*See Duncan*, 19 F.4th at 1112 (rejecting a similar facial Takings Clause challenge).

## V.    Measure 114's restrictions on LCMs are not unconstitutionally vague.

> Measure 114 is not impermissibly vague.  In a facial challenge, a statute is

unconstitutionally vague only if it fails to provide a person of ordinary intelligence fair notice of

what is prohibited.  *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013).  A law is not void

for vagueness merely because "there will be close cases requiring some degree of law

enforcement subjectivity" when enforcing the law. *Edge v. City of Everett*, 929 F.3d 657, 666

(9th Cir. 2019). Instead, a law is unconstitutionally vague only if people "must necessarily guess

at its meaning." *Id.* at 665 (quotation marks and citation omitted).

Here, the definition of "large-capacity magazine" is not impermissibly vague. Section

11(1)(d) of Measure 114 defines "[l]arge-capacity magazine" as:

> [A] fixed or detachable magazine, belt, drum, feed strip, helical
> feeding device, or similar device, including any such device joined
> or coupled with another in any manner, or a kit with such parts,
> that has an overall capacity of, or that can be readily restored,
> changed, or converted to accept, more than 10 rounds of
> ammunition and allows a shooter to keep firing without having to
> pause to reload….

Plaintiffs contend that the definition is vague because "[n]o guidance is given on what"

the phrase "can be readily restored, changed, or converted to accept" means. (Pls.' Trial Br. at

20.) But this phrase does not require Oregonians to guess at its meaning. Measure 114 restricts

magazines that can be quickly altered to accept more than 10 rounds. *State v. Briney*, 345 Or.

505, 517 (2008) (holding that a "readily capable" firearm is one "operational or promptly able to

be made so"). Magazines are legal if they have a capacity of 10 rounds or fewer and cannot

"readily" be converted to hold more. Measure 114 § 11(1)(d). The Constitution does not require

"meticulous specificity" if "it is clear what the ordinance as a whole prohibits." *United States v.

Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021) (quotation marks and citation omitted).

Rather, like Measure 114, the former federal assault weapons ban defined "large capacity

ammunition feeding device" as "any magazine, belt, drum, feed strip, or similar device . . . that

has the capacity of, or that can be *readily restored or converted to accept*, more than 10 rounds

of ammunition."[25] The District of Columbia, Massachusetts, Colorado, New York, Connecticut,

---

[25] Former 18 U.S.C. § 921(31) (emphasis added).

Vermont, and Rhode Island similarly define magazine and firearm restrictions to include items that can be "readily" converted to include a large number of rounds.[26]  These laws have been on the books for decades, and plaintiffs do not identify any history of widespread confusion about their meaning.  *Cf. United States v. Stewart*, 451 F.3d 1071, 1072 (9th Cir. 2006) (affirming conviction for possessing kit "readily" convertible into banned firearm).

The only federal court of appeals to have addressed this issue rejected the same vagueness argument that plaintiffs make here.  In their complaint, plaintiffs contend that Measure 114 is vague because it does not specify whether the magazine must be "readily" convertible by the person in possession or instead "by a master gunsmith using the facilities of a fully-equipped machine shop."  (*Eyre* Am. Compl. ¶ 135.)  In *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, the Second Circuit considered and rejected this gunsmith hypothetical, holding that plaintiffs' reading of statute was "implausible" and could be resolved in an as-applied challenge if such a prosecution ever arose.  804 F.3d 242, 266 (2d Cir. 2015).  Plaintiffs' reliance on a Sixth Circuit case addressing Ohio law is inapposite because that case interpreted a different statutory phrase—"may be restored" without the modifier "readily."  *See id.* (so holding).  The phrase "readily restored, changed, or converted" is not unconstitutionally vague.

## VI.    Measure 114's restrictions on LCMs are not impermissibly retroactive.

Contrary to plaintiffs' assertion, Measure 114 does not have "retrospective aspects" that "violate due process."  (Pls.' Trial Br. at 62.)  The law does not punish past purchases; it regulates only future conduct (*e.g.*, possession and transfers) after Measure 114's effective date. That is, Measure 114 does not attach new legal consequences to any conduct completed before

---

[26] Colo. Rev. Stat. Ann. § 18-12-301; N.Y. Penal Law § 265.00(23); Conn. Gen.Stat. § 53–202w(a)(1); Mass. Gen. Laws Ann. ch. 140, § 121; R.I. Gen. Laws § 11-47.1-2; D.C. Code Ann. § 7-2506.01; Vt. Stat. Ann. tit. 13, § 4021.

Measure 114 is in effect. *Landgraf v. USI Film Prod.*, 511 U.S. 244, 269-70 (1994) (discussing legal standard for retroactivity). It therefore is not retroactive and does not violate the Due Process Clause.

In fact, Measure 114 is more forgiving than the law requires, in that it allows current owners of LCMs to keep and continue to use their existing magazines for certain purposes. Measure 114 § 11(5). As such, this Court has already concluded that "Measure 114 is not retroactive: it does not render Plaintiffs' already-possessed large-capacity magazines illegal, allows Plaintiffs to retain possession of these large-capacity magazines on their property, and allows Plaintiffs to use these large-capacity magazines in limited situations." (TRO Order at 37.)

## VII. In the unlikely event plaintiffs prove any claim, the Court should narrowly tailor any relief.

### A. The Court must consider public safety when determining the scope of an injunction and Measure 114 will protect public safety.

