**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | |
| Plaintiffs, | Civil Action No. 2:22-cv-01815-IM (lead case) |
| | 3:22-cv-01859-IM (trailing case) |
| v. | 3:22-cv-01862-IM (trailing case) |
| | 3:22-cv-01869-IM (trailing case) |
| TINA KOTEK, et al. | |
| Defendants. | |

**BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN OPPOSITION TO PLAINTIFFS' REQUEST FOR A PERMANENT INJUNCTION**

*Of Counsel:*

Daniel Weltz
Rachel Bercovitz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com
RBercovitz@cov.com

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush St. #555
San Francisco, CA 94104

Timothy C. Hester (*admitted pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................. 1

INTRODUCTION .................................................................................................... 1

I.    MEASURE 114 DOES NOT IMPLICATE THE SECOND AMENDMENT
      BECAUSE IT IMPOSES NO BURDEN ON THE RIGHT TO SELF-DEFENSE. .......... 2

      A.    The Second Amendment Right as Articulated in *Bruen* and *Heller* Is
            Based on Lawful "Self-Defense." ........................................................... 2

      B.    Plaintiffs Cannot Establish That Measure 114 Burdens the Right to Lawful
            Self-Defense. ........................................................................................ 4

II.   MEASURE 114 IS ANALOGOUS TO HISTORICAL FIREARMS
      REGULATIONS AND IS THEREFORE CONSTITUTIONAL. ..................................... 6

      A.    Measure 114 Is Analogous to Historical Firearms Restrictions That Did
            Not Burden the Right of Armed Self-Defense. ........................................ 6

      B.    Measure 114 Is "Relevantly Similar" to Historical Laws Restricting
            Weapons Capable of Firing Repeatedly Without Reloading. ................... 8

            1.    Firearms Capable of Firing Repeatedly Without Reloading Were
                  Not Broadly Available Until After Enactment of the Fourteenth
                  Amendment. .............................................................................. 9

            2.    Modern Firearms Capable of Firing Repeatedly Are
                  Fundamentally Different from Historical Antecedents. ............. 11

            3.    Under *Bruen*, a "More Nuanced Approach" Is Required Where
                  Firearms Capable of Firing Repeatedly Without Reloading Were
                  Not in Widespread Circulation Until the Early 20th Century. ..... 12

CONCLUSION .................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Andrews v. State*,
    50 Tenn. 165 (1871).................................................................................8

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. New
    Jersey*, 910 F.3d 106 (3d Cir. 2018) .......................................................4

*ANJRPC v. Att'y Gen. New Jersey*,
    974 F.3d 237 (3d Cir. 2020)...................................................................10

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*,
    No. 22-cv-951, 2023 WL 2655150 (D. Del. Mar. 27, 2023)....................7, 9, 13, 14

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)........................................................................ *passim*

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021) .................................................................4

*English v. State*
    35 Tex. 473 (1871)..................................................................................8

*Ex parte Thomas*,
    97 P. 260 (Okla. 1908)............................................................................8

*Hanson v. District of Columbia*,
    No. 22-cv-2256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023)........................ *passim*

*Heller v. D.C.* (*Heller II*),
    670 F.3d 1244 (D.C. Cir. 2011)..............................................................13

*Hill v. State*,
    53 Ga. 472 (1874) ..................................................................................7

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ...................................................................4

*Kolbe v. O'Malley*,
    42 F. Supp. 3d 768 (D. Md. 2014)...........................................................5

*New York State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022)...................................................................... *passim*

*O'Neill v. State*,
    16 Ala. 65 (1849)....................................................................................8

*Ocean State Tactical, LLC v. State of Rhode Island,*
    No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ............................................2, 4, 5

*Oregon Firearms Fed'n, Inc. v. Brown,*
    No. 2:22-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) ........................................... *passim*

*Rocky Mountain Gun Owners v. Polis,*
    467 P.3d 314 (Colo. 2020) ..............................................................................................4, 5

*State v. Buzzard,*
    4 Ark. 18 (1842) ...................................................................................................................8

*State v. Chandler,*
    5 La. Ann. 489 (1850) ..........................................................................................................8

*State v. Jumel,*
    13 La. Ann. 399 (1858) ........................................................................................................8

*State v. Misch,*
    214 Vt. 309 (2021) ...............................................................................................................4

*State v. Mitchell,*
    3 Blackf. 229 (Ind. 1833) .....................................................................................................8

*State v. Reid,*
    1 Ala. 612 (1840) .................................................................................................................8

*Worman v. Healey,*
    922 F.3d 26 (1st Cir. 2019) ..................................................................................................4

**Statutes**

Act of Feb. 4, 1812, ch. 195, 1812 Del. Sess. Laws 522 ..................................................................7

