Shawn M. Lindsay
shawn@jurislawyer.com
Daniel J. Nichols
dan@jurislawyer.com
JurisLaw LLP
Three Centerpointe Drive, Suite 160
Lake Oswego, OR 97035
Telephone: (503) 968-1475

*Attorneys for Eyre Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> TINA KOTEK, et al., <br><br> Defendants. | Case No. 2:22-cv-01815-IM *(Lead Case)* <br> Case No. 3:22-cv-01859-IM *(Trailing Case)* <br> Case No. 3:22-cv-01862-IM *(Trailing Case)* <br> Case No. 3:22-cv-01869-IM *(Trailing Case)* <br><br> CONSOLIDATED CASES <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS** |
| MARK FITZ, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | |
| KATERINA B. EYRE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | |
| DANIEL AZZOPARDI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELLEN F. ROSENBLUM, et al., <br><br> Defendants. | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL AND PROCEDURAL HISTORY ..................................................................... 3

      A.    Procedural History ................................................................................... 3

      B.    What Discovery Has Shown About the Implementation of
            Measure 114 ............................................................................................ 5

ARGUMENT ....................................................................................................................... 9

I.     Plaintiffs Unquestionably Have Standing ........................................................... 9

II.    Defendants' Arguments About Plaintiffs' "Facial Challenge" Are Legally And
       Factually Flawed ................................................................................................ 12

III.   Defendants' Arguments About Plaintiffs' Purported "As-Applied Challenge"
       Are Equally Misguided ...................................................................................... 18

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

*Alcoa, Inc. v. Bonneville Power Admin.*,
    698 F.3d 774 (9th Cir. 2012) ........................................................................ 10

*Arnold v. Brown*,
    No. 22CV41008 (complaint filed Dec. 2, 2022) ......................................... 4

*Bateson v. Geisse*,
    857 F.2d 1300 (9th Cir. 1988) ..................................................................... 4

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988) .................................................................................... 19

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) .................................................................................... 14

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) .............................................................................. 11, 13

*Daniels v. Williams*,
    474 U.S. 327 (1986) .................................................................................... 15

*David Hill Dev., LCC v. City of Forest Grove*,
    688 F.Supp.2d 1193 (D. Or. 2010) ............................................................. 11

*Davis v. Passman*,
    442 U.S. 228 (1979) .................................................................................... 11

*Doe v. Snyder*,
    101 F.Supp.3d 722 (E.D. Mich. 2015) ....................................................... 15

*Forsyth Cnty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ........................................................................ 10, 11, 13

*Italian Colors Rest. v. Becerra*,
    878 F.3d 1165 (9th Cir. 2018) .................................................................... 11

*Jerry Beeman & Pharmacy Servs., Inc.*
    *v. Anthem Prescription Mgmt., LLC*,
    652 F.3d 1085 (9th Cir. 2011) .................................................................... 15

*Kicking Woman v. Hodel*,
    878 F.2d 1203 (9th Cir. 1989) .................................................................... 11

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .................................................................................... 11

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  142 S.Ct. 2111 (2022) ............................................................... 13, 14, 19

*Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*,
  676 F.3d 829 (9th Cir. 2012) ............................................................ 11, 12

*Patel v. City of Los Angeles*,
  738 F.3d 1058 (9th Cir. 2013) ................................................................ 14

*Portman v. Cnty. of Santa Clara*,
  995 F.2d 898 (9th Cir. 1993) ................................................................. 11

*Republican Party of Minn. v. Klobuchar*,
  381 F.3d 785 (8th Cir. 2004) ................................................................. 18

*Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*,
  968 F.3d 738 (9th Cir. 2020) ................................................................. 12

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ................................................................. 10, 11, 12

*Tucker v. State of Cal. Dep't of Ed.*,
  97 F.3d 1204 (9th Cir. 1996) ................................................................. 17

*United States v. Friday*,
  525 F.3d 938 (10th Cir. 2008) ............................................................... 21

*United States v. Rahimi*,
  61 F.4th 443 (5th Cir. 2023) ................................................................. 14

*United States v. Salerno*,
  481 U.S. 739 (1987) .................................................................... 14, 15

*Valdivia v. Schwarzenegger*,
  599 F.3d 984 (9th Cir. 2010) ................................................................. 17

*Wolfson v. Brammer*,
  616 F.3d 1045 (9th Cir. 2010) ............................................................... 11

**Other Authorities**

*Ballot Measures: Measure 114*, The Oregonian, https://bit.ly/3U2ZOz4 (last
  visited May 17, 2023) ......................................................................... 3

Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect
  Even Sooner, State Says*, The Oregonian (Nov. 18, 2022),
  https://bit.ly/3GINalU ......................................................................... 4

Stephen Gutowski, *Oregon Gun-Control Initiative Faces Immediate Legal Peril After Slim Victory*, The Reload (Nov. 15, 2022), https://bit.ly/3tWCMzh ............................... 3

## INTRODUCTION

After nearly six months of insisting that Plaintiffs' constitutional challenges to Measure 114 could not be resolved *even preliminarily* without discovery and full-blown trial, Defendants now do an about-face and ask this Court to grant them judgment as a matter of law on some portion (or perhaps even all; it is not entirely clear) of Plaintiffs' challenge to Oregon's novel permitting regime. That much-belated request is legally and factually flawed.

Defendants first suggest—for the first time ever—that Plaintiffs lack either Article III or "prudential" standing to challenge the implementation Measure 114's permitting regime. But Plaintiffs' Article III standing is obvious, as they seek to challenge a regime that self-evidently imposes burdens on their exercise of constitutional rights (or, for those Plaintiffs who sell firearms, their efforts to facilitate the exercise of constitutional rights by others) in the form of additional time and costs. That is classic Article III injury regardless of whether permits are still possible to obtain. As for prudential standing, Defendants' suggestion that this Court should grant them summary judgment on the permitting challenges now, after they insisted on proceeding to discovery and trial rather than urging the Court to resolve Plaintiffs' preliminary-injunction motions or filing prompt motions to dismiss, smacks far more of gamesmanship than of any legitimate basis for this Court to withhold the exercise of jurisdiction that it plainly has.

