**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>TINA KOTEK, et al.,<br><br>            Defendants,<br><br>    and | Case No. 2:22-cv-01815-IM (lead case)<br>       3:22-cv-01859-IM (trailing case)<br>       3:22-cv-01862-IM (trailing case)<br>       3:22-cv-01869-IM (trailing case)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' *DAUBERT* MOTIONS** |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' *DAUBERT* MOTIONS**

OREGON ALLIANCE FOR GUN SAFETY,

                                    Intervenor-Defendant.

MARK FITZ, et al.,

                                    Plaintiffs,

                v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants.

KATERINA B. EYRE, et al.,

                                    Plaintiffs,

                v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants,

DANIEL AZZOPARDI, et al.,

                                    Plaintiffs,

                v.

ELLEN F. ROSENBLUM, et al.,

                                    Defendants.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' *DAUBERT* MOTIONS**

## TABLE OF CONTENTS

**Introduction** ................................................................................................................ **2**

**Background** ................................................................................................................. **2**

**Legal Standard** ........................................................................................................... **3**

**Argument** ................................................................................................................... **4**

**I.    Defendants' historian witnesses do not offer improper legal opinions.** ....................... **5**

    A.    Dr. Spitzer's testimony regarding the history of weapon technologies
        and regulations does not state any legal opinions. ...................................... 5

    B.    Dr. Rivas's testimony regarding America's history of regulating
        dangerous weapons does not state any legal opinions. ........................................ 8

    C.    Dr. DeLay's testimony regarding the history of high-capacity firearms
        does not state any legal opinions. ........................................................... 10

**II.    Plaintiffs' objections regarding the relevance of certain experts are based
     on an incorrect reading of *Bruen*.** ....................................................... **12**

    A.    Ms. Allen's testimony regarding defensive gun use and mass shootings
        is relevant. ..................................................................................... 13

    B.    Dr. Klarevas' testimony concerning mass shootings is relevant. ...................... 14

    C.    Dr. McDowall's testimony regarding defensive gun use is relevant. .................. 15

    D.    Dr. Siegel's testimony regarding the effect of LCMs on fatalities is
        relevant, and his testimony regarding the effect of LCM bans on
        fatalities is admissible. ..................................................................... 16

        1.    Testimony of the effect of LCMs on fatalities is relevant. ...................... 16

        2.    Testimony of the effectiveness of gun permit requirements is
            admissible. .......................................................................... 17

**III.    Dr. Sweeney's testimony regarding the historical availability of firearms is
      relevant and based on sufficient and reliable data.** ................................... **18**

**Conclusion** ................................................................................................................ **20**

**INTRODUCTION**

The Court should deny plaintiffs' motion to exclude all or portions of testimony from 10 of defendants' experts. Plaintiffs do not contest the qualifications of these experts. Instead, they raise various challenges to the methods underlying the experts' opinions and the relevance of their testimony, none of which have merit. Each of these experts provide testimony that is relevant under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court instructed lower courts, when faced with cases "implicating unprecedented societal concerns or dramatic technological changes," to follow "a more nuanced approach" and "conduct . . . reasoning by analogy" to determine whether a modern firearm regulation would be "unimaginable at the founding." *Id.* at 2132-33. Plaintiffs' experts offer reliable, relevant, and admissible testimony to assist the Court in following *Bruen*'s approach. The Court should deny plaintiffs' *Daubert* motions in its entirety.

**BACKGROUND**

Plaintiffs move to exclude all or part of the testimony of 10 of defendants' and intervenor's 12 expert witnesses: Dr. Robert Spitzer, Dr. Brennan Rivas, Dr. Brian DeLay, Ms. Lucy Allen, Dr. Louis Klarevas, Dr. David McDowall, Dr. Kevin Sweeney, Dr. Mackenzie Cook, Dr. Michael Siegel, and Dr. Dennis Baron. (5/15/23 Plaintiffs' Daubert Motions ("Pls.' Daubert Mot.") (ECF 177).)

Defendants have described the claims and defenses in their Trial Brief. (5/15/23 Defendants' Trial Brief (ECF 167).) The Court further described the relevant legal and factual background in its opinion denying plaintiffs' motions for temporary restraining orders. (12/6/22 Opinion and Order on Temporary Restraining Order ("TRO Order") (ECF 39).)

