Jessica A. Skelton, OSB #102714
jessica.skelton@pacificalawgroup.com
PACIFICA LAW GROUP LLP
1191 2nd Avenue, Suite 2000
Seattle, WA 98101-3404
206-245-1700

*Attorney for Intervenor-Defendant*
*Oregon Alliance for Gun Safety*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM *(Lead Case)* |
|                Plaintiffs, | Case No. 3:22-cv-01859-IM *(Trailing Case)* |
|      v. | Case No. 3:22-cv-01862-IM *(Trailing Case)* |
| | Case No. 3:22-cv-01869-IM *(Trailing Case)* |
| TINA KOTEK, et al., | |
|                Defendants, | CONSOLIDATED CASES |
|    and | INTERVENOR-DEFENDANT OREGON ALLIANCE FOR GUN SAFETY'S NOTICE OF SUPPLEMENTAL AUTHORITY |
| OREGON ALLIANCE FOR GUN SAFETY, | |
|                Intervenor-Defendant. | |

| |
|---|
| MARK FITZ, et al., |
|                Plaintiffs, |
|      v. |
| ELLEN F. ROSENBLUM, et al., |
|                Defendants. |

| |
|---|
| KATERINA B. EYRE, et al., |
|                Plaintiffs, |
|      v. |
| ELLEN F. ROSENBLUM, et al., |
|                Defendants, |

and

OREGON ALLIANCE FOR GUN
SAFETY,

                    Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

                    Plaintiffs,

        v.

ELLEN F. ROSENBLUM, et al.,

                    Defendants.

## **NOTICE**

Intervenor-Defendant Oregon Alliance for Gun Responsibility (the "Alliance") respectfully submits this notice to bring to the Court's attention to the attached decision in *Hartford v. Ferguson*, --- F.Supp.3d ----, No. 3:23-cv-05364-RJB, 2023 WL 3836230 (W.D. Wash. June 6, 2023), denying the plaintiffs' motion for preliminary injunction in a Second Amendment challenge to a Washington State statute restricting assault weapons. This supplemental authority is submitted in support of the Alliance's Trial Brief, ECF 176.


DATED this 12th day of June, 2023.

PACIFICA LAW GROUP LLP

*s/Zachary J. Pekelis*
Jessica A. Skelton, OSB #102714
Zachary J. Pekelis, *Pro Hac Vice*
Kai A. Smith, *Pro Hac Vice*
W. Scott Ferron, *Pro Hac Vice*

*Attorneys for Intervenor-Defendant
Oregon Alliance for Gun Safety*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of June, 2023, I electronically filed the foregoing document with the Clerk of the United States District Court using the CM/ECF system which will send notification of such filing to all parties who are registered with the CM/ECF system.

DATED this 12th day of June, 2023.

_____
Erica Knerr

2023 WL 3836230
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Tacoma.

Lawrence HARTFORD; Douglas Mitchell;
Brett Bass; Sporting Systems Vancouver, Inc.;
Second Amendment Foundation, Inc.; and
Firearms Policy Coalition, Inc., Plaintiffs,
v.
Robert FERGUSON, in his official capacity
as Washington State Attorney General; John
R. Batiste, in his official capacity as Chief of
the Washington State Patrol; John Gese, in his
official capacity as Sheriff for Kitsap County;
Clayton Myers, in his official capacity as Sheriff
for Kittitas County; John Horch, in his
official capacity as Sheriff for Clark County; Adam
Fortnoy, in his official capacity as Sheriff
for Snohomish County; Chad M. Enright, in
his official capacity as County Prosecutor for
Kitsap County; Greg Zempel, in his official
capacity as County Prosecutor for Kittitas
County; Tony Golik, in his official capacity as
County Prosecutor for Clark County; and Jason
Cummings, in his official capacity as County
Prosecutor for Snohomish County, Defendants.

CASE NO. 3:23-cv-05364-RJB
|
Signed June 6, 2023

**Synopsis**
**Background:** Individual gun owners, a gun dealer,
and associations of gun owners dedicated to Second
Amendment advocacy brought § 1983 action against
Washington State Attorney General, Chief of the
Washington State Patrol, and sheriffs and prosecutors
for various Washington counties, in their official
capacities, alleging that Washington law prohibiting
the manufacture, importation, distribution or sale of
assault weapons with certain exceptions violated their
Second Amendment right to keep and bear arms.
Plaintiffs moved for preliminary injunction and to
advance a trial on the merits and consolidate it with the
preliminary injunction or, in the alternative, to grant
summary judgment.