Here, in the unlikely event that plaintiffs prove any of their claims, the Court should narrowly tailor its relief. *Galvez v. Jaddou*, 52 F.4th 821, 834 (9th Cir. 2022) (An "injunction must be tailored to remedy the specific harm alleged. An overbroad injunction is an abuse of discretion." (Cleaned up)). Indeed, Measure 114 requires that its provisions go into force to the greatest extent possible:

> If any provision of this 2022 Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable. The people hereby declare that they would have adopted this Chapter, notwithstanding the unconstitutionality, invalidity and ineffectiveness of any one of its articles, sections, subsections, sentences or clauses.

Measure 114 § 12.

"In determining the scope of an injunction, a district court has broad latitude, and must balance the equities between the parties and give due regard to the public interest." *Apple Inc. v.*

*Psystar Corp.*, 673 F. Supp. 2d 943, 951 (N.D. Cal. 2009), *aff'd*, 658 F.3d 1150 (9th Cir. 2011).

"Public safety should be considered by a court when granting equitable relief." *Dahl v. HEM*

*Pharms. Corp.*, 7 F.3d 1399, 1404 (9th Cir. 1993) (citation omitted).

Measure 114 will protect public safety and should, therefore, be given the broadest

possible effect. Dr. Klarevas will testify that of the 80 shootings nationally since January 1,

1990, resulting in six or more victims killed, in which LCM use can be determined, 62 involved

LCMs, resulting in 713 deaths. (Klarevas Decl. ¶ 15.) The average death toll for these incidents

is 11.5 fatalities per shooting. (*Id.*) By contrast, the average death toll for the 18 incidents in

which it was determined that LCMs were not used is 7.3 fatalities per shooting. (*Id.*) In the past

33 years, LCMs were used in 94% of all mass shootings resulting in more than 10 deaths and

100% of all mass shootings resulting in more than 15 deaths. (*Id.* ¶ 14.)

LCM bans and permit requirements protect public safety. Dr. Michael Siegel will testify

that "state-level bans on large-capacity magazines . . . reduce both the incidence and severity of

mass shootings." (Decl. of Michael Siegel ¶ 33 (ECF 133).) Indeed, one study reviewed by

Dr. Siegel identified two policies associated with reductions in fatal mass shootings: LCM

restrictions and permits to purchase. (*Id.* ¶ 31.) Furthermore, the scientific literature shows that

"there is overwhelming evidence that state-level gun permitting laws are effective in reducing

rates of firearm homicide." (*Id.* ¶ 48.)

    **B.**    **The Court should not enter any relief that enjoins absent parties.**

The Court should also consider that permit agents are not defendants in this litigation.

Here, plaintiffs allege that permit agents will act unlawfully by failing to certify instructors, by

failing to perform in-person demonstrations, and by needlessly delaying permit applications.

Those claims cannot be asserted against State officials as a stand-in for permit agents who have

their own responsibilities to administer the law. *See, e.g.*, *Nat'l Audubon Soc'y, Inc. v. Davis*,

307 F.3d 835, 847 (9th Cir.), *op. am. on denial of reh'g,* 312 F.3d 416 (9th Cir. 2002) (holding plaintiffs must show that state officials had "the requisite enforcement connection" to the challenged law); *Buffin v. City & Cnty. of San Francisco*, No. 15-CV-04959-YGR, 2016 WL 6025486, at *11 (N.D. Cal. Oct. 14, 2016) (dismissing state officials because plaintiffs' "claims are based on the Sheriff's enforcement").

The absent permit agents are also necessary parties and the Court should exercise its discretion to shape the relief in this case to exclude the claims against them. Under Federal Rule of Civil Procedure 19(a)(1)(B)(i), an absent party is a necessary party if they "claim[] an interest relating to the subject of the action" and their absence will "impair or impede" their interest. The Ninth Circuit has held that a public entity has an interest in a lawsuit that could result in the invalidation or modification of one of its ordinances, rules, regulations, or practices. *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1082 (9th Cir. 2010). In *Peabody*, the Equal Employment Opportunity Commission challenged an employment preference in a coal mine's land lease with a Native American tribe. The Secretary of the Interior had mandated that the mine include the disputed provision in its lease. The Ninth Circuit held that the Secretary had an interest in defending the "legality" of her practice of ordering the mine to include this provision in leases. As in *Peabody*, the absent permit agents are necessary parties because they have a "interest" in defending themselves from these claims of illegality.

Rule 19(b)(1)(2)(B) permits this court to "shap[e] relief" as necessary to lessen or avoid "prejudice" to an absent party. Here, in the unlikely event plaintiffs prevail on any claim, the Court should shape its relief so that it does not enjoin permit agents who are not defendants and do not have the opportunity to defend against plaintiffs' criticism of their future conduct.

## CONCLUSION

At the conclusion of trial, this Court should issue a judgment in defendants' favor.

DATED this 15th day of May, 2023.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:    *s/ Harry B. Wilson*
_____
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Hannah K. Hoffman, OSB #183641
HannahHoffman@MarkowitzHerbold.com
*Special Assistant Attorneys General for*
*Defendants*

Brian Simmonds Marshall, OSB #196129
brian.s.marshall@doj.state.or.us
*Of Attorney for Defendants*

1444153