Act of Jan. 30, 1847, ch. 79, 1846–47 Va. Acts 67 .........................................................................7

Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130 .....................................................13

Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256 ............................................................13

Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887 ..............................................................13

Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650 ...................................................................13

Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245 ............................................................14

Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189 .........................................................................14

## Other Authorities

*1860 Henry Repeating Rifle*, Fandom: Deadliest Warrior Wiki,
    https://perma.cc/H9YW-SZHG ........................................................................11

*1st DC Cavalry Martial Henry Rifle*, College Hill Arsenal,
    https://perma.cc/LFP3-AVDY .......................................................................10

*Armed Citizen Stories*, NRA-ILA,
    https://perma.cc/H9BC-95HF .........................................................................4

*Belton Flintlock*, Military Fandom,
    https://perma.cc/SSM6-NAJC ......................................................................10

Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was
    Written*, Wash. Post (June 13, 2016),  https://perma.cc/H6X5-C2NL.............................11, 12

Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives
    (Mar. 12, 2012), https://perma.cc/QTL7-U8EM .......................................................4

Dan Alex, *Henry Model 1860: Lever-Action Repeating Rifle*, Military Factory
    (last edited Feb. 4, 2022), https://perma.cc/N47S-7PKR..........................................11

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory
    (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M......................................................12

Declaration of Brian DeLay, *Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-01815 (D. Or. filed Feb. 6, 2023) (ECF No. 118) .........................................9, 10, 11

Declaration of Edward Troiano, *Ocean State Tactical, LLC v. State of Rhode
    Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3)..........................................5

Declaration of James W. Johnson, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md.
    2014), No. 1:13-cv-02841 (ECF No. 44-3) (filed Feb. 14, 2014)............................................5

Declaration of Kevin Sweeney, *Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-01815 (D. Or. filed Feb. 6, 2023) (ECF No. 124) ...............................................9, 10

Declaration of Lucy P. Allen, *Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-01815 (D. Or. filed Feb. 6, 2023) (ECF No. 116) .....................................................4

Declaration of Michael Vorenberg, *Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-01815 (D. Or. filed Nov. 30, 2022) (ECF No. 17-4)..............................................8

Declaration of Robert Spitzer, *Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-01815 (D. Or. filed Feb. 6, 2023) (ECF No. 123) .................................10, 11, 12, 14

Declaration of Roger Pauly, *Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 2:22-01815 (D. Or. filed Feb. 6, 2023) (ECF No. 120) .....................................................12

*Firearms History and the Technology of Gun Violence*, UC Davis Library,
https://perma.cc/YHZ6-8QPG ................................................................................11

*Girandoni Air Rifle*, Fandom: Military Wiki, https://perma.cc/4RFA-Q9BK..............................10

John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure* (Mar. 15,
2011), https://perma.cc/57AB-X2BE.........................................................................10

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep
Arms in Early America: The Legal Context of the Second Amendment*, 25 Law
& Hist. Rev. 139 (2007)...........................................................................................7

Rock Island Auction Co., *Repeating Flintlock Rifles?!?*, YouTube (Sept. 7, 2021),
https://www.youtube.com/watch?v=0FkW-CSTCwo .........................................................10

Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020),
https://perma.cc/7STW-8WMS ...............................................................................11

*Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench,
https://perma.cc/PRY3-YHSN...................................................................................11

*Winchester 1866 Prototype Musket*, The Armourer's Bench,
https://perma.cc/PB83-TSM4 ..................................................................................10

*Winchester Rifle: A Resource Guide*, Library of Congress, https://perma.cc/96SG-
HRWG .................................................................................................................10

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are national gun violence prevention organizations that have filed numerous *amicus* briefs involving firearms regulations and constitutional principles affecting gun policy. Brady Center to Prevent Gun Violence is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy and political action. Giffords Law Center to Prevent Gun Violence promotes and defends the laws and policies proven to reduce gun violence. March for Our Lives is a youth-led non-profit organization dedicated to promoting civic engagement, education and direct action by youth to achieve sensible gun violence prevention policies.[1]

## INTRODUCTION

Measure 114, which prohibits the purchase and restricts the use of large-capacity magazines ("LCMs"), is constitutional under the Second Amendment—Plaintiffs make no showing that it imposes any burden on the "right of armed self-defense" recognized by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022) and *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). (Part I, *infra*.) Beyond that fundamental flaw in their position, Plaintiffs' claim should also be rejected because Measure 114 is "relevantly similar" to historical firearms regulations and is fully consistent with the nation's historical tradition of regulating firearms that can fire repeatedly without reloading. (Part II, *infra*.)