Defendants next contend that Plaintiffs' "facial challenge" to "the implementation" of the permitting regime fails because Plaintiffs' have not shown that no one will *ever* be able to get a permit under that new regime. That is both wrong and beside the point. To be sure, one of the many problems with Measure 114 is that there is no indication that the state will *ever* be able to implement it, because discovery has revealed that the FBI is neither willing nor legally able to provide the background checks that Measure 114 requires. But Plaintiffs have never confined their

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS

challenges to the notion that Measure 114 is *impossible* to implement.  They have instead always argued that Measure 114 cannot be implemented in a manner that is *consistent with the Constitution*, because it subjects the exercise of Second Amendment rights to burdens that find no support in our historical tradition of firearms regulation (or due process).  That problem would persist even if Defendants could implement Measure 114 exactly as its plain terms contemplate, as delay, discretion, and other onerous burdens are baked into the regime on its face.  In all events, Defendants' argument fails even on its own terms, as the record is replete with evidence that Measure 114 cannot be implemented at all.  At the very least, the factual dispute among the parties on that forecloses a grant of summary judgment on that question in Defendants' favor.

Defendants' attacks on what they dub Plaintiffs' "as applied" challenge to "the implementation" of the permitting regime fare no better.  In reality, what they attack are just additional arguments about the manner in which Defendants plan to implement Measure 114, which exacerbates all the constitutional concerns that are evident on the face of the law. Defendants ask this Court to ignore all of the evidence that their new regime will be riddled with delay, confusion, and other burdens, and instead simply accept their say-so that everything will work well enough when the time comes.  But Defendants had five months of discovery during which to try to prove that these assurances are based in reality, and they came up woefully short. Their desire to avoid a trial during which all the evidence refuting those assurances is exposed is understandable, as discovery has revealed that Measure 114's implementation is in shambles.  To take just a few examples, those whose background checks have been marked "delayed" are given a timeline the state *knows* to be wrong, as well as instructions to direct any questions to a phone number and email that the state has decided not to answer.  Lindsay Decl. ISO Pltfs' MSJ, Exhibit D, LeJeune Dep. (ROUGH) 60:1-62:20; 65:22-67:14.  The current state of technology for the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS

"database" required by the law is an empty Excel spreadsheet.  And the FBI is not cooperating—and for reasons of federal law, will not cooperate—in the administration of the background checks that Measure 114 requires the FBI to conduct.  But Defendants' palpable desire to avoid having to defend that abysmal record does not begin to justify their request that this Court simply grant judgment in their favor without even considering whether they will actually be able to implement Measure 114 in a manner even remotely consistent with the Second Amendment and due process.

At bottom, Defendants' motion is just a not-so-thinly-disguised effort to avoid the creation of a record that will confirm for all the world just how fatally flawed both Measure 114 and their efforts to implement it are.  But they fail to identify any legal basis on which the Court could grant them that relief.  The Court should accordingly deny their motion in its entirety.

## FACTUAL AND PROCEDURAL HISTORY

### A.    Procedural History

On November 8, 2022, Oregon voters approved Measure 114 by a margin of 50.6% to 49.4%.  *See Ballot Measures: Measure 114*, The Oregonian, https://bit.ly/3U2ZOz4 (last visited May 17, 2023).  At the time, "[s]upporters of the initiative claim[ed] there will be plenty of time, potentially even months, for lawmakers and law-enforcement officials to work out the details." Stephen Gutowski, *Oregon Gun-Control Initiative Faces Immediate Legal Peril After Slim Victory*, The Reload (Nov. 15, 2022), https://bit.ly/3tWCMzh.  That promise was essential, given the new mechanisms required for successful implementation:  The Oregon State Police ("OSP") had to create an entirely new background-check system from scratch, as well as a workable electronic database and new rules to administer the Measure; sheriffs and regulated parties had to set up corresponding systems and rules; and someone (it was not clear who) had to provide the new

training courses Measure 114 requires applicants to take and pass before they can acquire a firearm.

But the now-resigned Oregon Secretary of State had other ideas:  She set Measure 114's effective date as *December 8, 2022*—before the final votes on Measure 114 had been even certified, and long before the necessary arrangements to administer the system could be put into place.  *See* Maxine Bernstein, *Oregon's Measure 114, Strict New Gun Limits Go Into Effect Even Sooner, State Says*, The Oregonian (Nov. 18, 2022), https://bit.ly/3GINalU.

Between the passage of the ballot measure and the (new and accelerated) implementation date, Plaintiffs in this since-consolidated action sued in federal court.  A separate group of plaintiffs sued in state court, in the Circuit Court for Grant and Harney County.  *See Arnold v. Brown*, No. 22CV41008 (complaint filed Dec. 2, 2022).  On December 6, 2022, the Harney County Court granted a temporary restraining order, *see* Dkt.52 at 4, and on December 15, 2022, it issued a preliminary injunction, *see* Dkt.61-2.[1]  Under the terms of that ruling, the state may not enforce any part of Measure 114.  Dkt.61 at 9; *see* Dkt.61-3.

Meanwhile, this Court denied a motion for a temporary restraining order on December 6, 2022.  *See* Dkt.39.  But because the state was unable to make the system for administering the permitting provisions work, the state agreed to a 30-day stay, which this Court approved.  *Id.* at 4, 43.  The inability to make the permitting system work proved persistent, and Defendants had to agree to a subsequent stay until March 7, 2023.  *See* Dkt.69 at 2; Dkt.70.  Though that stay expired, the state remains bound by the terms of the Harney County Court's rulings.  But Defendants have continued to take the position that they should be allowed to implement Measure 114 immediately.  *See, e.g*, Dkt.115 at 34-35; Dkt.121 ("[T]he permit-to-purchase system is ready to be implemented

---

[1] Unless otherwise specified, all docket numbers refer to the docket in No. 2:22-cv-01815-IM.

now and enforced when the state court lifts its injunction in September."); *see also* Dkt.61 at 12-13 (insisting, even in the posture of asking for a "brief[] stay[ of] enforcement of the permit-to-purchase provision," that "Defendants intend to seek mandamus review of the Harney County Court's order").

### B.    What Discovery Has Shown About the Implementation of Measure 114.

At every turn during the litigation, Defendants have insisted that discovery and a trial on the merits is necessary to resolve this dispute.  They never moved to dismiss this action, even as they argued that Plaintiffs' motion for a preliminary injunction was moot and advocated for trial on a swift basis.  *See* Dkt.115 at 43; Dkt.136 at 3-4.  Accordingly, while Plaintiffs were ready and willing to proceed with resolution of their preliminary-injunction motion without it, extensive discovery has instead proceeded at the behest of the state.