## LEGAL STANDARD

The well-known principles of Federal Rule of Evidence 702 provide that expert opinion is admissible if: (1) the witness is sufficiently "qualified as an expert by knowledge, skill, experience, training, or education"; (2) the "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the product of reliable principles and methods"; and (5) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

In addition to the express requirements of Rule 702, a trial court "must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-44 (9th Cir. 2014) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). Testimony rests on a "reliable foundation" if it is rooted "in the knowledge and experience of the relevant discipline." *Id.* at 1044. In turn, testimony is "relevant" if the knowledge underlying it has a "valid connection to the pertinent inquiry." *Id.* "The relevance prong under *Daubert* means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009).

The law is clear that this Court possesses "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Furthermore, the exclusion of expert testimony is "the exception rather than the rule." *See* Fed. R. Evid. 702 Committee Notes on Rules, 2000 Amendment. In a bench trial, the risk of prejudice is diminished. *F.T.C v. BurnLounge, Inc.*, 753. F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we

are mindful that there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial.").

## ARGUMENT

Plaintiffs' motions to exclude certain testimony of 10 of defendants' expert witnesses should be denied because the challenged testimony is relevant under *Bruen*, reliable, and otherwise admissible under the federal rules of evidence. [1]

Plaintiffs have challenged the testimony of defendants' experts on the following grounds:

- Plaintiffs incorrectly contend that Dr. Spitzer, Dr. Rivas, and Dr. DeLay are impermissibly rendering opinions on legal conclusions.  (*See generally*, Pls.' Daubert Mot. at 11-14.)  They are rendering permissible opinions on facts that are in dispute, not on legal issues;

- Plaintiffs incorrectly contend that Ms. Allen, Dr. Klarevas, Dr. McDowall, Dr. Sweeney, Dr. Cook, and Dr. Siegel all offer testimony that is irrelevant.  (*Id.* at 14-20.)  These arguments are premised on plaintiffs' incorrect and incomplete reading of *Bruen*; and

- Plaintiffs incorrectly contend that Dr. Siegel's testimony regarding the effectiveness of permits to reduce gun deaths is flawed.  (*Id.* at 24-26.)  His evidence on this topic is admissible under *Bruen*.

Moreover, of the post-*Bruen* district courts to consider large-capacity magazine ("LCM") regulations, nearly all have ruled in favor of the regulations, relying on precisely this same evidence.  *See, e.g., Ocean State Tactical, LLC* v. *State of Rhode Island,* No. 22-CV-246 JJM-PAS, 2022 WL 17721175 at *16 (D.R.I. Dec. 14, 2022); *Hanson v. D.C.,* No. 22-2256 (RC),

---

[1] Defendants join intervenor's contemporaneously-filed opposition brief, including its arguments relating to Dr. Baron and Dr. Cook.

2023 WL 3019777 at *17 (D.D.C. Apr. 20, 2023); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.,* No. CV 22-951-RGA, 2023 WL 2655150 at *13 (D. Del. Mar. 27, 2023); *Bevis* v. *City of Naperville, Illinois,* No. 22 C 4775, 2023 WL 2077392 at *16 (N.D. Ill. Feb. 17, 2023); *Herrera v. Raoul,* No. 23 CV 532, 2023 WL 3074799 at *7 (N.D. Ill. Apr. 25, 2023).

As explained below, all of plaintiffs' *Daubert* challenges are incorrect.

I.    **Defendants' historian witnesses do not offer improper legal opinions.**

A.    **Dr. Spitzer's testimony regarding the history of weapon technologies and regulations does not state any legal opinions.**

Robert Spitzer is a professor emeritus at the State University of New York and holds a Ph.D in Government from Cornell University.  (2/6/23 Decl. of Robert J. Spitzer ("Spitzer Decl.") (ECF 123) ¶ 4.)  He has been studying, teaching, and writing about gun policy for over 30 years.  (*Id.* ¶ 5.)  Since 1985, he has published six books and over 100 articles, papers, and essays on gun policy.  (*Id.*)  He has served as an expert witness in many cases involving firearm safety regulations.  (*Id.* ¶ 6, Ex. A.)

His declaration exhaustively describes the development, use, and regulation of weapons and firearms, and especially multi-shot firearms, over the last several centuries.

He provides opinions on two main topics.  (*Id.* ¶¶ 8-10 (summary of opinions).)  First, he opines that a specific relationship existed between the development of new weapons technologies, their spread into society, and regulation by the government as part of a centuries-long effort to protect the public from harm and to dampen weapons-related criminality and violence.  (*Id.* ¶ 8.)  Second, he examines several specific examples of weapons that, when they were invented or developed and then made their way into civil society, were subject to governmental restriction.  (*Id.*)  Those weapons include early experimental multi-shot firearms,

later multi-shot firearms that proved more successful, as well as the Bowie and similar long-bladed fighting knives.  (*Id.* ¶ 9.)