**Holdings:** The District Court, Robert J. Bryan, J., held
that:

[1] plaintiffs failed to make clear showing of evidence
that supported contention that weapons covered under
law were protected by Second Amendment;

[2] law was consistent with historic tradition of arms
regulation;

[3] plaintiffs failed to show that they were likely to
suffer irreparable harm in the absence of preliminary
relief; and

[4] plaintiffs failed to show that the balance of equities
tipped in their favor or that an injunction was in the
public interest.

Motions denied.

**Procedural Posture(s):** Motion for Preliminary
Injunction; Motion for Summary Judgment; Other.

West Headnotes (18)

**[1]    Injunction**

The first test plaintiffs seeking a
preliminary injunction in the Ninth Circuit
may establish requires plaintiffs to show:
(1) that they are likely to succeed on
the merits, (2) that they are likely to
suffer irreparable harm in the absence
of preliminary relief, (3) the balance of
equities tips in their favor, and (4) an
injunction is in the public interest.

**[2]    Injunction**

Under the second variant of the Ninth
Circuit's test for a preliminary injunction,
the "sliding scale" version of the standard
provides that if a plaintiff can only show
that there are serious questions going
to the merits—a lesser showing than

likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two preliminary injunction factors are satisfied.

**[3]    Injunction**  🔑

Preliminary injunction may only be awarded upon clear showing of evidence that supports each relevant preliminary injunction factor.

**[4]    Injunction**  🔑

Even though a clear showing of evidence that supports each relevant preliminary injunction factor is required; due to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings.

**[5]    Injunction**  🔑

In deciding motion for preliminary injunction, district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact.

**[6]    Weapons**  🔑

Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home. U.S. Const. Amend. 2.

**[7]    Weapons**  🔑

Second Amendment right to keep and bear arms is not unlimited. U.S. Const. Amend. 2.

**[8]    Weapons**  🔑

In determining whether firearm regulation violates Second Amendment right to keep and bear arms, test announced in 🚩 *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, applies: first to be considered, is whether the Second Amendment's plain text covers an individual's conduct regulated by the challenged law; if so, the Constitution presumptively protects that conduct; second, the burden shifts to proponents of the law to justify the challenged law by demonstrating that it is consistent with the nation's historical tradition of firearm regulation. U.S. Const. Amend. 2.

**[9]    Weapons**  🔑

The first consideration under the analysis, in 🚩 *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms requires inquiry into whether the plain text of the Second Amendment protects each of the individual plaintiffs' proposed courses of conduct. U.S. Const. Amend. 2.

**[10]    Weapons**  🔑

Individual gun owners, gun dealer, and associations of gun owners failed to make clear showing of evidence supporting contention that weapons covered under Washington law prohibiting sale of assault weapons were in common use and protected by Second Amendment, and thus they did not show likelihood of success on the merits or serious questions going to merits, which weighed against preliminary injunction, in § 1983 action against Washington State and county officials, alleging that law violated right to keep and bear arms; plaintiffs' submission of articles purporting to indicate that there were millions of assault weapons sold in United States and court cases discussing

number of assault weapons was marked by argument without citations or sources showing support by admissible evidence.

U.S. Const. Amend. 2; 42 U.S.C.A. § 1983.

**[11]    Weapons**

Under the analysis, in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms, in order to show that a law is consistent with the Nation's historical tradition of firearm regulation, proponents of the law must point to a historic regulation or regulations that is an analogue for the modern firearm regulation at issue; this inquiry requires a determination of whether the two regulations are relevantly similar using at least two metrics: the how and why the regulations burden a law-abiding citizen's right to armed self-defense. U.S. Const. Amend. 2.

**[12]    Weapons**

In demonstrating that proposed law is consistent with the nation's historical tradition of firearm regulation, proponents of a law regulating firearms need not point to a historical twin or a dead ringer for historical precursors to pass constitutional muster, under the analysis, in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms. U.S. Const. Amend. 2.

**[13]    Weapons**

Washington law prohibiting sale of assault weapons was consistent with historic tradition of arms regulation, and thus gun owners, gun dealer, and associations of gun owners failed to establish likelihood of success on merits or serious questions going to merits, which weighed against preliminary injunction, in § 1983 action against Washington officials, alleging that law violated Second Amendment right to keep and bear arms; trap guns, bowie knives, clubs, slingshots, multi-shot revolvers, and automatic weapons were examples of weapons regulated due to use for interpersonal violence, and historical regulations and Washington law imposed comparable burdens on right of armed self-defense that were justified by public safety concerns regarding weapons considered extremely dangerous. U.S. Const. Amend. 2; 42 U.S.C.A. § 1983.