Measure 114 is also constitutional because (i) LCMs are accessories not subject to constitutional protection as "arms" under the Second Amendment because they are not required to

---

[1] No party or counsel to any party in this matter authored this brief in part or in whole, no party or counsel to any party in this matter contributed money intended to fund the preparation or submission of this brief, and no person other than *amici* contributed money intended to fund the preparation or submission of this brief.

use a firearm, and the regulation of them does not prevent the use of any firearm,[2] and (ii) "'weapons that are most useful in military service' fall outside of Second Amendment protection," *Hanson v. District of Columbia*, No. 22-cv-2256 (RC), 2023 WL 3019777, at *8 (D.D.C. Apr. 20, 2023) (quoting *Heller*, 554 U.S. at 627). This brief does not address these separate bars to Plaintiffs' claims, but rather demonstrates why Measure 114 is constitutional assuming *arguendo* that LCMs are within the scope of the Second Amendment.

## ARGUMENT

I.   **MEASURE 114 DOES NOT IMPLICATE THE SECOND AMENDMENT BECAUSE IT IMPOSES NO BURDEN ON THE RIGHT TO SELF-DEFENSE.**

    A.   **The Second Amendment Right as Articulated in *Bruen* and *Heller* Is Based on Lawful "Self-Defense."**

Plaintiffs assert that, under *Bruen* and *Heller*, the "end of the matter" is whether firearms are "typically possessed by law-abiding citizens for lawful purposes." Eyre Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, ECF No. 44, at 19 ("Eyre Mem."); *see also* Fitz Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, ECF No. 43, at 10 ("Fitz Mem.") ("firearms . . . in common use . . . cannot be banned" (quotations and citations omitted)). That flatly misstates the scope of the Second Amendment as articulated by *Bruen* and *Heller*. Under *Bruen*, "the Second and Fourteenth Amendments protect an individual right to keep and bear arms *for self-defense*." 142 S. Ct. at 2125.[3] *See also id*. at 2128 (addressing the "individual right to *armed self-defense*"); *id*. at 2133 (addressing "burden on the right of *armed*

---

[2] *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-01815-IM, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022); *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246 JJM-PAS, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022).

[3] All emphases added unless otherwise noted.

self-defense"); *id*. ("individual self-defense is the **central component** of the Second Amendment right") (quotations omitted).

     Plaintiffs quote a phrase out of context in *Bruen*, where the Court, quoting from *Heller*, stated that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"  142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).  In context, the Court was clearly referring to weapons "in common use" *for self-defense*.  *See id*. at 2134 ("handguns are weapons 'in common use' today for self-defense"); *id*. at 2143 (handguns "are indisputably in 'common use' for self-defense today").  The phrase Plaintiffs quote appears in a paragraph that begins with the Court's statement that *Heller* held "that the Second Amendment protected an individual right **to armed self-defense**."  *Id.* at 2128.  And the following paragraph ends with a quote from *Heller* that "the Second Amendment did not countenance a 'complete prohibition' on the use of 'the most popular weapon chosen by Americans **for self-defense** in the home.'"  *Id*. (quoting *Heller*, 554 U.S. at 629); *see also id.* at 2125 ("In *Heller* and *McDonald* we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms **for self-defense**."); *id*. at 2159 ("All that we decide in this case is that the Second Amendment protects the rights of law-abiding people to carry a gun outside the home **for self-defense**.") (Alito, J., concurring).

     Plaintiffs are therefore wrong in suggesting that the Second Amendment right extends to any firearm "typically possessed . . . for lawful purposes."  Eyre Mem. at 19 (quotations and citation omitted).  The Second Amendment, as *Bruen* establishes, applies only to "commonly used firearms **for self-defense**."  *Bruen*, 142 S. Ct. at 2138.  Nothing in *Bruen* suggests that the Second Amendment extends to other "lawful purposes" of a firearm.

**B.    Plaintiffs Cannot Establish That Measure 114 Burdens the Right to Lawful Self-Defense.**

Empirical research, thoroughly examined by numerous courts,[4] establishes that LCM restrictions do not burden the "right to armed self-defense" because the ability to fire more than ten rounds without reloading is empirically unnecessary for self-defense.  The National Rifle Association's own database of "armed citizen" accounts shows that the use of more than ten rounds of ammunition for self-defense is "extremely rare."[5]  Studies of this database establish that the average number of shots fired by civilians in self-defense was about *two*.[6]  Of 736 self-defense incidents from January 2011 to May 2017 reflected in the NRA database, the defender was reported to have fired more than ten bullets in only "*two* incidents (0.3% of all incidents)."[7]

Numerous court decisions similarly have found no evidence that firing more than ten bullets without reloading is necessary for self-defense.  *See, e.g., Worman*, 922 F.3d at 37 ("[N]ot one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired."); *Duncan*, 19 F.4th at 1104–05 ("The use of more

---

[4] *See Ocean State Tactical, LLC*, 2022 WL 17721175, at *16; *Oregon Firearms Fed'n, Inc.*, 2022 WL 17454829, at *9; *Hanson*, 2023 WL 3019777, at *10–12; *Duncan v. Bonta*, 19 F.4th 1087, 1104–05 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. (ANJRPC) v. Att'y Gen. New Jersey,* 910 F.3d 106, 121 n.25 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *State v. Misch*, 214 Vt. 309, 356–57 (2021), *reargument denied* (Mar. 29, 2021); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020).