That discovery has proven that the problems with the state's new permitting regime are even more extensive than Plaintiffs anticipated.  To start with the permit-to-purchase application, the state's 30(b)(6) witnesses testified that OSP can receive applications only via fax, (snail) mail, "or courier."  Lindsay Decl. ISO Pltfs' MSJ, Exhibit A, Landers Dep. 8:7-22.  OSP can receive fingerprints only by mail or courier.  *Id.* at 8:23-25.  Once a permit-to-purchase application is received, an employee must manually process the background check every step of the way.  *Id.* at 14:12-24 (noting "at this time we don't have a system that we would use.  We have been very open about that.  It would be a manual process.").  The employee must also manually enter the permit-to-purchase information into an Excel spreadsheet.  *Id.* 20:9-18.  That bare list of information regarding those who apply for a permit is presently the sum total of what Defendants maintain constitutes a "database" sufficient to satisfy the requirements of Measure 114 §4.  *See* Lindsay Decl. ISO Pltfs. MSJ, Exhibit I, Defendants' Response to Plaintiffs' First Set of Interrogatories,

No. 11.  To be clear, at the moment, this "database" is literally an empty Excel spreadsheet with some column headers.  *Id.*  The state has not even begun to think about how more than one (much less 20) employees could work simultaneously on it, and the answer for now appears to be yet more manual inputting.  *See* Landers Dep. 22:2-12.  No special physical, administrative, or security safeguards exist for this "database."  *Id.* 22:13-24:17.

While Defendants are using an Excel spreadsheet as a fig leaf when it comes to the "database" requirement, when it comes to Measure 114's requirement that OSP "conduct a criminal background check … through the Federal Bureau of Investigation," §4(1)(e), Defendants do not even have a pretense of compliance.  Under Measure 114, "the criminal background check" that is required (1) "shall … includ[e] … a fingerprint identification, through the Federal Bureau of Investigation," and (2) is not considered "complet[e]" until after the FBI has "return[ed] the fingerprint cards used to conduct the criminal background check."  *Id.*  Yet it is undisputed that the FBI "will not perform fingerprint-based criminal background checks for permit applicants" submitted by OSP.  Agreed Upon Facts ("AUF") 42, Dkt.161; *see* Decl. of Commander Rebecca David ¶7.  And for reasons of federal law, the FBI will not do so going forward.  *See* AUF.42; Defendants' Response to Plaintiffs' First Set of Interrogatories, No. 13.  OSP has thus been forced to effectively rewrite the law:  It is instructing its employees to process fingerprints through the Oregon system rather than through the FBI.  Landers Dep. 10:9-11:21.  This workaround not only is unauthorized by Measure 114; it is also causing significant delay.  Collecting the (paper) fingerprint cards and running them manually through the *Oregon* system (which is, again, not what Measure 114 requires) is a novel addition to Oregon's background check system that is creating a considerable bottleneck.  *See id.* 36:15-22 (testifying that "if fingerprints weren't involved .… it would be the same background as what our FICS currently does.").

Making matters worse, permit agents do not have authority under Measure 114 to issue a permit based on an OSP background check alone. Defendants have claimed, first in a footnote and subsequently at 30(b)(6) deposition, that permit agents "should issue the permit" where "OSP determines that an applicant passes its background checks, and reports that determination, along with the FBI's refusal to conduct a check." State.PI.Br.29 n.12; *see* Landers Dep. 10:9-13:9. But, in making this assertion, they did not cite anything in Measure 114 that supports it, likely because nothing in Measure 114 does. And the evidence in this case refutes the notion that permit agents will grant permits on terms that Measure 114 does not allow. Defendants note that "Kevin Campbell, Executive Director of the Oregon Association of Chiefs of Police ('OACP'), was clear in deposition that his members will implement Measure 114." State.PI.Br.30. But what Mr. Campbell actually said is that chiefs of police will implement Measure 114 *as written*. *See id.* (quoting Mr. Campbell saying, "When a law is passed, we implement the law."). There is thus no reason to think that permit agents will implement anything other than the law that was actually passed, which does not allow permit agents to issue a permit until an FBI background check has been completed. 2d Decl. of Kevin L. Campbell ¶8; 2d Decl. of Jason Myers ¶14.

Even if citizens could secure the permits-to-purchase, the OSP process for the second background check is an even bigger mess. As a reminder, once a citizen has her permit-to-purchase and goes to a store, she must ask the dealer to request a second background check at the point of sale. If the dealer submits the background-check request to OSP online, the state's 30(b)(6) witnesses testified that it is automatically approved only approximately 40% of the time. Lindsay Decl. ISO Pltfs' MSJ, Exhibit B, LeJeune Dep. (CLEAN) 16:20-17:4; 26:9-24. The rest of the applications—the majority—are kicked to the "web queue." *Id.* Though this is occasionally owing to actual concerns about whether someone is prohibited from possessing a firearm, much of this is

due to issues having nothing to do with any legitimate basis to withhold a firearm, like having a "common name." *Id.* 32:22; *see id.* 29:4-36:18. The wait time once in the "web queue" has been typically above 45 days and often longer. *See* Lindsay Decl. ISO Pltfs' MSJ, Exhibit D, LeJeune Dep. (ROUGH) 61:12-62:20.

For those whose background checks are marked "pending or delayed," OSP's processes become truly Kafkaesque. OSP always informs firearms dealers that "pending or delayed" background checks will take 45 days to process—a figure that does not reflect reality, but that OSP provides because giving honest answers generated too many complaints. *See id*. 60:1-62:20; *see also id.* 54:4-55:13. And while OSP provides both a phone number and an email for those whose background checks have been delayed to try to obtain more information, OSP has made the intentional decision, at a management level, *not to respond* to voicemails or emails citizens leave at this number or email address. *Id*. 65:22-67:14. Moreover, "the FICS unit does not currently have a deadline on when" it must resolve a pending or delayed application, and Measure 114 does not impose one. *Id.* 69:13-15. Meanwhile, for those customers who purchase from a dealer willing to submit their background check requests via the phone in the first instance, rather than submit to this digital labyrinth, wait times just to speak to someone are typically 1-to-3 hours, while others are disconnected and have to start over again—and it is the *dealer*, not the customer, who has to agree to devote all of this time to processing a transaction for just a single customer. LeJeune Dep. (CLEAN) 25:13-16, 58:23-59:9.