Dr. Spitzer examines the societal contexts that surrounded the development of increasingly dangerous weapons, the use of those weapons by criminal elements, and the resulting regulations that were intended to protect the public.  (*See id.* ¶¶ 13-37 (regulatory history of automatic firearms); ¶¶ 38-53 (history of pre-twentieth century firearms technology); ¶¶ 54-83 (historical restrictions on knives, blunt weapons, and pistols).)  He ultimately concludes that "firearms and other dangerous weapons were subject to remarkably strict, consistent, and wide-ranging regulation throughout our history when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality."  (*Id.* ¶¶ 84.)

Dr. Spitzer's testimony provides critical context as to *why* regulations of dangerous and unusual weapons—including LCM regulations—came into existence.  As this Court has noted, in *Bruen*, the Supreme Court instructed lower courts, when faced with cases "implicating unprecedented societal concerns or dramatic technological changes" to follow "a more nuanced approach" and "conduct . . . reasoning by analogy" to determine whether a modern firearm regulation would be "unimaginable at the founding."  (TRO Order at 16 (quoting *Bruen*, 142 S. Ct. at 2132-33).)

That is precisely what Dr. Spitzer's testimony facilitates.  He provides historical connections between various weapons—including early multi-shot weapons and Bowie knives—and regulations of those weapons.  In nearly all cases, they were regulated when they became increasingly popular with violent criminals and thus posed a growing threat to the public.  (*See generally* Spitzer Decl. ¶¶ 13-83.)  His testimony shows that such regulations not only were imaginable at the Founding and later—they were common.  When this Court relied on similar

evidence by Dr. Spitzer in its order denying plaintiffs' motion for a preliminary injunction, the Court acknowledged that Dr. Spitzer provided evidence that LCMs implicate dramatic change in firearms technology and unprecedented societal concerns. (TRO Order at 25, 28-31.) Dr. Spitzer's testimony is thus relevant and useful to the trier of fact.

Separately, *Bruen*'s history and tradition test tasks courts with reviewing historical firearm regulation going back to colonial and even pre-colonial times for relevant analogues. This is nothing like the usual case where an expert is excluded for offering a legal opinion regarding the precise statute at issue in the case. Every court to have addressed the issue has held that trial courts can and should rely on experts to distill the historical record and assist in fact-finding post-*Bruen*. (*See supra* § I.) As one district court put it when relying on evidence from "expert historians" to apply *Bruen*, "[u]nlike the Supreme Court, trial courts have the ability to receive evidence and rely on that evidence to find facts that support the legal reasoning and lead to conclusions." *Ocean State Tactical*, 2022 WL 17721175, at *6.

Plaintiffs' accusation that Dr. Spitzer's analysis "is full of pages upon pages of statutory interpretation and interpretation of case law" is wrong. (Pls.' Daubert Mot. at 11.) He is not interpreting law or opining on the validity of court decisions—he is analyzing the regulation of highly dangerous weapons from a historical viewpoint. (*See* Spitzer Decl. ¶ 84.) Dr. Spitzer's testimony concerns the facts surrounding the development of highly dangerous weapons, the societal response to the proliferation of those weapons, and the resulting governmental regulation of those weapons, not the interpretation of laws. These are topics that an expert like Dr. Spitzer is eminently qualified to discuss.

Plaintiffs also criticize Dr. Spitzer for discussing colonial gunpowder laws. (Pls.' Daubert Mot. at 13.) Dr. Spitzer opined that colonial gunpowder laws were an example of tight

regulation of weapons components during the colonial era (Spitzer Decl. ¶¶ 78-83), and Dr. Spitzer's testimony will be helpful to this Court in assessing whether 18th century limitations on a component of ammunition (gunpowder) are comparable in purpose and burden to Measure 114's limitations on 21st century ammunition-feeding devices (LCMs). Plaintiffs contend that this discussion was "rejected" by the Supreme Court in *Heller*. Plaintiffs are mistaken. *Heller* simply held that the burden imposed by historical gunpowder storage requirements was not comparable to the "burden" imposed by D.C.'s "absolute ban on handguns." *D.C. v. Heller*, 554 U.S. 570, 632 (2008). Nothing in *Heller* stated or implied that future courts should exclude all testimony about historical gunpowder regulations, especially when compared to different present-day regulations. *See United States v. Serrano*, No. 21-CR-1590 JLS, 2023 WL 2297447, at *12-13 (S.D. Cal. Jan. 17, 2023) (citing Dr. Spitzer on gun powder regulations, among others, to find a California law "consistent with this Nation's history and tradition of firearm regulation").