**[14]    Weapons**

In demonstrating that proposed law is consistent with the nation's historical tradition of firearm regulation, analysis, in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms does not require that the historical regulation be the exact same; it is not a historical straight jacket. U.S. Const. Amend. 2.

**[15]    Weapons**

In demonstrating that proposed law is consistent with the nation's historical tradition of firearm regulation, under analysis, in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111, for determining whether firearm regulation violates Second Amendment right to keep and bear arms, analogical reasoning requires that the law's proponents identify a well-established and representative historical analogue, not a historical twin. U.S. Const. Amend. 2.

**[16]    Weapons** 🔑

Individual gun owners, gun dealer, and associations of gun owners failed to show that they were likely to suffer irreparable harm in the absence of preliminary relief, which weighed against preliminary injunction, in their § 1983 action against Washington State and county officials, alleging that Washington law prohibiting sale of assault weapons violated their Second Amendment right to keep and bear arms, although individual gun owners asserted that they already owned assault weapons and were harmed because they wished to purchase more; individual owners had alternative weapons available, particularly for self-defense, and gun dealer had no independent Second Amendment right to sell firearms separate from its customer's right to acquire them.

U.S. Const. Amend. 2; 🚩 42 U.S.C.A. § 1983.

**[17]    Injunction** 🔑

When the government is a party, the last two preliminary injunction factors, balance of equities and public interest, merge.

**[18]    Weapons** 🔑

Individual gun owners, gun dealer, and associations of gun owners failed to show that the balance of equities tipped in their favor or that an injunction was in the public interest, which weighed against preliminary injunction in their § 1983 action against Washington State and county officials, alleging that Washington law prohibiting sale of assault weapons violated their Second Amendment right to keep and bear arms; considering the exceptional dangerousness of assault weapons, public interest in their regulation outweighed plaintiffs' desire to purchase them, and

in light of recent mass deaths caused by assailants using assault weapons, it was appropriate for governmental bodies to find ways to protect the public from dangerous weapons, within the limits of the Second Amendment. U.S. Const. Amend. 2; 🚩 42 U.S.C.A. § 1983.

**Attorneys and Law Firms**

Joel B. Ard, Ard Law Group PLLC, Bainbridge Island, WA, for Plaintiffs.

R. July Simpson, William McGinty, Attorney General's Office, Olympia, WA, Andrew R.W. Hughes, Kristin Beneski, Attorney General's Office, Seattle, WA, for Defendants Robert Ferguson, John R. Batiste.

Christine M. Palmer, Kitsap County Prosecutor's Office, Port Orchard, WA, for Defendants John Gese, Chad M. Enright.

Christopher E. Horner, Kittitas County Prosecuting Attorney, Ellensburg, WA, for Defendants Clayton Myers, Gregory L. Zempel.

Amanda Marie Migchelbrink, Leslie Anne Lopez, Clark County Prosecuting Attorney's Office, Vancouver, WA, for Defendants John Horch, Tony Golik.

Lyndsey Marie Downs, Margaret Duncan, Snohomish County Prosecuting Attorney (Civil), Civil Division, Everett, WA, for Defendants Adam Fortnoy, Jason Cummings.

Kai A. Smith, Meha Goyal, Zachary J. Pekelis, Pacifica Law Group LLP, Seattle, WA, for Defendant Alliance for Gun Responsibility.

Trevor Burrus, Pro Hac Vice, Arlington, VA, Derek Angus Lee, Angus Lee Law Firm, PLLC, Vancouver, WA, for Amici Washington Gun Rights, American Firearms Association.

ORDER DENYING MOTION FOR
PRELIMINARY INJUNCTION

ROBERT J. BRYAN, United States District Judge

 **\*1**  This matter comes before the Court on the Plaintiffs' Motion for Preliminary Injunction. Dkt. 10. The Court has considered the pleadings filed regarding the motion and the remaining file. It is fully advised. No party has requested oral argument on this motion under Local Rule W.D. Wash. 7(b)(4) and argument is not necessary to decide the motion fairly.

In this case, the Plaintiffs challenge a recently enacted Washington State assault weapons regulation, Substitute House Bill 1240 ("HB 1240"), arguing that it violates their constitutional right to bear arms. Dkt. 1. They now move for an order preliminarily enjoining HB 1240's enforcement. Dkt. 10. For the reasons provided below, the motion (Dkt. 10) should be denied.