[5] Declaration of Lucy P. Allen ¶ 7 (ECF No. 116) [hereinafter "Allen Decl."]; *see also Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF.

[6] *See* Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM (average of 2.2 defensive shots fired per incident from 1997–2001); Allen Decl., *supra* note 5, at ¶ 10 (same, from January 2011 to May 2017).

[7] Allen Decl., *supra* note 5, at ¶ 10.

than ten bullets in defense of the home is *'rare,'* or **non-existent**."); *Rocky Mountain Gun Owners*, 467 P.3d at 331 ("In no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more." (quotations and citation omitted)).

Experts have similarly concluded and testified that the ability to fire more than ten rounds without reloading is fundamentally unnecessary for self-defense. *See* Declaration of Edward Troiano ¶¶ 9, 10, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3) ("I am unaware of ***any incident*** in which a civilian has ***ever*** fired as many as 10 rounds in self-defense."); Declaration of James W. Johnson ¶¶ 30, 31, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768 (D. Md. 2014), No. 1:13-cv-02841 (ECF No. 44-3) (filed Feb. 14, 2014) (then-Baltimore County Police Chief testifying that he was "***unaware of any self-defense incident***" in Baltimore County or "anywhere else in Maryland" for which "it was necessary to fire as many as 10 rounds in self-defense").

In this litigation, this Court found previously that LCMs do not "fall within the plain text of the Second Amendment" because "large-capacity magazines are rarely used by civilians for self-defense." *Oregon Firearms Fed'n, Inc.*, No. 2:22-01815-IM, 2022 WL 17454829, at *11 (D. Or. Dec. 6, 2022). Similarly, a district court upheld Rhode Island's LCM ban because "[t]here is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not." *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246 JJM-PAS, 2022 WL 17721175, at *14 (D.R.I. Dec. 14, 2022); *see also Hanson*, 2023 WL 3019777, at *12 ("[T]he Second Amendment does not cover LCMs because they are not typically possessed for self-defense.").[8]

---

[8] The experts Plaintiffs cite in asserting that LCMs are in "common use" for self-defense do not support what Plaintiffs say. *See* Eyre Mem. at 16, 18 n.3; Fitz Mem. at 12, 22. Plaintiffs' expert Massad F. Ayoob testified that the "majority" of the incidents he had researched "[involved] law enforcement," and that he could not "say anything with confirmation" about how often civilians

In short, Plaintiffs do not and cannot demonstrate that LCMs are needed for "armed self-defense," and accordingly have failed to show that Measure 114 infringes their Second Amendment rights as articulated in *Bruen* and *Heller*.

## II.    MEASURE 114 IS ANALOGOUS TO HISTORICAL FIREARMS REGULATIONS AND IS THEREFORE CONSTITUTIONAL.

Because Measure 114 does not impose ***any*** burden on "a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133, the Court need not evaluate whether Measure 114 is "consistent with this Nation's historical tradition of firearm regulation," *id*. at 2126.  That analogical step only applies in evaluating whether a challenged regulation imposes a "***comparable burden on the right of armed self-defense***." *Id*. at 2133.  Here, there is ***no*** burden on the "right of armed self-defense articulated in *Bruen*.  But, in any event, historical analogues demonstrate that Measure 114 is consistent with the nation's history of firearms regulations.

### A.    Measure 114 Is Analogous to Historical Firearms Restrictions That Did Not Burden the Right of Armed Self-Defense.

From the Founding Era and through the 19th century, states have placed restrictions on carrying firearms in sensitive places, limitations on the type of arms individuals could lawfully possess, and prohibitions on the concealed carry of arms.  *See Bruen*, 142 S. Ct. at 2138.