The state's witnesses candidly acknowledged that a major reason for all of these problems is that the state has woefully underfunded the regime it seeks to interpose between Oregonians and their constitutional rights. As to the revamped general background check, the state's representative testified that OSP needs significantly more staff than it is currently allotted. *See* LeJeune Dep.

(CLEAN) 59:13-60:10 (agreeing that "[i]n a perfect world … it would happen in a short time frame," but testifying that in this world, the FICS unit needs "additional resources or additional money from the budget" or to "hire additional people").  Meanwhile, to administer the permit-to-purchase regime, OSP would need to hire (at least) 20 more employees, yet it currently has no budget or authority to do so.  Landers Dep. 17:7-19:25.  Until OSP can hire and train more employees, it will be forced to try to run the program with only its current, already-overwhelmed staff, with employees "split[ting] responsibilities between permit to purchase applications and background checks." *Id*. 15:4-18:5, 20:5-8.  And while OSP has identified a vendor it would like to work with to receive LiveScan fingerprints, it has no money to do so. *Id*. 33:12-24; 38:8-10.

## ARGUMENT

Five months of discovery have produced an abysmal record for the state, which has proven thoroughly incapable of constitutionally implementing a permitting regime that is already of dubious constitutionality on its face.  It is little surprise, then, that after insisting for the better part of a year that Plaintiffs' challenges to this regime could not be resolved even in a preliminary-injunction posture without a full-blown trial, Defendants have now done an about-face and seek to preclude Plaintiffs from having their day in court, based on purely legal arguments that Defendants could have asked this Court to resolve months ago.  But Defendants' efforts to resist a day of reckoning on the state's novel permitting regime are for naught, as they fail to identify any basis on which this Court could grant judgment in their favor.

## I.   Plaintiffs Unquestionably Have Standing.

At the outset, to the extent Defendants suggest that Plaintiffs lack Article III standing, *see* Def.MSJ.4-5, that argument is patently meritless—which likely explains why they have never before raised it in all the months this case has been pending.  Plaintiffs include individuals who

seek to obtain firearms, as well as associations representing those who seek to do so. They also include entities that seek to facilitate the exercise of that constitutional right by selling firearms to those who are legally permitted to possess them, as well as associations representing those who seek to do so. The state's new regime thus injures Plaintiffs for an obvious reason: It imposes burdens, in the form of both time and money, on their ability to exercise or facilitate the exercise of Second Amendment rights. That is classic injury-in-fact. Just as parade organizer does not have to be denied a permit to challenge an onerous parade permitting regime, *see Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 127 (1992), an individual does not need to be denied a permit to challenge an onerous firearms permitting regime.

To be sure, that injury has not yet come to pass. But that is not because Plaintiffs based their claims to standing on "'contingent future events that may not occur.'" Def.MSJ.4 (quoting *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012)). It is because the state ended up being enjoined from implementing Measure 114 during the course of this litigation. If and when the state is permitted to implement Measure 114—as Defendants continue to maintain they should be allowed to do immediately—Plaintiffs will suffer that injury, regardless of the precise details as to how the state ultimately implements Measure 114. Accordingly, at all times throughout this litigation, Plaintiffs have been subject to a very "credible threat" that they will have to suffer the very injury they seek to avoid. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5, 159 (2014). Again, Article III demands nothing more.[2]

---

[2] To the extent Defendants argue that Plaintiffs cannot argue that certain provisions of the permitting regime are unconstitutional unless and until they are applied to them in a way that causes them injury, *see, e.g.*, MSJ.Br.14-15 (arguing that Plaintiffs cannot challenge the discretion that Measure 114 grants permitting agents), that is wrong too. The injury-in-fact that Plaintiffs stand to suffer is unquestionably traceable to Measure 114, and it unquestionably would be redressed by an injunction enjoining the state from enforcing Measure 114. *See, e.g., Italian*

Defendants' "prudential" arguments fare no better.  At the outset, the Supreme Court has cautioned that "prudential" principles should be deployed very cautiously, if at all, as they are in "some tension with … the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'"  *Id.* at 167 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).   At any rate, this case is unquestionably prudentially ripe.  "The question of prudential ripeness requires us to first consider the fitness of the issues for judicial review, followed by the hardship to the parties of withholding court consideration."  *Oklevueha Native Am. Church of Hawaii, Inc. v. Holder*, 676 F.3d 829, 837 (9th Cir. 2012).  Both factors weigh strongly in favor of exercising jurisdiction here.

As to the first question, nothing about this case is unfit for judicial review.  It presents the same kinds of issues that courts have routinely resolved in the context of voter ID laws, parade permitting laws, and myriad other regimes imposing obstacles to the exercise of constitutional rights.  *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 185-86 (2008) (challenge to voter ID law); *Forsyth Cnty.*, 505 U.S. at 127 (challenge to parade permit scheme).  Each side's legal arguments have been developed through extensive briefing, and will be developed even more fully through argument and trial, and the parties have developed an extensive factual record to inform the Court's consideration of the constitutional questions.  *See Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 903 (9th Cir. 1993) ("[T]he prudential component [of ripeness] focuses on whether there is an adequate record upon which to base effective review.").  The case is thus plainly

---

*Colors Rest. v. Becerra*, 878 F.3d 1165, 1174 (9th Cir. 2018); *Wolfson v. Brammer*, 616 F.3d 1045, 1056 (9th Cir. 2010).  Plaintiffs are thus entitled to challenge any aspect of Measure 114 that could lead to its invalidation.  *See Kicking Woman v. Hodel*, 878 F.2d 1203, 1206 n.7 (9th Cir. 1989) ("It is of course unquestioned that plaintiffs with standing may challenge the facial constitutionality of a statute in federal court." (citing *Davis v. Passman*, 442 U.S. 228, 242 (1979)).

"fit[] … for judicial review." *Oklevueha*, 676 F.3d at 837; *see, e.g.*, *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 752 (9th Cir. 2020).