Plaintiffs also argue Dr. Spitzer is biased because he disagreed with the new approach to the Second Amendment adopted in *Heller* and continued in *Bruen*. (Pls.' Daubert Mot. at 12-13.) It is well-established that "evidence of bias goes toward the credibility of a witness, not his competency to testify." *United States v. Abonce-Barrera*, 257 F.3d 959, 965 (9th Cir. 2001). Plaintiffs are free to cross-examine Dr. Spitzer about his supposed biases, but it is not a proper basis for excluding his testimony.

The Court should thus deny plaintiffs' motion to exclude Dr. Spitzer's testimony.

**B.    Dr. Rivas's testimony regarding America's history of regulating dangerous weapons does not state any legal opinions.**

Like Dr. Spitzer, Brennan Rivas is a professional historian. She has a Ph.D in history from Texas Christian University, where her dissertation was on the development, evolution, and

enforcement of gun and weapon policy in Texas from the era of Mexican independence to the 1930s.  (2/6/23 Decl. of Brennan G. Rivas ("Rivas Decl.") (ECF 121) ¶ 4.)  Her expertise includes historical weapon regulations in the United States, and she has authored multiple publications on this topic.  She has also provided expert testimony in at least seven firearm regulation cases.  (*Id*. ¶¶ 5-6.)

Dr. Rivas's declaration explains that Americans have a long history of regulating weapons considered especially dangerous to the peace and safety of their communities.  (*Id*. ¶ 10 (summary of opinion).)  Before repeating firearms were developed, Americans regulated large fighting knives and pocket-sized revolvers as a reaction to public outcry at the unnecessary violence and public cost of these weapons.  (*Id*.)  These are all opinions regarding historical facts on which Dr. Rivas is qualified to opine.  Plaintiffs do not contend otherwise.

Plaintiffs' only objection to Dr. Rivas is that she offers legal conclusions contrary to *Bruen*.  (Pls.' Daubert Mot. at 13.)  They say that Dr. Rivas's report "declares defiantly that '[s]cholarly historical research has shown that, under common law, courts considered the act of carrying deadly weapons in public spaces to be inherently terrifying and therefore a breach of the peace'—which is exactly the contention that the Supreme Court rejected in *Bruen*."  (*Id*.)  But Dr. Rivas is stating her opinion on a matter of historical fact, not making a legal conclusion. Dr. Rivas does not discuss the *Bruen* decision or argue that it was wrong.  Moreover, Dr. Rivas's opinion is consistent with *Bruen*, which acknowledged that firearms induced "terror" that diminished over time.  *Bruen*, 142 S. Ct. at 2141 ("As time went on, 'domestic gun culture in England softened' any 'terror' that firearms might once have conveyed. . . .  Thus, whatever place handguns had in English society during the Tudor and Stuart reigns, by the time we reach the 18th century—and near the founding—they had gained a fairly secure footing in English

culture." (Alteration and citation omitted)). To the extent plaintiffs believe that Dr. Rivas's exploration of the historical record misinterprets that record, they are free to cross-examine her about that.[2]

Plaintiffs' contention that Dr. Rivas is impermissibly opining on legal issue is as false as their similar contention regarding Dr. Spitzer. Dr. Rivas has provided competent and unchallenged testimony regarding how and why various weapons were regulated. Her testimony is permissible under Rule 702 and relevant to the Court's analysis under *Bruen*. The Court should deny plaintiffs' motion to exclude her testimony.

### C.   Dr. DeLay's testimony regarding the history of high-capacity firearms does not state any legal opinions.

Brian DeLay is a historian. He received his M.A. and Ph.D. in history from Harvard University. (2/6/23 Decl. of Brian DeLay ("DeLay Decl.") (ECF 118) ¶ 4.) He is widely published on historic arms control and has provided expert witness testimony on this topic before. (*Id*. ¶¶ 5-6, Ex. A.) He opines on three topics. First, that high-capacity firearms were merely experimental and, consequently, vanishingly rare in the United States in 1791. (*Id*. ¶ 7.) Second, while reliable firearms with fixed high-capacity magazines first came on the market in the 1860s, they still accounted for less than 0.002% of guns in the U.S. in 1868. (*Id*.) Third, firearms with removable high-capacity magazines began coming under state and federal regulation soon after they first became commercially available throughout the United States in the 1920s and 1930s. (*Id*.)