## I. FACTS AND PROCEDURAL HISTORY

On April 25, 2023, HB 1240 was enacted in the State of Washington. 2023 Wash. Sess. Laws, ch. 162, § 1. HB 1240 prohibits the manufacture, importation, distribution or sale of "assault weapons" with certain exceptions. *Id.* It does not bar the possession or inheritance of an "assault weapon." *Id.* "Assault weapons" are defined in HB 1240 to include specific firearms like AK-47s, AR15s, and M16s, semiautomatic rifles that have an overall length of less than 30 inches, conversion kits, and semiautomatic weapons that accept a detachable magazine and have one of several other enumerated accessories. *Id.* While the Plaintiffs maintain that these weapons are not "assault weapons," this opinion will refer to the weapons regulated under HB1240 as "assault weapons" because that is the term that is used, and defined, in the statute.

The Plaintiffs, individual gun owners who wish to purchase weapons covered by HB 1240, a gun dealer, and two associations of gun owners dedicated to Second Amendment advocacy, filed this case on April 25, 2023, arguing that HB 1240 violates their Second Amendment rights, as applied to enactments of Washington state through the Fourteenth Amendment. Dkt. 1.

Plaintiffs moved for a preliminary injunction on May 5, 2023. Dkt. 10. In addition to moving for a preliminary injunction, the Plaintiffs move the Court to advance a trial on the merits and consolidate it with the preliminary injunction, or in the alternative, grant summary judgment to the Plaintiffs. *Id.*

In Plaintiffs' Motion for Preliminary Injunction and supporting documents, they contend that they have alleged, both directly and impliedly, all of the facts necessary to justify their position and to pass the test justifying a preliminary injunction. In Defendants' responsive pleadings, however, Defendants have alleged facts contrary to Plaintiffs' showing which raise fact questions challenging Plaintiffs' showing.

## II. DISCUSSION

### A. STANDARD ON MOTION FOR PRELIMINARY INJUNCTION

 **[1]**   **[2]**  Plaintiffs seeking a preliminary injunction in the Ninth Circuit must establish one of two tests. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). The first test requires plaintiffs to show: (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Coffman v. Queen of Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018)(*citing* Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Under the second variant of the Ninth Circuit's test for a preliminary injunction, the "sliding scale" version of the Winter standard provides that "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two Winter factors are satisfied." *All. for the Wild Rockies* at 1217 (*cleaned up*).

**\*2** **[3]** **[4]** **[5]** A preliminary injunction may only be awarded "upon a clear showing" of evidence that supports each relevant preliminary injunction factor. *Winter* at 22, 129 S.Ct. 365. Even though a "clear showing" is required under *Winter*, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.,* 736 F.3d 1239, 1250 n. 5 (9th Cir. 2013). Further, "[i]n deciding a motion for a preliminary injunction, the district court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551 (9th Cir. 1986).

## B. SUCCESS ON THE MERITS/SERIOUS QUESTIONS GOING TO THE MERITS

Adopted in 1791 as part of the Bill of Rights, the Second Amendment to the U.S. Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." At the time of the Bill of Rights' adoption, it was understood to only apply to the federal government. *D.C. v. Heller,* 554 U.S. 570, 619, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In 1868, the Fourteenth Amendment was adopted, applying the Bill of Rights, including the Second Amendment, to the States. *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 764, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

**[6]** **[7]** The Second Amendment protects "a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald* at 780, 130 S.Ct. 3020. This Second Amendment right "is not unlimited." *Heller* at 626, 128 S.Ct. 2783. The Supreme Court in *Heller* noted:

> From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626-627, 128 S.Ct. 2783. The *Heller* Court also "recognized another important limitation on the right to keep and carry arms ... the sorts of weapons protected were those 'in common use at the time.' " *Id.* at 627, 128 S.Ct. 2783. *Heller's* list of permitted prohibitions on arms use, possession, and sale does not purport to be exhaustive. *Id.* at 626 n. 26, 128 S.Ct. 2783.

**[8]** In determining whether Washington's assault weapons regulation violates the Plaintiffs' Second Amendment rights, a test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* —— U.S. ——, 142 S. Ct. 2111, 2138, 213 L.Ed.2d 387 (2022), applies. First to be considered under *Bruen,* is whether the "Second Amendment's plain text covers an individual's conduct" regulated by the challenged law. *Bruen* at 2126, 2129-2130. If so, the "Constitution

presumptively protects that conduct." 🚩 *Id.* Second, under 🚩 *Bruen,* the burden shifts to proponents of the law to justify the challenged law "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 🚩 *Id.* at 2126 and 2130.