Applying the *Bruen* standard, Measure 114 is "relevantly similar" to these historical laws because it imposes a "comparable burden" on the right of armed self-defense.  *See id*. at 2132–33.  Unlike the regulations addressed in *Bruen* and *Heller*, which the Supreme Court held entirely

---

use more than ten rounds in self-defense.  Ayoob Dep. 23:2–11, 24:12–19 (ECF No. 126-4).  Similarly, Plaintiffs' expert Mark Hanish acknowledged that he was unqualified to "assess the validity or the reliability" of the unpublished survey data he relied on, and admitted that he had picked "[t]he one or two pieces of information out of [the survey data] that, you know, supported my opinion."  Hanish Dep. 57:16–58:17, 85:7–10, 86:7–10 (ECF No. 126-2).  A third expert for Plaintiffs, Gary Kleck, stated that he "would not rely" on the survey data used by Hanish because its "self-selected sample" was "not a valid sample technique."  Kleck Dep. at 76:5–77:11 (ECF No. 126-3).

prevented the exercise of the right to armed self-defense, Measure 114 does not prevent armed self-defense at all (*see* Part I.B, *supra*) and is thus "relevantly similar" to these historical laws. *See Oregon Firearms Fed'n, Inc.*, 2022 WL 17454829, at *13–14 (holding that 19th century laws limiting the "carrying of arms in crowded places," restricting excessively dangerous weapons like Bowie knives, and prohibiting concealed carry were "relevantly similar" to Oregon's LCM ban); *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, No. 22-cv-951-RGA, 2023 WL 2655150, at *11–13 (D. Del. Mar. 27, 2023) (holding that 19th and 20th century regulation of excessively dangerous "melee" weapons, restrictions on concealed carry, and laws banning the possession of fully automatic firearms were "relevantly similar" to Delaware's LCM ban).

1.   ***Sensitive places.***   Around the time of ratification of the Bill of Rights, colonial Philadelphia, New York and Boston prohibited the discharge of firearms within their cities.[9]  By the time of the Fourteenth Amendment's ratification in 1868, states such as Virginia and Delaware had passed regulations on the discharge of firearms in sensitive or crowded public places.[10]  Other states, such as Georgia, prohibited the carrying of weapons in sensitive places.  *See Hill v. State*, 53 Ga. 472, 474, 482–83 (1874) (rejecting Second Amendment challenge because the law did "not interfere with the ordinary bearing and using arms").[11]

---

[9] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162–63 (2007).

[10] *See* Act of Jan. 30, 1847, ch. 79, 1846–47 Va. Acts 67; Act of Feb. 4, 1812, ch. 195, 1812 Del. Sess. Laws 522, 522–24.

[11] Although the law was passed two years after the ratification of the Fourteenth Amendment, "'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605).

2. ***Excessively dangerous weapons.***  States have historically regulated weapons deemed excessively dangerous and courts have consistently upheld these laws, reasoning that such arms are not necessary for self-defense.  *See*, *e.g.*, *O'Neill v. State*, 16 Ala. 65, 67 (1849); *Andrews v. State*, 50 Tenn. 165, 171, 186 (1871); *English v. State* 35 Tex. 473, 474, 477 (1871).

3. ***Concealed carry.***  States have regulated the concealed carry of firearms for more than two centuries, and courts have repeatedly upheld these laws because they impose no burden on self-defense.  *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *Ex parte Thomas*, 97 P. 260, 265 (Okla. 1908); *State v. Reid*, 1 Ala. 612, 614, 621 (1840); *State v. Buzzard*, 4 Ark. 18, 18 (1842); *State v. Chandler*, 5 La. Ann. 489, 489–90 (1850); *State v. Jumel*, 13 La. Ann. 399, 399–400 (1858).

Measure 114 is "relevantly similar" to these historical restrictions because it likewise does not burden the right of armed self-defense articulated in *Bruen* and *Heller*.  (*See* Part I.B, *supra*.)

**B.     Measure 114 Is "Relevantly Similar" to Historical Laws Restricting Weapons Capable of Firing Repeatedly Without Reloading.**

Measure 114 is also consistent with nearly a century of state firearms laws restricting weapons capable of firing repeatedly without reloading.[12]  Such weapons were not in widespread circulation until ***after*** ratification of the Fourteenth Amendment in 1868, and ***long after*** ratification of the Second Amendment in 1791.  As a result, such laws date to those weapons' entry into widespread circulation, rather than to the Founding Era or the Civil War when virtually no citizens possessed them legally.[13]

---

[12] Declaration of Robert Spitzer ¶¶ 13–34 (ECF No. 123).

[13] *See, e.g.,* Declaration of Michael Vorenberg ¶ 52 (ECF No. 17-4) ("Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction. Furthermore . . . legal possession . . . was limited almost exclusively to U.S. soldiers and civilian law enforcement officers.").

In *Bruen*, the Court stated that historical evidence through the 20th century could be probative if it did not "contradict[] earlier evidence." *Id.* at 2154 n.28; *see also Hanson*, 2023 WL 3019777, at *16 ("apply[ing] 20th century history to the regulation at issue . . . [that] do[es] not contradict any earlier evidence"); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *12 ("declin[ing] to disregard" "analogous twentieth-century regulations" restricting machine guns).