As to the second question, to withhold resolution of Plaintiffs' challenges at this late date would impose considerable—and patently unfair—hardship on Plaintiffs. Any "prudential" objections Defendants may have to resolution of Plaintiffs' challenges to the permit-to-purchase regime have been available for them to raise at any point in this case. Yet rather than urge this Court to resolve Plaintiffs' preliminary-injunction motion as a matter of law or file an early motion to dismiss, Defendants insisted on proceeding with full-blow discovery that has now been underway for five months. Only after a wealth of factual development revealed just how extensive the problems with the state's new regime are did they suddenly decide that the better course is to insist that the Court should not resolve the merits of Plaintiffs' challenges at all. Meanwhile, Defendants want this Court to free them up to impose the very permitting regime that Plaintiffs maintain imposes an unconstitutional burden on Second Amendment rights. Thus, all withholding review right now would accomplish is to force Plaintiffs to bring the exact same claims, and the parties to conduct extensive discovery all over again, as soon Defendants get their way. That is exactly the kind of hardship that weighs heavily in favor of this Court exercising its "virtually unflagging" "obligation to hear and decide" Plaintiffs' constitutional challenges. *Susan B. Anthony List*, 573 U.S. at 167; *see also, e.g.*, *Oklevueha*, 676 F.3d at 837.

## II.    Defendants' Arguments About Plaintiffs' "Facial Challenge" Are Legally And Factually Flawed.

Defendants next insist that Plaintiffs' "facial implementation" challenge to Measure 114 fails as a matter of law because Plaintiffs "have not adduced any evidence that Measure 114 will be implemented in such a way that no permit applicant will be able to obtain a permit." Def.MSJ.6.

It is not entirely clear what exactly they mean that argument to cover, but it is entirely clear that it is legally confused and factually wrong.

At the outset, while Plaintiffs very much dispute the proposition that the Measure 114 can be implemented *at all*, their constitutional challenges—whether to the law itself or to its implementation—have never been confined to the claim that Measure 114 makes it *impossible* to obtain a permit.[3]  Plaintiffs contend that Measure 114 imposes unconstitutional burdens on the exercise of Second Amendment rights even assuming some people can successfully run the gauntlet it creates.  *See, e.g.*, *Eyre* FAC ¶85 ("*On its face*, Oregon's new permit-to-purchase law restricts a person's ability 'to purchase or acquire a firearm.'" (emphasis added)) (listing the parts of the law Plaintiffs challenge in this count); *OFF* TAC ¶120 (same); Pltfs.MSJ.2 ("Measure 114's permitting regime could not pass muster even if it worked perfectly as set out in the statute.").  Just a parade-permitting regime can operate in a facially unconstitutional manner even if people remain able to secure the requisite permits, *Forsyth Cnty.*, 505 U.S. at 127, a voter ID regime could operate in a facially unconstitutional manner even if some people are able to secure the requisite identification, *cf. Crawford*, 553 U.S. at 185-86, and a concealed-carry licensing regime could operate in a facially unconstitutional manner even if some people are able to secure the requisite licenses, *see N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2123, 2125 (2022), a permit-to-purchase regime can operate in a facially unconstitutional manner even if people are able to secure the requisite permits.  That is because a regime that authorizes the imposition of

---

[3]  Defendants repeatedly describe their motion as seeking judgment on Plaintiffs' "implementation challenges," but they then define those challenges to cover the entirety of the counts in Plaintiffs' complaints challenging Measure 114's permitting regime.  *See* Def.MSJ.Br.3.  It is thus not entirely clear whether Defendants are seeking judgment on Plaintiffs' permitting claims in their entirety, or just trying to preclude Plaintiffs from presenting any evidence or making any arguments about how Defendants plan to implement that regime.  Either way, however, their arguments fail.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS

unconstitutional burdens on the exercise of constitutional rights is unconstitutional in all of its applications, not just as applied to those who cannot spare the time or money or whatever else is necessary to overcome those burdens.

The relevant question for Second Amendment purposes, then, is not whether "Measure 114 will be implemented in such a way that no permit applicant will be able to obtain a permit," Def.MSJ.6, but whether the state can prove that the burdens Measure 114 imposes on the exercise of Second Amendment rights are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2126. After all, "if a statute is inconsistent with the Second Amendment's text and historical understanding, then it falls under any circumstances." *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023). To the extent it even has any application here, that is how the test articulated *United States v. Salerno*, 481 U.S. 739 (1987), works when it comes to constitutional rights: If a law does not satisfy the governing standard for burdens on the constitutional right at stake, then it is unconstitutional, full stop. The Ninth Circuit has applied that rule in all manner of cases involving other constitutional rights, as has the Supreme Court. *See, e.g.*, *Patel v. City of Los Angeles*, 738 F.3d 1058, 1065 (9th Cir. 2013) (holding an ordinance "facially invalid under the Fourth Amendment" because its "procedural deficiency affects the validity of all searches authorized by [it]," even if some of those searches may still be constitutional), *aff'd sub nom. City of Los Angeles v. Patel*, 576 U.S. 409, 417 (2015) (expressly rejecting city's argument that "facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications"). Indeed, the Court applied that rule in *Bruen* itself, holding New York's "proper-cause" regime *facially*

unconstitutional without even so much as mentioning *Salerno* or the fact that the regime did not make it *impossible* to get a license.[4]

Of course, if a permitting regime operates in such a manner as to make it impossible to obtain a permit at all, then it self-evidently violates the Second Amendment (not to mention due process[5]). But as *Bruen* itself makes clear, a licensing regime can still be facially unconstitutional even if it leaves some people able to obtain licenses. And that is precisely what Measure 114 is, as it both by design and in effect imposes burdens on the exercise of Second Amendment rights that find no purchase in our nation's historical tradition of firearms regulation.[6] That was apparent from the start, and it has become only more so after discovery, which has confirmed that Plaintiffs' concerns about the delays and costs that Measure 114 will impose are anything but hypothetical. To take just one example, discovery has revealed that more than 60% of all background checks

---

[4] That is unsurprising, as the kinds of "facial" challenges that *Salerno* deemed disfavored are those involving parties who concede that a law is constitutional *as applied to them*, yet try to invalidate it facially on the ground that it is unconstitutional *as applied to others*. *See, e.g.*, *Salerno*, 481 U.S. at 743, 746 (mob boss and enforcer challenging constitutionality of pretrial denial of bail on grounds of future dangerousness); *cf. Jerry Beeman & Pharmacy Servs., Inc. v. Anthem Prescription Mgmt., LLC*, 652 F.3d 1085, 1097 (9th Cir. 2011) ("Defendants challenge neither the specific manner in which the statute applies to them nor a particular instance of the statute's application."), *vacated on other grounds sub nom. Beeman v. Anthem Prescription Mgmt., LLC*, 741 F.3d 29 (9th Cir. 2014). That is not and has not ever been Plaintiffs' argument.