Plaintiffs do not take issue with the first two of Dr. DeLay's opinions. As to his third opinion, plaintiffs contend that this one sentence is an impermissible legal conclusion: in passing

---

[2] Dr. Rivas's testimony is also relevant to assist the Court with its task to "conduct . . . reasoning by analogy" to determine whether a modern firearm regulation would be "unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132-33.

gun regulations in the 1920's and 1930s, "lawmakers acted consistently with American tradition and practice dating back to the early colonial era." (Pls.' Daubert Mot. at 13, quoting DeLay Decl. ¶ 77.) Plaintiffs do not explain how this is a legal conclusion or why Dr. DeLay may not utter those words. The paragraphs of his declaration that lead to this conclusion describe at length the development of automatic and semi-automatic weapons from 1870 through the 1930s and the resulting efforts of states to regulate those firearms. (DeLay Decl. ¶¶ 61-77.) This discussion followed a lengthy discussion of the development and regulation of firearms from the colonial period to the 1870s. (*See Id.* at ¶¶ 32-45.) It was thus logical and permissible for Dr. DeLay to ultimately conclude that regulations in the 1920s and 1930s were consistent with American tradition and practice dating back to the colonial era. This conclusion, like the rest of Dr. DeLay's declaration—about which plaintiffs have no complaint—is useful historical background. Dr. DeLay does not offer opinions about how to interpret historical firearms regulations.

* * *

Dr. Spitzer, Dr. Rivas, and Dr. DeLay all explain why and how gun regulations came into existence in the first place, and the contemporaneous burdens these regulations posed at the time. As this Court correctly concluded, this testimony is useful under *Bruen*.[3] (TRO Order at 25, 28-31.)

---

[3] Plaintiffs' witness Clayton Cramer and Ashley Hlebinsky purport to make the same analysis. (1st Decl. of Clayton Cramer (Permit System) (ECF 34); Decl. of Ashley Hlebinsky (ECF 32).)

**Page 11 - DEFENDANTS' RESPONSE TO PLAINTIFFS' *DAUBERT* MOTIONS**

II.    **Plaintiffs' objections regarding the relevance of certain experts are based on an incorrect reading of *Bruen*.**

Plaintiffs contend that the testimony of Ms. Allen, Dr. Klarevas, Dr. McDowall, Dr. Siegel, and Dr. Cook are irrelevant under *Bruen*.  This argument is premised on a fundamental misunderstanding of what is required by *Bruen*.

In *Bruen*, the Supreme Court held that, in adjudicating Second Amendment claims, courts must first determine that "the Second Amendment's plain text covers an individual's conduct," 142 S. Ct. at 2129-30—*i.e.*, that the challenged regulation prevents law-abiding citizens from "keep[ing]" or "bear[ing]" protected "Arms."  U.S. Const. amend. II.  If it does, "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  To satisfy this burden, the government must identify a "well-established and representative historical *analogue*"—not a "historical *twin*" or "dead ringer"—to the challenged law, which is "relevantly similar" according to "two metrics": "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2132-33.  Thus, the historical comparator must have "impose[d] a comparable burden on the right of armed self-defense" that is also "comparably justified."  *Id.*

In addition, although *Bruen* rejected "interest balancing," which took into account the public-safety rationale for a challenged law in assessing its tailoring, 142 S. Ct. at 2131, the *Bruen* standard does not require the courts to blind themselves to present-day justifications and realities.  *Bruen* requires courts to account for contemporary public-safety rationales in at least two respects at the historical stage of the inquiry.  First, *Bruen* requires a "more nuanced" approach when the law addresses "regulatory challenges posed by firearms today," including "unprecedented societal concerns or dramatic technological changes[.]"  *Id.* at 2131-32.  Second,

in comparing the challenged law to the historical analogues, courts are required to determine

whether the burden imposed by the challenged law is "comparably justified."[4]  *Id.* at 2133.

This Court has said as much: the Court "may consider the public safety concerns of

today" in determining whether LCM restrictions are "comparably justified."  (TRO Order at 31.)