The Plaintiffs maintain that they need only show that the "arms" regulated by HB 1240 are "in common use" today for lawful purposes and so are not "unusual." Dkts. 10 and 50. If they do, they contend, the weapon cannot be banned under 🚩 *Heller* and 🚩 *Bruen. Id.*

**\*3** The Plaintiffs misread 🚩 *Heller* and 🚩 *Bruen.* 🚩 *Heller* noted that the right to keep and bear arms protected under the Second Amendment is limited to the sorts of weapons "in common use at the time." 🚩 *Heller* at 627, 128 S.Ct. 2783. It found that this limitation is "supported by the historical tradition of prohibiting 'dangerous and unusual weapons.' " 🚩 *Id.* 🚩 *Heller* does not hold that access to all weapons "in common use" are automatically entitled to Second Amendment protection without limitation. Further, under 🚩 *Bruen,* if Plaintiffs demonstrate that their proposed conduct, that of buying and selling weapons regulated by HB1240, is covered by the Second Amendment, the "Constitution **presumptively** protects that conduct." 🚩 *Bruen* at 2126, 2129-2130 (*emphasis added*). This presumption can be overcome. 🚩 *Id.*

This opinion will now turn to the two 🚩 *Bruen* considerations.

### 1. Whether Plain Text Covers Conduct Regulated by HB 1240

**[9]** The first consideration under the 🚩 *Bruen* analysis requires inquiry into whether the plain text of the Second Amendment protects each of the individual Plaintiffs' proposed courses of conduct. 🚩 *Id.* at 2126.

**[10]** The Plaintiffs seek to either buy or sell weapons regulated by HB 1240. Dkt. 10. In support of their theory that the weapons regulated by HB 1240 are protected under the Second Amendment, the Plaintiffs point to various articles and websites purporting to indicate that there are millions of assault weapons sold in the United States. Dkts. 10 and 50. They point to court cases in which the number of assault weapons in the United States is discussed. *Id.* However, the Plaintiffs' submissions fail to submit any **evidence** in the record before this Court. Their showing is marked by argument without citations and sources showing that their argument would be supported by admissible evidence, even under the relaxed rules for preliminary injunctions. It is wholly unclear whether **all** of the weapons (like conversion kits or semiautomatic pistols) regulated by HB 1240 are "in common use" based on the Plaintiffs' scant submission. The Plaintiffs have not made "a clear showing" of evidence ( 🚩 *Winter* at 22, 129 S.Ct. 365) that supports their contention that all of the weapons covered by HB 1240 are "in common use" and therefore not "unusual" ( 🚩 *Heller* at 626, 128 S.Ct. 2783).

Nevertheless, for purposes of this motion only, the Court is willing to assume that Plaintiffs can produce evidence in support of 🚩 *Bruen's* first requirement, that the Plaintiffs had made a "clear showing" that the Constitution presumptively protected the Plaintiffs' proposed conduct. That assumption does not end the inquiry. 🚩 *Bruen* at 2130. This opinion will now address the second portion of 🚩 *Bruen* - the burden shifting analysis.

### 2. Whether the Regulations in HB 1240 are Consistent with Historical Regulations

**[11]**   **[12]** At this stage, the burden shifts to the law's proponents to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 🚩 *Bruen* at 2126, 2130. In order to show that a law is "consistent with the Nation's historical tradition of firearm regulation," the proponents must point to a historic regulation (or regulations) that is an analogue for the modern

firearm regulation at issue. 🚩 *Id.* at 2132. This inquiry "requires a determination of whether the two regulations are relevantly similar" using at least two metrics: the "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 🚩 *Id.* at 2133. The proponents need not point to a "historical twin" or a "dead ringer for historical precursors" to pass constitutional muster. 🚩 *Id.*

 **[13]**  While no U.S. Circuit Court of Appeals has ruled on this issue, other district courts have held that several regulations in our Nation's history are sufficiently analogous to newly passed assault weapons bans to justify those bans and defeat motions for preliminary injunction consistent with the Second Amendment. *Bevis v. City of Naperville, Illinois*, 2023 WL 2077392, at *11-12 (N.D. Ill. Feb. 17, 2023); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 2023 WL 2655150, at *12 (D. Del. Mar. 27, 2023); 🚩*Herrera v. Raoul*, 2023 WL 3074799, at *6 (N.D. Ill. Apr. 25, 2023). The reasoning in these cases is persuasive.