### 1.    *Firearms Capable of Firing Repeatedly Without Reloading Were Not Broadly Available Until After Enactment of the Fourteenth Amendment.*

Plaintiffs misleadingly claim that "firearms capable of holding more than ten rounds without reloading" have "been available for centuries." Fitz Mem. at 16; *see also* Eyre Mem. at 20 ("Firearms capable of rapidly firing more than 10 rounds without reloading long predate the Founding."). However, no firearm capable of firing more than ten rounds without reloading became broadly available in the United States prior to the late 19th century. *See* Declaration of Brian DeLay ¶ 60 (ECF No. 118) [hereinafter "DeLay Decl. (ECF No. 118)"] ("[H]igh-capacity firearms [capable of firing more than ten rounds without reloading] constituted less than 0.002% of all firearms in the United States as late as 1872.").

Plaintiffs cite several firearms invented before ratification of the Fourteenth Amendment (Eyre Mem. at 20–22), but none was widely available to civilians or in common use:

- **Pim Repeater** (Eyre Mem. 20). The Pim repeater was never offered for sale and "no examples of a repeating long-arm by Pim[] survive; it was a novelty." Declaration of Kevin Sweeney at ¶ 23 (ECF No. 124) [hereinafter "Sweeney Decl. (ECF No. 124)"].
- **Lorenzoni Repeater** (Eyre Mem. 20-21). Lorenzoni repeaters required "very skilled machinists to manufacture and repair [them]" and the Lorenzoni system "was not used for mass produced firearms."[14] The Lorenzoni repeater was slow to reload because the shooter had to point the barrel toward the ground and push a lever to prepare the next round between each shot, *see* Sweeney Decl. (ECF No. 124) at ¶ 26, and was prone to explosion if "the parts of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when firing." *Id*. Plaintiffs' own expert stated that the

---

[14] *Id*.

Lorenzoni repeater "was very expensive and thus was not widely used" in the United States, *see* Helsley Dep. at 138:19–139:1 (ECF No. 128-Exhibit C).

- **Girardoni Air Rifle** (Eyre Mem. 21).  The Girardoni air rifle was not a civilian rifle. It was a military firearm that required a wagon-mounted pump filled with water to sustain the pressure needed to operate; without the pump, the weapon required nearly 1,500 manual hand pumps to restore power.[15]  Moreover, the weapon was delicate, would frequently malfunction, and faced significant manufacturing difficulties.[16]  Only 1,500 or so were ever built.  Declaration of Robert Spitzer ¶ 42 (ECF No. 123) (quotations and citations omitted) [hereinafter "Spitzer Decl. (ECF No. 123)"].

- **Belton Rifle** (Eyre Mem. 21).  The rifle was so rare that "the only evidence of its existence is the correspondence between Belton and Congress" in which Belton described his invention.[17]  The Belton rifle required the shooter to "cock and prime [the rifle] each time before pulling the trigger and firing the gun," so the rifle "was not a rapid-fire repeating arm."  It was so heavy and difficult to operate that using it was "a bit of a three-handed job."  Sweeney Decl. (ECF No. 124) at ¶ 33.  No evidence suggests that a significant number of Belton rifles were manufactured, much less commonly owned by civilians.

- **1821 Repeater** (Eyre Mem. 21).  The 1821 repeater, known as the Jennings Flintlock rifle, was not common.  *See Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Att'y Gen. New Jersey*, 974 F.3d 237, 255 (3d Cir. 2020), *judgment vacated on other grounds*, 142 S. Ct. 2894 (2022) (Matey, J., dissenting) (noting that "[t]echnical challenges" "limited widespread adoption" of the rifle, which failed to "achiev[e] real popularity" (quotations omitted)).  Just 521 of these firearms were produced for use by the New York militia, and manual manipulation was required between each shot of this rifle, unlike modern semi-automatic firearms.[18]

- **Winchester Repeating Rifle** (Eyre Mem. 21–22).  Although Plaintiffs claim the Winchester repeating rifle was used in self-defense in 1864, Eyre Mem. 21–22, no Winchester rifles existed in 1864.  The first Winchester rifle was the Model 1866,[19] and it was first produced in 1867.[20]  Winchester's company produced the Henry Lever Action Rifle in the early 1860s, *see* DeLay Decl. (ECF No. 118) at ¶ 58, but it was "underpowered for a military firearm"; the "open magazine bottom under the barrel could easily become fouled"; the rifle's design could make it difficult to operate and

---

[15] John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, Guns.com (Mar. 15, 2011), https://perma.cc/57AB-X2BE.

[16] *Girandoni Air Rifle*, Fandom: Military Wiki, https://perma.cc/4RFA-Q9BK.