[5] *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 331 (1986); *Doe v. Snyder*, 101 F.Supp.3d 722, 724 (E.D. Mich. 2015) ("Holding an individual criminally liable for failing to comply with a duty imposed by statute, with which it is legally impossible to comply, deprives that person of his due process rights."); *see also Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988); *David Hill Dev., LLC v. City of Forest Grove*, 688 F. Supp. 2d 1193, 1219-20 (D. Or. 2010).

[6] For the third time in the past six days, Defendants once again insist that Plaintiffs "have [not] brought a facial challenge to the provisions of Measure 114 that amend existing state background check statutes." Defs.MSJ.7 n.1. As Plaintiffs have pointed out to Defendants twice—now thrice—in the same amount of time, that is simply wrong. Dkt.165 at 22-23; Dkt.161 at 3. Indeed, this Court has noted explicitly that Defendants' operative complaints "raise … substantive challenges to Measure 114's background check requirements." Dkt.70 at 5 n.1. Defendants' continued failure to defend these provision is thus reason enough to deny their motion.

submitted to OSP online will be significantly delayed, most often for reasons as innocuous as having a "common last name." *See supra*, p.7. OSP will then deliberately lie to these citizens about the length of the wait they can expect to have to withstand just to exercise a constitutional right, as well as the method for obtaining more information. *See supra*, p.8. Measure 114 thus not only requires Plaintiffs and other law-abiding citizens to jump through far more hoops than the Constitution tolerates, but leaves them with only a roughly one-in-three chance of successfully doing so. A voter ID regime in which bureaucratic delay left citizens with only a one-in-three chance of successfully securing the requisite identification would not pass constitutional muster for a minute.

All of that said, Plaintiffs certainly do also contend that Measure 114 suffers from the additional problem that Oregon does not have the means to implement it *at all*, and will not have the means to do so at any time in the foreseeable future. *See, e.g.*, *Eyre* FAC ¶96; *OFF* TAC ¶131; Pltfs.MSJ.2. But the notion that the state is entitled to summary judgment on that question blinks reality. As Plaintiffs have explained repeatedly, Measure 114 precludes a permitting agent from issuing a permit unless and until the FBI has completed a background check. *See* Pltfs.MSJ.25-26; Dkt. 161 at 9-10. Yet discovery has revealed that the FBI will not and cannot perform the background checks that Measure 114 requires permitting agents to obtain from them. *See, e.g.*, AUF.42; Lindsay Decl., Ex. 1, Defendants' Responses to Plaintiffs' First Set of Requests for Admission ("RFA") No. 31. And as multiple permit agents have testified (in testimony the state continues to misconstrue), when the law is allowed to go into effect, they will have to enforce it as written, meaning they must have *an actual FBI background check*, not just an OSP report of "the outcome from the FBI … that they declined to run the check," Defs.MSJ.9, before they can issue a permit. *See* 2d Decl. of Kevin L. Campbell ¶8; 2d Decl. of Jason Myers ¶14; *cf.* Defs.MSJ.7-8.

If anything, that self-described "'legal obstacle to implementing' Measure 114," Defs.MSJ.7, ought to compel summary judgment in *Plaintiffs*' favor.  At the very least, the record evidence that permitting agents will not be able to issue any permits at all precludes granting summary judgment to Defendants.

Implicitly recognizing this problem, Defendants contend that "even if the court determines that Measure 114 requires the FBI to run a criminal background check before a permit agent can issue a permit"—which it plainly does, *see* §4(1)(e)—then the Court should (a) declare that provision a "legal nullity"; (b) "sever[]" it; and then (c) "grant summary judgment against plaintiffs' facial challenges to the implementation of Measure 114." Defs.MSJ.9-10.  But they conspicuously decline to explain how in the world this Court would have the power to nullify and sever a duly enacted provision of state law without first finding it legally deficient—which would require granting judgment to *Plaintiffs*, on the ground that Measure 114 as enacted *is* unconstitutional because it makes permits impossible to obtain.  Federal courts cannot just void provisions of state law because the state would prefer not to have to defend them.  They may do so only to remedy a constitutional or other deficiency.  *See, e.g.*, *Valdivia v. Schwarzenegger*, 599 F.3d 984, 995 (9th Cir. 2010) (collecting cases); *see also Tucker v. State of Cal. Dep't of Ed.*, 97 F.3d 1204, 1217 (9th Cir. 1996) ("[I]t is not within the province of [a federal] court to 'rewrite' [a state law] to cure its substantial constitutional infirmities.").

In all events, both Measure 114 and the manner in which Defendants plan to implement it remain facially unconstitutional with or without the problem of FBI background checks that are impossible to obtain, for the basic reasons that it authorizes the state to force law-abiding citizens to jump through all sorts of hoops that have no historical grounding whatsoever just to exercise their Second Amendment rights and that it explicitly authorizes both exercises of discretion and

lengthy delays that cannot be reconciled even with other, less onerous background check regimes. And the record evidence that Plaintiffs' have now amassed confirming that, if anything, the delays, costs, and confusion inherent in Measure 114 will prove even more pronounced in practice just reinforces the conclusion that was already evident on the face of the law:  Measure 114 is unconstitutional.  At the very least, that wealth of evidence forecloses any claim that Defendants are entitled to judgment as a matter of law.

## III. Defendants' Arguments About Plaintiffs' Purported "As-Applied Challenge" Are Equally Misguided.

Defendants next try to cleave off what they characterize as Plaintiffs "as-applied" challenge to Measure 114, by which they appear to mean Plaintiffs' additional arguments that even assuming permits would not be *impossible* to obtain under Measure 114, the manner in which Defendants plan to implement it would still remain unconstitutional.  Once again, Defendants are confused about the law and wrong about the facts.