*Bruen*, properly understood and as explained by this Court, permits the testimony of Ms. Allen,

Dr. Klarevas, Dr. McDowall, Dr. Seigel, and Dr. Cook.

### A.    Ms. Allen's testimony regarding defensive gun use and mass shootings is relevant.

Lucy Allen is an economist, a Managing Director of NERA Economic Consulting, a

member of NERA's Securities and Finance Practice, and Chair of NERA's Product Liability and

Mass Torts Practice.  (2/6/23 Decl. of Lucy Allen ("Allen Decl.") (ECF 116) ¶ 2.)  She holds an

A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees

in economics, also from Yale University.  Prior to joining NERA, Ms. Allen served on the

Council of Economic Advisers for both President George H.W. Bush and President Bill Clinton.

(*Id*. ¶ 4.)  She has provided expert statistical analysis on defensive gun uses and mass shootings

in numerous Second Amendment cases.  (*Id*. ¶ 3.)

Under *Bruen*'s standard, Ms. Allen's testimony is relevant at both stages of the analysis.

Ms. Allen will testify that it is extremely rare for individuals who use firearms in self-defense to

fire more than ten rounds, that defenders fired 2.2 shots on average, and that in 18.2% of

incidents, the defender did not fire any shots.  (*Id*. ¶ 10.)  Similar statistics exist for incidents

occurring in the home.  (*Id.* ¶ 11.)  This testimony is relevant to whether LCMs are useful for

lawful self-defense and thus qualify as protected "Arms" at the textual stage of the *Bruen*

---

[4] In addition, public safety is relevant to the scope of the remedy under the public interest
prong of permanent injunction standard.  (Defs.' Tr. Br. (ECF 167) at 41-43.)

analysis (*i.e.*, whether LCMs are in common use for lawful purposes). It is also relevant under *Bruen* to assess whether the regulation imposes a comparable burden on self-defense to historical regulations.

Regarding the use of LCMs in mass shootings, she concluded that the average number of fatalities and injuries was 25 per mass shooting with an LCM versus nine for those without. (*Id.* ¶ 27.) Under *Bruen*, that testimony is relevant to whether Measure 114 has a comparable justification to analogous historical regulations. This Court has permissibly relied on functionally identical testimony from Ms. Allen for precisely these purposes. (TRO Order at 22-23, 27, 28, 31.)

### B.     Dr. Klarevas' testimony concerning mass shootings is relevant.

Dr. Louis Klarevas is a security policy analyst and research professor at Teachers College, Columbia University, in New York. (2/6/23 Decl. of Louis Klarevas ("Klaveras Decl.") (ECF 119) ¶ 3.) He is the author of *Rampage Nation*, a comprehensive study of high-fatality mass shootings in the United States, and he has conducted extensive, peer-reviewed research into the efficacy of gun-safety interventions, including restrictions on large-capacity magazines. (*Id.* ¶¶ 3-6.) In the past four years, Dr. Klarevas provided expert testimony in at least nine other Second Amendment cases. (*Id.* ¶ 7.)

Dr. Klarevas's expert report provides testimony that is directly relevant to this Court's evaluation of Measure 114 under *Bruen*. He testifies that mass shootings pose the deadliest threat to the safety of American society in the post-9-11 era, that mass shootings involving LCMs have resulted in substantially larger loss of life than similar incidents that did not involve LCMs, and that mass shootings resulting in double-digit fatalities are relatively modern phenomena in American history largely related to the use of assault weapons and LCMs. (*Id.* at ¶¶ 12-22.)

**Page 14 - DEFENDANTS' RESPONSE TO PLAINTIFFS'** *DAUBERT* **MOTIONS**

These social developments, which are a product of relatively recent advances in firearms technology, bear directly on *Bruen*'s questions of whether a more nuanced analogical approach is called for due to "unprecedented societal concerns" and "dramatic technological changes," *Bruen*, 142 S. Ct. 2131-32, and whether LCM restrictions have a justification comparable historical analogues. Professor Klarevas's report also describes the rising trend of mass shootings and the efficacy of LCM bans in reducing the incidence and lethality of mass shootings. (Klaveras Decl. ¶¶ 23-40.) Like Ms. Allen's testimony, this supports the present-day justifications for LCM regulations, which is part of *Bruen*'s historical analysis. Accordingly, Dr. Klarevas's testimony is relevant to both the textual and historical stages of the *Bruen* analysis. This Court properly relied on similar testimony by Dr. Klarevas when it denied plaintiffs' motion for preliminary injunction. (TRO Order at 23, 27.)