 **\*4**  As in *Bevis, Delaware State Sportsmen,* and 🚩*Herrera,* HB 1240's proponents have demonstrated that HB 1240 is arguably consistent with the Nation's historic tradition of arms regulation. According to the proponents' experts, Brennan Rivas, Ph.D. and Robert J. Spitzer, Ph.D., throughout the Nation's history, there are times when a new weapon is invented, perhaps for the military, and then ended up on the commercial market for civilian use. Dkts. 47 at 2-3; 48 at 2-3. Drs. Rivas and Spitzer further note that often these new weapons proliferated and resulted in a rise in criminal violence that terrorized the public. *Id.* They point out that it was then that States historically stepped in and regulated those dangerous weapons. *Id.*

HB 1240's proponents convincingly point to regulations on trap guns, bowie knives, clubs, slungshots, multi-shot revolvers, and automatic weapons (like the Thompson submachine gun or "Tommy Gun") as historical examples of weapons that, after being invented, their use proliferated, the weapons began to be used for interpersonal violence, and then States regulated the weapons. Dkt. 42 (*citing* Dkts. 47 and 48).

As early as 1771, twenty years before the Second Amendment was adopted, regulations banning dangerous weapons existed. According to Dr. Spitzer, in 1771, New Jersey passed a law that prohibited trap guns, "devices or contraptions rigged in such a way as to fire when the owner need not be present." Dkt. 48 at 19. Fifteen more states followed suit over the next several years. Dkt. 48-2.

As stated above, this court is not the only court to consider historical analogues for assault weapons bans. The *Bevis* court (that was considering whether a state and local ban on the sale of assault weapons and related accessories violated the Second Amendment) examined over fifty examples of arms regulation from the Colonial era to the early 20th century, including those that HB 1240's proponents point to here. Relying on Dr. Spitzer's opinion (also filed in this case at Dkt. 48), the *Bevis* court's review of a portion of those regulations provided, in part:

An early example of these regulations concerned the "Bowie knife," originally defined as a single-edged, straight blade between nine and ten inches long and one-and-half inches wide. In the early 19th century, the Bowie knife gained notoriety as a "fighting knife" after it was supposedly used in the Vidalia Sandbar Fight, a violent brawl that occurred in central Louisiana. Shortly afterwards, many southerners began carrying the knife in public because it offered a better chance to stop an assailant than the more cumbersome guns of the era, which were unreliable and inaccurate. They were also popular in fights and duels over the single-shot pistols. Responding to the growing prevalence and danger posed by Bowie knives, states quickly enacted laws regulating them. Alabama was first, placing a prohibitively expensive tax of one hundred dollars on "selling, giving or disposing" the weapon, in an Act appropriately called "An Act to Suppress the Use of Bowie Knives," followed two years later by a law banning the concealed carry of the knife and other deadly weapons. Georgia followed suit the same year, making it unlawful "for any merchant ... to sell, or offer to sell, or to keep ... Bowie, or any other kinds of knives." By 1839, Tennessee, Florida, and Virginia passed similar laws. The trend continued. At the start of the twentieth century,

every state except one regulated Bowie knives; thirty-eighty states did so by explicitly naming the weapon, and twelve more states barred the category of knives encompassing them.

*Id.* at 10. Dr. Spitzer notes that, all told, fifteen states barred the carrying of a Bowie knife. Dkt. 48 at 9. After noting that state courts uniformly upheld the laws regulating Bowie knives, the *Bevis* court turned to other laws regulating "melee weapons," again relying on Dr. Spitzer's opinion:

  **\*5**  As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons. Popular instruments included the billy (or billie) club, a heavy, hand-held club usually made of wood, plastic, or metal, and a slungshot, a striking weapon that had a piece of metal or stone attached to a flexible strip or handle. States responded to the proliferation of these weapons. The colony of New York enacted the first "anti-club" law in 1664, with sixteen states following suit, the latest being Indiana in 1905, which proscribed the use of clubs in sensitive places of transportation. The city of Leavenworth, Kansas passed the first law regulating the billy club in 1862. By the early 1900s, almost half of states and some municipalities had laws relating to billy clubs. Many, such as North Dakota and the city of Johnstown, Pennsylvania, banned their concealed carry, while others outlawed them entirely. "Anti-slungshot" carry laws proved the most ubiquitous though. Forty-three states limited slungshots, which "were widely used by criminals and street gang members in the 19th Century" because "[t]hey had the advantage of being easy to make silent, and very effective, particularly against an unsuspecting opponent." ...