[17] *Belton Flintlock*, Military Fandom, https://perma.cc/SSM6-NAJC.

[18] Rock Island Auction Co., *Repeating Flintlock Rifles?!?*, YouTube (Sept. 7, 2021), https://www.youtube.com/watch?v=0FkW-CSTCwo.

[19] *Winchester Rifle: A Resource Guide*, Library of Congress, https://perma.cc/96SG-HRWG.

[20] *Winchester 1866 Prototype Musket*, The Armourer's Bench, https://perma.cc/PB83-TSM4.

aim; and the rifle was prone to becoming jammed and inoperable.[21]  Just 14,000 Henry rifles were manufactured by 1866,[22] and production of the Henry rifle ceased after the Civil War.[23]  The 1866 Winchester rifle had similar flaws, and required the shooter to manipulate a lever between each shot (unlike modern semi-automatic firearms).[24] Fewer than 800 Henrys and Winchesters combined were sold to civilians prior to 1872. *See* DeLay Decl. (ECF No. 118) at ¶ 59; Spitzer Decl. (ECF No. 123) at ¶ 48.

## 2.    *Modern Firearms Capable of Firing Repeatedly Are Fundamentally Different from Historical Antecedents.*

Modern firearms capable of firing repeatedly without reloading bear little resemblance to their historical predecessors.  At the time of the Founding, the typical Revolutionary-era musket (i) could hold just one round at a time, (ii) could fire no more than three rounds per minute, (iii) had a maximum accurate range of 55 yards, and (iv) had a muzzle velocity of approximately 1,000 feet per second.[25]  Further, these muskets had to be loaded before they could even be used.[26]  By contrast, a typical modern AR-15 (i) can hold 30 rounds, (ii) can fire approximately 45 rounds per minute, (iii) can shoot accurately from approximately 600 yards, (iv) attains a muzzle velocity of over 3,000 feet per second, and (v) can be stored loaded and immediately fired.[27]

Even the most advanced firearms of the Civil War era were a far cry from the modern AR-15.  For example, the 1866 Winchester rifle, discussed *supra*, had a maximum effective range of

---

[21] *1st DC Cavalry Martial Henry Rifle*, College Hill Arsenal, https://perma.cc/LFP3-AVDY.

[22] Dan Alex, *Henry Model 1860: Lever-Action Repeating Rifle*, Military Factory (last edited Feb. 4, 2022), https://perma.cc/N47S-7PKR.

[23] *1860 Henry Repeating Rifle*, Fandom: Deadliest Warrior Wiki, https://perma.cc/H9YW-SZHG.

[24] *See* Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS; *Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN; *see also* Spitzer Decl. (ECF No. 123) at ¶ 48.

[25] Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL.

[26] *See*, *e.g.*, *Firearms History and the Technology of Gun Violence*, UC Davis Library, https://perma.cc/YHZ6-8QPG (describing the "complicated process" of loading muskets used by soldiers during the Civil War).

[27] *See* Ingraham, *supra* note 25.

approximately 100 yards (about one-sixth of an AR-15) and had a muzzle velocity of 1,100 feet per second (roughly one-third of an AR-15).[28]   Today's firearms are "significantly different weapon[s]" than those of the Founding or Antebellum eras because they are in a "distinctly different class of lethality" due to vast changes in "ease of use, rate of fire, muzzle-velocity, power and accuracy."  Declaration of Roger Pauly ¶ 100–03 (ECF No. 120).

### 3.    Under **Bruen**, a "More Nuanced Approach" Is Required Where Firearms Capable of Firing Repeatedly Without Reloading Were Not in Widespread Circulation Until the Early 20th Century.

Plaintiffs assert there "simply is no enduring American tradition of state regulation forbidding magazines and firearms capable of holding more than 10 rounds" and that "laws, enacted for the first time in the twentieth century, come too late to provide insight into the meaning of [the Constitution]."  Eyre Mem. at 20, 22 (quotations and citation omitted).  But the lack of any pre-20th century "historical tradition" of regulating firearms technology that ***did not exist*** when the Second and Fourteenth Amendments were enacted is meaningless.  Plaintiffs fail to identify any firearm capable of firing more than ten rounds without reloading that achieved widespread circulation among civilians prior to the 20th century, and laws regulating these weapons proliferated once these weapons became broadly available to civilians.  *See generally* Spitzer Decl. (ECF No. 123) at ¶¶ 31–37.

As *Bruen* recognizes, courts must adopt a "more nuanced approach" in light of "dramatic technological changes" in firearms technology.  142 S. Ct. at 2132.  There may inherently be no comparable regulation from the Colonial Period or Antebellum Era when the technology now at issue simply ***did not exist*** then.  *See Oregon Firearms Fed'n, Inc.*, 2022 WL 17454829, at *12.