To be sure, Plaintiffs have raised additional concerns about the state's rush to implement Measure 114 before it even has the means to do so in a manner consistent with what Measure 114 contemplates.  *Eyre* FAC ¶96; ("[C]ompounding all other constitutional concerns, the state is rushing to implement Measure 114 before it has set up the system by which it could be administered," and that as a result, "no citizen can obtain a firearm."); *OFF* TAC ¶131 (same); *Azzopardi* FAC ¶31; Pltfs.MSJ.2 ("But undisputed facts developed through discovery—as set forth below—have confirmed that Measure 114's permitting regime does *not* work as intended—not even close.").  But that does not convert Plaintiffs' challenge into some sort of unripe "as applied" challenge.  The type of "as-applied" claim Defendants seem to have in mind is a challenge to government action only as applied to a subset of individuals.  *See Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004) ("An as-applied challenge consists of a challenge to

the statute's application only as-applied to the party before the court.  If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758-59 (1988)).  That is not and has not ever been the nature of Plaintiffs' claims.  Again, Plaintiffs contend that the problems with Measure 114 render it unconstitutional as applied to *all* Oregonians, not just as to some subset who have the most trouble obtaining a permit.  That is no less true of their arguments about the manner in which the state plans to implement Measure 114 than of their arguments about how Measure 114 operates on its face:  In both respects, the law imposes unconstitutional burdens on Second Amendment rights (and violates due process) across the board.[7]

Nor are those arguments premature.  Defendants have consistently taken the position throughout this litigation that they can constitutionally implement Measure 114 *right now*.  Plaintiffs are therefore entitled to know, and this Court is entitled to consider, exactly how they intend to implement it, as that is part and parcel of the inquiry into whether they can do so consistent with the Constitution.  By Defendants' logic, even if discovery revealed that Defendants concededly had no plans of *ever* granting *any* permits to *anyone*, the Court would have to blind

---

[7] That makes Defendants' insistence that this "as-applied" challenge should fail because it "is not, in fact, an as-applied challenge," Def.MSJ.12, particularly perplexing, as no one but Defendants has ever suggested that this is an "as-applied" challenge in the sense that they seem to have in mind.  Defendants' confusion appears to stem from a line in Justice Kavanaugh's concurring opinion in *Bruen* noting that "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice."  Def.MSJ.11 (quoting 142 S.Ct. at 2162 (Kavanaugh, J.)).  Setting aside the obvious point that this was merely a concurrence, Justice Kavanaugh nowhere suggested that these are the *only* types of challenges to licensing regimes that may be made.  Nor did the *Bruen majority* say anything to the effect that challenges alleging that permitting regimes have the practical effect of "deny[ing] ordinary citizens their right to public carry" need to be "as applied."  142 S.Ct. 2138 n.9.

itself to those concessions because the state has not yet put that blatantly unconstitutional plan into action.  That is not the law, and it would make particularly little sense to adopt such a topsy-turvy argument when the only reason Defendants are not presently implementing Measure 114 in exactly the manner that their own witnesses have testified they plan to do is because another court has preliminarily enjoined them from implementing the law at all.  Having asked *this Court* to issue a judgment holding that they are entitled to implement Measure 114 *right now*, Defendants cannot simultaneously insist that the Court must ignore all the record evidence confirming how they would do so if they could.

Defendants' desire to avoid that reckoning is understandable; the record is abysmal.  As their own witnesses have admitted: "the State of Oregon was not prepared to process or issue any permits to purchase under the permit-to-purchase scheme set up by Measure 114" when Defendants first claimed the power to do so; "no existing firearm safety courses in the State of Oregon comply with Measure 114's requirements"; "the State of Oregon has not certified any existing firearm safety courses in the State of Oregon as compliant with Measure 114's requirements"; "" no existing firearm safety courses in the State of Oregon includes certified live-fire training"; "the transmission system … that allows local law enforcement departments to transmit fingerprints electronically is not ready"; and "the Federal Bureau of Investigation has said that it will not process the fingerprint-based background checks required by Measure 114."  RFA Nos. 3, 5, 6, 7, 18, 22, 31.  In the face of that, the best Defendants can muster is to brag—twice—that at least background checks under Measure 114 are "processed automatically" "38-41%" of the time, Defs.MSJ.13; *see id*. at 7 n.1, and the bald assurance that while they have yet to certify even a single one of the requisite safety courses over the past six months, "that provides only a

speculative basis to think that instructors will remain unavailable" in the future, Defs.MSJ.12.[8] Defendants' own evidence thus confirms that the state's "permitting process is so ensnarled in delay and maladministration that the entire process is effectively futile." *United States v. Friday*, 525 F.3d 938, 951 (10th Cir. 2008).

Implicitly recognizing as much, Defendants essentially argue that even if they could not implement their permitting regime in a manner consistent with the Constitution right *now*, the Court should take their word for it that they will be able to do so *someday*. That argument fails first and foremost because Defendants are asking this Court to hold that they *may* implement it now, which necessarily entails an inquiry into how they would do so if they could. But even setting aside that rather glaring problem, the record affirmatively refutes their assurances that all the problems they are presently experiencing will somehow miraculously ameliorate over the coming months, notwithstanding their own admissions that many of them are the product of a funding deficit for which there is no evident end in sight. At the very least, all of that evidence forecloses Defendants' claim that the Court should grant them judgment as a matter of law without even considering the five months of discovery that they themselves insisted was necessary to resolve any and all issues in this case.

---

[8] The state's reliance on the 38-41% metric to label Plaintiffs' concerns about background-check delays "speculative," Defs.MSJ.12, is particularly bizarre. Something that by Defendants' own admission will happen more often than not is the polar opposite of speculative. And as for Defendants' effort to dismiss Plaintiffs' arguments about the discretion Measure 114 affords permitting agents, *see* MSJ.Br.14-15, the problem is that the law *on its face* permits a degree of discretion that is impermissible under *Bruen*'s definition of what a true shall-issue regime is.

# CONCLUSION

For the reasons set forth above, this Court should deny Defendants' motions.