### C. Dr. McDowall's testimony regarding defensive gun use is relevant.

Dr. McDowall is a professor of criminal justice at the State University of New York. He received his Ph.D in sociology from Northwestern University. (McDowall Expert Report at 1 (ECF 170-1).) He is widely published on firearm policies and regulation. (*Id.*) Dr. McDowall's report primarily rebuts plaintiffs' expert report of Dr. Kleck, who opined on the frequency of defensive gun use. Dr. McDowall takes issue with much of Dr. Kleck's methodology and concludes that Dr. Kleck's estimations of the frequency of defensive gun use are unreliable and likely significantly overstated.

Plaintiffs incorrectly contend that this testimony is out of bounds under *Bruen*. (Pls.' Daubert Mot. at 18.) Like the testimony of Ms. Allen and Dr. Klarevas, Dr. McDowall's testimony regarding the frequency of defensive gun use, or lack thereof, is relevant to show whether LCMs are in "common use" for self defense. Dr. McDowall's testimony is also relevant to determining whether the public safety concerns of today mean LCM restrictions are

"comparably justified" when considered alongside historical regulation of arms.  (TRO Order at 31.)

> ### D. Dr. Siegel's testimony regarding the effect of LCMs on fatalities is relevant, and his testimony regarding the effect of LCM bans on fatalities is admissible.
>
> #### 1. Testimony of the effect of LCMs on fatalities is relevant.

Dr. Siegel is a professor in the Department of Public Health and Community Medicine at the Tufts University School of Medicine.  He is also a physician trained in public health, preventive medicine, and epidemiology.  He earned his medical degree from Yale University School of Medicine in 1990, and his master's degree in public health from the University of California at Berkeley in 1992 with a concentration in epidemiology.  (2/6/23 Decl. of Dr. Michael Siegel ("Siegel Decl.") (ECF 122) ¶¶ 2, 5.)  He is an expert in the analysis of the effectiveness of public policies in improving the public's health.  (*Id.* ¶ 7.)

Among other things, he testifies that there is strong evidence in the scholarly literature that the use of LCMs increases the number of fatalities in mass shootings, and that their regulation reduces such fatalities.  (*Id.* ¶¶ 7-9.)  He also testifies that LCMs are "particularly prominent in public mass shootings and those resulting in the highest casualty counts."  (*Id.* ¶ 17.)  He ultimately concludes that "state-level bans on large-capacity magazines are effective in reducing fatalities due to public mass shootings."  (*Id.* ¶ 34.)

As with Ms. Allen and Dr. Klarevas, plaintiffs' objection to the admissibility of this evidence is based on plaintiffs' incorrect reading of *Bruen.*  Dr. Siegel's testimony shows the unprecedented effect these weapons have in the rise of mass shootings, and it is relevant to defendants' contentions that regulations of LCMs have comparable justifications to historical regulations of dangerous and unusual weapons and that LCMs "represent the kind of dramatic

technological change envisioned by the *Bruen* Court." (TRO Order at 26.) Plaintiffs' relevance objections are incorrect.

### 2. Testimony of the effectiveness of gun permit requirements is admissible.

Defendants have also offered Dr. Siegel to opine that "state laws that require state permits for the purchase and possession of firearms are effective in reducing firearm violence, both from firearm homicide generally and from mass public shootings." (Siegel Decl. at 24.) For this, Dr. Siegel reviewed all studies in the peer-reviewed literature that analyzed the impact of state-level gun permit requirements on firearm homicide rates. (*Id.* ¶ 35.)

In total, Dr. Siegel identified 11 studies that examined the effectiveness of state-level gun permit requirements. Of these, 10 (all but one) found a significant reduction in firearm homicides associated with state permitting laws. In nine of the studies, state permit requirements were found to reduce the overall rates of firearm homicide. In two studies, state permit requirements were found to reduce the incidence of public mass shootings. In these studies, permit requirements were the only state law found to be associated with a lower incidence of mass public shootings. (*Id.* ¶ 47.) Based on this review, Dr. Siegel concluded that there is overwhelming evidence that state-level gun permitting laws are effective in reducing rates of firearm homicide. (*Id.* ¶ 48.)