*Bevis* at 11.

The regulatory pattern continued when multi-shot revolvers became popular. According to Dr. Spitzer, "single shot guns were the ubiquitous firearm until after the Civil War." Dkt. 48 at 26. It wasn't until the 1830s when the "affordable, reliable" Colt multi-shot revolver was developed that multi-shot weapons became widely used. *Id.* Once revolvers began to spread from the military to the civilian market following the Civil War "and became associated with lawless violence, they were swiftly met by laws and

regulations aimed at curbing their possession and use." *Id.* at 26 and 30-31; Dkt. 47 at 13-15.

Dr. Spitzer opines that it was only in the post-World War I era when multi-shot semiautomatic and fully automatic long guns, like Tommy guns, began to publicly circulate and "came to be associated with criminal use that they became a regulatory and public policy concern, leading to the enactment of anti-machine gun laws in at least 32 states and between eight and eleven state laws restricting semi-automatic firearms." Dkt. 48 at 31. As an example of restrictions on semiautomatic weapons, in the 1920s, Rhode Island enacted a law that prohibited the manufacture, sale, purchase, and possession of "any weapon which shoots more than twelve shots semi-automatically without reloading." 1927 R.I. Pub. Laws 256-57, ch. 1052 §§ 1,4.

In response to the rise in crime related to automatic weapons, in 1934, Congress enacted the National Firearms Act, which imposed extensive regulations on fully automatic weapons. Dkt. 48 at 42. Later, in 1994, Congress passed the Violent Crime Control Act of 1994, which imposed a ten-year ban on semiautomatic assault weapons. Pub. L. 103-322. In part, it prohibited the manufacture, transfer or possession of assault weapons. 🚩 18 U.S.C. § 922(v)(1)(*now expired*). Even these late events are part of assault weapon regulation in the Nation's history.

Each of the above arms restrictions, including bans and restrictions on carrying, arose from the same historical pattern. The weapon was invented, perhaps for the military, became widely popular with civilians, was associated with criminal use, and was then regulated by the States. Dkts. 47 and 48. As has been the case throughout our Nation's history, HB 1240's prohibition on the manufacture, import, and sale of semiautomatic assault weapons responds to the same pattern: technological weapons change that sets forth unprecedented social concerns.

Semiautomatic assault weapons represent a significant technological change - they allow a shooter to fire as fast as they can pull the trigger, unlike previous guns. Dkt. 45 at 3-6. While semiautomatic weapons like the AR-15 were invented in the 1950s,

the growth in ownership of semiautomatic assault weapons proliferated in the late 2000s. *Id.* at 6-15.

HB 1240's proponents have shown that unprecedented social concerns have arisen from the proliferation of these weapons. These weapons are exceptionally dangerous. Assault weapons are used disproportionately in mass shootings (Dkt. 46 at 11), police killings (*Bevis* at 15) and gang activity (*Id.*). Mass shootings are on the rise. Dkt. 46 at 6-8. Use of assault weapons in mass shootings leads to a disproportionately greater likelihood of death. Dkt. 46 at 12. "For instance, assault weapons were used in 80% of all mass public shootings resulting in more than 24 deaths and 100% of all high-fatality mass shootings resulting in more than 40 deaths." *Id.* In the last ten years, the use of assault weapons in high-fatality mass shootings and mass public shootings has resulted, respectively, in 109% and 106% increases in average fatalities per incident. Dkt. 46 at 14-15. Regulation of assault weapons and their dangerous accessories, as HB 1240 regulates, is arguably consistent with our Nation's history and tradition of exceptionally dangerous arms regulation.

**\*6**  **[14]**  **[15]**  The Plaintiffs argue that not all of the regulations recounted above were complete bans so they are not historical analogues of the type required under 🔖 *Bruen.* Dkt. 50. This argument is unavailing.

🔖 *Bruen* does not require that the historical regulation be the exact same; it is not a "historical straight jacket."

🔖 *Bruen* at 2133. Analogical reasoning requires that the law's proponents "identify a well-established and representative historical analogue, not a historical twin." 🔖 *Id.* Further, as explained by Dr. Spitzer in relation to the Bowie knife regulations, complete bans on the possession of certain weapons (as opposed to laws forbidding the carrying of those weapons) did not occur as much in our early Nation's history because the federal and state governments did not have the "maturity, powers, tools, or resources" to implement and enforce a complete ban. Dkt. 48 at 10. Instead, the chief remedy enacted by the states was to bar the carrying of knives, "along with the other two categories of weapons that also threatened public safety, clubs and pistols." 🔖 *Id.* 🔖 *Bruen* specifically cautioned that in cases of "dramatic technological

changes" or "unprecedented societal concerns," a "more nuanced approach" may be necessary. 🔖 *Bruen* at 2132.