---

[28] Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M.

District courts that have considered the matter since *Bruen* have consistently held that modern LCMs represent the type of dramatic technological change that *Bruen* held requires a more "nuanced approach." *See Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *10–11; *Oregon Firearms Fed'n, Inc.*, 2022 WL 17454829, at *12–13; *Hanson*, 2023 WL 3019777, at *13.

Further, contrary to Plaintiffs' claims, as civilians gained widespread access to weapons capable of firing repeatedly without reloading, Congress and most states ***did respond*** by passing laws regulating these weapons. For example, in 1923, Vermont prohibited persons engaged in hunting from possessing "an automatic rifle of military type with a magazine capacity of over six cartridges."[29] In 1927, Rhode Island passed a law prohibiting "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[30] That same year, Michigan prohibited any firearm that fired more than sixteen times without reloading.[31] In 1932, Congress passed a law prohibiting "any firearm" in the District of Columbia "which shoots automatically or semiautomatically more than twelve shots without reloading"—a prohibition that has existed in some regulatory form ever since.[32] In 1933, Ohio outlawed any firearm that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading," and South Dakota banned firearms "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged

---

[29] Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130.

[30] Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4.

[31] Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888, § 3.

[32] Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1248 (D.C. Cir. 2011), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

from a magazine."[33]   In total, between 1925 and 1934, at least 31 states and the District of Columbia restricted access to certain weapons capable of firing repeatedly without reloading,[34] and at least 22 states plus the District of Columbia restricted ammunition magazines or similar feeding devices, and/or imposed limits on the rounds that could be fired without reloading.[35]

Measure 114 is "relevantly similar" to these early 20th century laws.  *See e.g.*, *Hanson*, 2023 WL 3019777, at *12, 15 ("The District's LCM ban is similar to the Prohibition-era regulations [of firearms capable of firing repeatedly without reloading] in that the burden it places on an individual's right of self-defense is relatively light."); *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, at *12–13 (upholding Delaware's LCM ban because any burden imposed on the right of armed self-defense "is slight" and "comparable" to that imposed by historical laws, including 20th century restrictions on firearms capable of firing repeatedly without reloading).

In other words, an individual bearing arms in 1791 or 1868 was as a technological matter unable to commit mass murder with a gun in a matter of seconds.  That situation radically changed only relatively recently.  As the Supreme Court has instructed, historical antecedents require a "more nuanced approach" when evaluating restrictions on firearms technology that did not exist before 1791 or 1868.  *See* 142 S. Ct. at 2132.  Applying that "more nuanced approach," these early 20th century laws demonstrate a clear history and tradition of regulating firearms that can fire repeatedly without reloading.  And they reflect a recognition that such regulations do not impinge

---

[33] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3; Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1.

[34] *See* Spitzer Decl. (ECF No. 123) at ¶ 23.  Although most of these laws restricted access to fully automatic weapons, at least seven and as many as ten states, plus the District of Columbia, restricted semi-automatic weapons.  *Id.* ¶ 29.

[35] *See id.* ¶¶ 32, 34 ("Regulations concerning removable magazines and magazine capacity were thus common as early as the 1920s—as these regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time.").

on any legitimate needs for armed self-defense, but are instead intended to reduce the carnage that can result when many rounds can be fired without reloading.

## CONCLUSION

Measure 114 does not violate the Second Amendment because (1) applying the standards of *Bruen* and *Heller*, Measure 114 does not burden the right to "armed self-defense" (and Plaintiffs make no showing of any such burden), (2) Measure 114 is "relevantly similar" to historical laws that imposed restrictions on firearms without burdening "the right of armed self-defense," *Bruen*, 142 S. Ct. at 2132–33, and (3) Measure 114 is consistent with the country's 20th century history of regulating firearms that can fire repeatedly without reloading.

Dated: May 15, 2023

*Of Counsel:*

Daniel Weltz
Rachel Bercovitz
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
DWeltz@cov.com
RBercovitz@cov.com

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Respectfully submitted,

/s/ Timothy C. Hester

Timothy C. Hester (*admitted pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

15

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2023, an electronic copy of the foregoing *Amicus Curiae*
Brief was filed with the Clerk of Court for the United States District Court for the District of
Oregon using the Court's *CM-ECF* system and was served electronically by the Notice of Docket
Activity upon registered *CM-ECF* participants.

Dated: May 15, 2023                         Respectfully submitted,

                                            /s/ Timothy C. Hester
                                            Timothy C. Hester (*admitted pro hac vice*)
                                            COVINGTON & BURLING LLP
                                            One CityCenter
                                            850 Tenth Street, NW
                                            Washington, DC 20001
                                            (202) 662-6000
                                            thester@cov.com