DATED:  May 17, 2023                          JURISLAW LLP

Paul D. Clement*                              s/ Shawn M. Lindsay
Erin E. Murphy*                               Shawn M. Lindsay (OSB No.: 020695)
Matthew D. Rowen*                             Daniel J. Nichols (OSB No.: 101304)
Nicholas M. Gallagher*                        Three Centerpointe Drive
Clement & Murphy, PLLC                        Suite 160
706 Duke Street                               Lake Oswego, OR 97035
Alexandria, VA 22314                          (503) 968-1475
(202) 742-8900                                shawn@jurislawyer.com

*admitted *pro hac vice*                      *Counsel for Eyre Plaintiffs*


s/ Stephen Joncus                             s/ Leonard W. Williamson
Stephen J. Joncus, OSB #013072                Leonard W. Williamson, OSB #910020
JONCUS LAW PC                                 VAN NESS WILLIAMSON LLP
13203 SE 172nd Ave Ste 166 #344               960 Liberty St. SE, Ste 100
Happy Valley, OR  97086                       Salem, OR 97302
(971) 236-1200                                (503) 365-8800
steve@joncus.net                              l.williamson@vwllp.com

                                              *Counsel for OFF Plaintiffs*

                                              s/ James L. Buchal
                                              James L. Buchal, OSB #910020
                                              MURPHY & BUCHAL LLP
                                              PO Box 86620
                                              Portland, OR 97286
                                              (503) 227-1011
                                              jbuchal@mbllp.com

                                              *Counsel for Fitz and Azzopardi Plaintiffs*

**ATTORNEY CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2023, I have made service of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMMARY JUDGMENT AND DEFENDANTS' MOTION TO DISMISS** of the party listed below in the manner indicated:

Matthew D. Rowen
Erin E. Murphy
Nicholas M. Gallagher
Paul D. Clement
Clement & Murphy, PLLC
706 Duke Street
Alexandria, VA 22314
*Attorney for Eyre Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email:
matthew.rowen@clementmurphy.com;
erin.murphy@clementmurphy.com;
nicholas.gallagher@clementmurphy.com;
paul.clement@clementmurphy.com
☒ Electronically via USDC CM/ECF system

Jessica A. Skelton
Zachary J. Pekelis
Kai Smith
W. Scott Ferron
Pacific Law Group LLP
1191 Second Avenue, Suite 2000
Seattle, WA 98101-3404
*Attorney for Proposed Intervenor-Defendant Oregon Alliance for Gun Safety*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email:
jessica.skelton@pacificlawgroup.com;
zach.pekelis@pacificalawgroup.com;
kai.smith@pacificlawgroup.com;
scott.ferron@pacificalawgroup.com
☒ Electronically via USDC CM/ECF system

James L. Buchal
Murphy & Buchal
PO Box 86620
Portland, OR 97286
*Attorney for Fitz Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: jbuchal@mbllp.com
☒ Electronically via USDC CM/ECF system

William Bergstrom
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
*Attorney for Fitz Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: wbergstrin@cooperkirk.com
☒ Electronically via USDC CM/ECF system

D. Angus Lee
Angus Lee Law Firm, PLLC
9105A NE HWY 99, Suite 200
Vancouver, WA
*Attorney for Fitz Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: Angus@AngusLeeLaw.com
☒ Electronically via USDC CM/ECF system

James L. Buchal
Murphy & Buchal
PO Box 86620
Portland, OR 97286
*Attorney for Azzopardi Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: jbuchal@mbllp.com
☒ Electronically via USDC CM/ECF system

William Sack
Firearms Policy Coalition, Inc.
5550 Painted Mirage Rd., Suite320
Las Vegas, NV 89149
*Attorney for Azzopardi Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: Wsack@FPClaw.org
☒ Electronically via USDC CM/ECF system

Adam Kraut
Second Amendment Foundation
12500 NE Tenth Place
Bellevue, WA 98665
*Attorney for Azzopardi Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: akraut@saf.org
☒ Electronically via USDC CM/ECF system

D. Angus Lee
Angus Lee Law Firm, PLLC
9105A NE HWY 99, Suite 200
Vancouver, WA
*Attorney for Azzopardi Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: Angus@AngusLeeLaw.com
☒ Electronically via USDC CM/ECF system

Stephen J. Joncus
Joncus Law LLC
13203 SE 172nd Ave, Ste 166 #344
Happy Valley, OR 97086
*Attorney for OFF Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: steve@joncus.net
☒ Electronically via USDC CM/ECF system

Leonard W. Williamson
Van Ness Williamson
960 Liberty Street S, Suite 100
Salem, OR 97302
*Attorney for OFF Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: l.williamson@vwllp.com
☒ Electronically via USDC CM/ECF system

Pete Serrano
Silent Majority Foundation
5238 Outlet Drive
Pasco, WA 99301
*Attorney for OFF Plaintiffs*

☐ U.S Mail
☐ Facsimile
☐ Hand Delivery
☐ Overnight Courier
☐ Email: pete@silentmajorityfoundation.org
☒ Electronically via USDC CM/ECF system

CERTIFICATE OF SERVICE                                                    24

| | |
|---|---|
| Jessica A. Skelton<br>Zachary J. Pekelis<br>Kai Smith<br>W. Scott Ferron<br>Pacific Law Group LLP<br>1191 Second Avenue, Suite 2000<br>Seattle, WA 98101-3404<br>*Attorney for Proposed Intervenor-Defendant*<br>*Oregon Alliance for Gun Safety* | ☐ U.S Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email:<br>jessica.skelton@pacificlawgroup.com;<br>zach.pekelis@pacificalawgroup.com;<br>kai.smith@pacificlawgroup.com;<br>scott.ferron@pacificlawgroup.com<br>☒ Electronically via USDC CM/ECF system |
| Brian Simmonds Marshall<br>Oregon Department of Justice<br>Trial Division<br>Special Litigation Unit<br>100 SW Market Street<br>Portland, OR 97201<br>*Attorney for Defendants* | ☐U.S Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email: brain.s.marshal@doj.state.or.us<br>☒ Electronically via USDC CM/ECF system |
| Erin N. Dawson<br>Hannah Hoffman<br>Harry B. Wilson<br>Markowitz Herbold PC<br>1455 SW Broadway, Suite 1900<br>Portland, OR 97201<br>*Attorney for Defendants* | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☐ Overnight Courier<br>☐ Email:<br>erindawson@markowitzherbold.com;<br>HannahHoffman@markowitzherbold.com;<br>harrywilson@markowitzherbold.com<br>☒ Electronically via USDC CM/ECF system |