Plaintiffs incorrectly contend that the Court should exclude this testimony because Dr. Siegel did not differentiate among permitting regimes.[5] (Pls.' Daubert Mot. at 24.) But Dr. Siegel explained that differences among permitting regimes are not material because the data does not show discrepancies between states: "I don't believe that [differences] are that important

---

[5] None of the studies Dr. Siegel considered addressed concealed carry licensing. (Siegel Decl. § II.)

because the evidence is quite robust from multiple studies that have looked at multiple states, and

we're not seeing discrepancies in the research so we're not seeing . . . in one state there was an

effect and another state there wasn't an effect.  Pretty much in every state that's been looked at

there has been an effect, so my opinion would be that there is no reason to believe that details

about the permitting system are going to change my opinion about its effectiveness."  (Decl. of

Greg Scott, Ex. 1 (Dep. of Michael Siegel at Tr. 55:18-56:3).)  Further, any such methodological

limitations go to the weight of Dr. Siegel's testimony, not its admissibility.  *Kennedy v. Collagen

Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (methodological limitations "go to the weight, not

the admissibility, of [the expert's] testimony"); *Spearman Corp. Marysville Div. v. Boeing Co.*,

No. C20-13RSM, 2022 WL 11823467, at *3 (W.D. Wash. Oct. 20, 2022) (challenges to

"incomplete" or "unadjusted" data "go to the weight, not admissibility of the testimony").

Dr. Siegel's testimony is admissible and relevant under *Bruen*.

### III.    Dr. Sweeney's testimony regarding the historical availability of firearms is relevant and based on sufficient and reliable data.

Professor Sweeney is a professor of history emeritus at Amherst College.  (2/6/23 Decl.

of Kevin Sweeney ("Sweeney Decl.") (ECF 124) ¶ 2.)  He has extensively researched

seventeenth- and eighteenth-century firearms, and his declaration describes the kinds of firearms

available then, as well as their usefulness for their intended purposes.  (*Id.* at ¶¶ 7-47.)  He

focuses on the availability, construction, and efficacy of those firearms, rather than on their

regulation.  He states that although some repeating firearms were available in colonial America,

that does not support the conclusion that Americans in the late 1700s would have assumed that

such weapons would inevitably become reliable, safe, and widely available.  (*Id.* ¶ 47.)

As this Court has recognized, *Bruen* permits examination of dramatic technological

changes to determine whether a modern firearm regulation would be "unimaginable at the

founding."  Dr. Sweeney's testimony helps establish that LCMs represent that kind of change. (TRO Order at 16, 25-26.)  His testimony is also critical to evaluating plaintiffs' assertions that the absence of early regulations on capacity size demonstrates that such regulations are inconsistent with historical tradition.  Plaintiffs' incorrect contention that this evidence is irrelevant is based on their selective misreading of *Bruen*.

Plaintiffs also incorrectly contend that Dr. Sweeney's deposition testimony should be excluded because gaps in historic recordkeeping make it impossible to completely track historic firearms transfers.  (Pls.' Daubert Mot. at 26-27.)  They cite Dr. Sweeney's deposition testimony where he explains that probate files would not have accounted for all firearms possessed during colonial times because, for example, such records would have not accounted for the weapons of some soldiers who fell in battle, or weapons that an executor did not know about.  (*Id.* at 27.) But the absence of complete historic records does not render Dr. Sweeney's testimony inadmissible; rather, it goes only to the weight of his testimony.  *Kennedy*, 161 F.3d at 1231 (methodological limitations "go to the weight, not the admissibility, of [the expert's] testimony"); *Spearman Corp. Marysville Div.*, 2022 WL 11823467, at *3 (challenges to "incomplete" or "unadjusted" data "go to the weight, not admissibility of the testimony"). Moreover, Dr. Sweeney has critically examined the strengths and weaknesses of the use of probate records and can testify about how those strengths and weaknesses effect his conclusions. (Sweeney Decl. ¶ 2 ("I also examined critically and wrote about the strengths and weaknesses of [probate inventories], their usefulness and pitfalls.")  The Court should thus deny plaintiffs' motion as to Dr. Sweeney's testimony.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion in its entirety.

DATED: May 22, 2023.

ELLEN ROSENBLUM
ATTORNEY GENERAL
FOR THE STATE OF OREGON

By:    *s/ Harry B. Wilson*

Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Hannah K. Hoffman, OSB #183641
HannahHoffman@MarkowitzHerbold.com
   *Special Assistant Attorneys General for*
   *Defendants*

Brian Simmonds Marshall, OSB #196129
brian.s.marshall@doj.state.or.us
   *Of Attorney for Defendants*

2000471