The burden imposed by both the historical regulations and HB 1240 are "relevantly similar:" they impose "comparable burdens" on the right of armed self-defense, and those burdens are "comparably justified." 🔖 *Bruen* at 2133. The burden of HB 1240 on armed self-defense is slight. The proponents of HB 1240 have pointed to evidence that assault weapons are rarely used for self-defense. Dkts. 44 and 45. Moreover, the burdens imposed by the historical regulations listed above and HB 1240 are "comparably justified." All were enacted to respond to public safety concerns regarding weapons considered to be extremely dangerous.

The Plaintiffs have not shown a "likelihood of success on the merits" or that there are "serious questions going to the merits" on the issue of whether HB 1240 violates their Second Amendment rights.

### C. IRREPARABLE HARM

**[16]**  The Plaintiffs have not shown that they are "likely to suffer irreparable harm in the absence of preliminary relief." While the Plaintiffs maintain that any constitutional violation results in irreparable harm, the case law cited is from First and Fourth Amendment violations and not from alleged Second Amendment violations. Dkt. 10 (*citing* 🔖 *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)(First Amendment violation) and 🔖 *Melendres v. Arpaio,* 695 F.3d 990 (9th Cir. 2012) (Fourth Amendment)). The individual Plaintiffs assert that they already own assault weapons and are harmed because they wish to purchase more. Yet, Plaintiffs have other alternative weapons available, particularly for self-defense. HB 1240 does not affect several other weapons, including handguns, which are the "quintessential self-defense weapon." 🔖 *Bruen* at 2143. Moreover, Sporting Systems Vancouver, Inc., the gun dealer Plaintiff, has no independent Second Amendment right to sell firearms separate from its customer's right to acquire them. 🔖 *Teixeira v. County of Alameda,* 873 F.3d 670, 690 (9th Cir. 2017). The Plaintiffs do not

demonstrate an irreparable harm or a constitutional emergency warranting the "extraordinary remedy" of a preliminary injunction. 🚩 *Winter* at 24, 129 S.Ct. 365.

### D. BALANCE OF EQUITIES AND PUBLIC INTEREST

[17]   When the government is a party, as here, the last two 🚩 *Winter* factors merge. *Drakes Bay Oyster Co. v. Jewell,* 747 F.3d 1073, 1092 (9th Cir. 2014).

[18]   The Plaintiffs have not shown that the "balance of equities tips in their favor" or that an "injunction is in the public interest." 🚩 *Winter* at 7, 129 S.Ct. 365. The Plaintiffs wish to buy or sell more assault weapons. Considering the exceptional dangerousness of these weapons, the public interest in their regulation by the State outweighs the Plaintiffs' desire to purchase more assault weapons. In light of recent mass deaths caused by assailants using assault weapons (Dkt. 44), it is appropriate for governmental bodies to find ways to protect the public from dangerous weapons, within the limits of the Second Amendment. Public opinion is apparently strongly divided between the Plaintiffs and Defendants – between those who wish unfettered access to assault weapons and those who seek to curtail that access for public protection. From the record here, neither position reflects the true public interest nor balances the equities in the favor of the Plaintiffs.

### E. CONCLUSION

*7   The Plaintiffs' Motion for Preliminary Injunction (Dkt. 10) should be denied. Plaintiffs have failed to demonstrate a likelihood of success on the merits of the motion nor have they raised a serious question on the merits tipping the balance of hardships in Plaintiffs' favor. They have not pointed to irreparable harm if an injunction does not issue, that the balance of equities tips in their favor, or that public interest favors a preliminary injunction. Issues raised in this opinion cannot be resolved on a motion for preliminary injunction.

To the extent that the Plaintiffs move to advance a trial on the merits or for summary judgment, those motions should be denied without prejudice.

### III. ORDER

It is **ORDERED** that:

- The Plaintiffs' Motion for Preliminary Injunction (Dkt. 10) **IS DENIED;** and

- The Plaintiffs' motion to advance to a trial on the merits and/or motion for summary judgment (Dkt. 10) **ARE DENIED WITHOUT PREJUDICE**.

### All Citations

--- F.Supp.3d ----, 2023 WL 3836230

---

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.